**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

SHOLOM RUBASHKIN,

        Movant,

vs.

UNITED STATES OF AMERICA.

No. 13-CV-1028-LRR
No. 08-CR-1324-LRR

**ORDER REGARDING
MOTION TO VACATE, SET ASIDE
OR CORRECT SENTENCE**

*TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **RELEVANT BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

III.   **PARTIES' ARGUMENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

    A.    *The Movant's Merits Brief* . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
        1.    *Ground one* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
        2.    *Ground three* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
    B.    *The Government's Responsive Brief* . . . . . . . . . . . . . . . . . . . . **14**
        1.    *Ground one* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
            a.    *Disclosure of forfeiture position and reliance on
                 newly discovered evidence* . . . . . . . . . . . . . . . . . . . . **15**
            b.    *Legality of forfeiture position* . . . . . . . . . . . . . . . . . **18**
            c.    *Testimony of Paula Roby* . . . . . . . . . . . . . . . . . . . . . **19**
            d.    *Impact of forfeiture on loss amount* . . . . . . . . . . . . . **21**
            e.    *Cause and prejudice to overcome procedural
                 default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**
        2.    *Ground three* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**
    C.    *The Movant's Reply Brief* . . . . . . . . . . . . . . . . . . . . . . . . . **26**
        1.    *Ground one* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**
        2.    *Ground three* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

IV.   **MOTION FOR LEAVE TO TAKE DISCOVERY** . . . . . . . . . . . . . . . . . **34**

V.      MOTION FOR AN EVIDENTIARY HEARING . . . . . . . . . . . . . . . . . .   35

VI.     ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

        A.      Proceedings Under 28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . .   36
        B.      The Movant's Grounds . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
                1.      Sentencing Error . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
                        a.      Background . . . . . . . . . . . . . . . . . . . . . . . . . .   42
                                (1)     Judicial proceedings . . . . . . . . . . . . . . . . . .   42
                                (2)     Record in relation to bankruptcy matters . . . . .   48
                                (3)     Additional information . . . . . . . . . . . . . . . . .   83
                        b.      Applicable legal principles . . . . . . . . . . . . . . . . . .   100
                                (1)     Framework relied upon after conviction . . . . .   100
                                (2)     Nature and extent of due process rights when
                                        a failure to disclose occurs during trial . . . . .   108
                        c.      Application . . . . . . . . . . . . . . . . . . . . . . . . . . . .   111
                                (1)     Procedural obstacles . . . . . . . . . . . . . . . . . .   111
                                (2)     Cognizability . . . . . . . . . . . . . . . . . . . . . . .   114
                                (3)     Merits of the sentencing error claim . . . . . . .   115
                                        (a)     Parties' positions/arguments . . . . . . .   117
                                        (b)     Understanding of the court . . . . . . . . .   123
                                                (i)     Variables or factors . . . . . . . . .   123
                                                (ii)    Estimate of loss . . . . . . . . . . .   128
                                        (c)     Application of the sentencing
                                                Guidelines . . . . . . . . . . . . . . . . . . .   133
                                (4)     Summary . . . . . . . . . . . . . . . . . . . . . . . . .   136
                2.      Trial Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   136

VII.    CERTIFICATE OF APPEALABILITY . . . . . . . . . . . . . . . . . . . . . . .   139

VIII.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   141

## I.  INTRODUCTION

Before the court is Sholom Rubashkin's motion to vacate, set aside or correct sentence (civil docket no. 3).  Sholom Rubashkin ("the movant") filed such motion on September 30, 2013.  With leave of court, the movant filed an amended motion pursuant

to 28 U.S.C. § 2255 ("motion pursuant to 28 U.S.C. § 2255") on March 18, 2014 (civil docket no. 27-2).[1]

## II. RELEVANT BACKGROUND[2]

In October and November of 2008, the government commenced criminal proceedings against the movant by filing criminal complaints against him. An October 30, 2008 criminal complaint charged the movant with immigration crimes, and a November 14, 2008 criminal complaint charged the movant with financial crimes. In November and December of 2008, the government presented evidence to the grand jury, and, after considering the evidence, the grand jury returned multiple indictments that charged the movant with immigration and financial crimes. The government alleged in a November 13, 2008 superseding indictment (criminal docket no. 80) that the movant committed immigration crimes, and the government alleged in a November 20, 2008 second superseding indictment (criminal docket no. 94) that the movant committed bank fraud

---

[1] The motion pursuant to 28 U.S.C. § 2255 asserts three grounds for relief. All of them are premised on *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and related legal authority. They are as follows: (1) the government (i) failed to disclose exculpatory information concerning actions it took to influence the bankruptcy trustee overseeing Agriprocessors' bankruptcy and prospective parties looking to buy Agriprocessors during bankruptcy proceedings and (ii) presented inaccurate testimony during the sentencing hearing; (2) the government failed to disclose material, favorable facts concerning pre-ICE enforcement action communications and, consequently, defense counsel failed to timely seek disqualification based on the appearance of bias; and (3) the government failed to disclose exculpatory information concerning the purpose of transferring money among accounts. *See generally* (civil docket nos. 3 & 27-2). Only ground one and ground three are at issue because the movant concedes that the court essentially rejected ground two when it denied his motion to recuse. *See* Merits Brief (civil docket no. 44) at 44-45.

[2] The facts and history of this case are well established. *See generally* Oct. 27, 2010 Order (criminal docket no. 958) (addressing motion under Rule 33); Jan. 20, 2016 Order (civil docket no. 42) (addressing motion to recuse); *United States v. Rubashkin*, 655 F.3d 849, 853-57 (8th Cir. 2011) (addressing the factual history of the criminal case and the issues raised on direct appeal).

when he diverted customer payments on accounts receivable and caused Agriprocessors'
books to reflect an inflated amount for accounts receivable which in turn he offered as
collateral for bank loans.[3]  On December 11, 2008, the grand jury returned a third
superseding indictment (criminal docket no. 150), which, among other things, sought the
criminal forfeiture of property connected to the immigration crimes under 8 U.S.C. §
1324(b), 18 U.S.C. § 982(a)(6)(A) and 28 U.S.C. § 2461(c).  The government's criminal
forfeiture allegation provided:

> Upon conviction . . ., [Agriprocessors, the movant and other
> defendants] shall forfeit to the United States the proceeds and
> gross proceeds of such violations, and any property traceable
> to such proceeds, and any property, real or personal, that was
> used to facilitate, or was intended to facilitate, the commission
> of the offenses of which the defendants are convicted,
> including but not limited to the following:
>
> 1.      the corporate name "Agriprocessors, Inc.";
>
> 2.      any and all trademarks of Agriprocessors, Inc.,
>         including but not limited to: Iowa Best Beef
>         (registration number 2679189); Shor Habor
>         (registration number 2036953); Aaron's Best
>         (registration number 2029970); and Rubashkin
>         (registration number 2031920); and
>
> 3.      any and all corporate stock of Agriprocessors,
>         Inc.

Third Superseding Indictment (criminal docket no. 150) at 14-15.

On January 15, 2009, the grand jury returned a fourth superseding indictment
(criminal docket no. 177), which, among other things, greatly expanded the number of
counts alleging that the movant committed financial crimes.   On March 31, 2009, the
grand jury returned a fifth superseding indictment (criminal docket no. 413).  On May 14,
2009, the grand jury returned a sixth superseding indictment (criminal docket no. 464),

---

[3] Agriprocessors, Inc. was named as a defendant in the November 20, 2008 second
superseding indictment.  *See* Second Superseding Indictment (criminal docket no. 94).

which, among other things, greatly expanded the number of counts alleging that the movant committed immigration crimes.

On July 16, 2009, a grand jury returned a 163-count seventh superseding indictment (criminal docket no. 544) against the movant. Count 1 charged the movant with conspiracy to harbor undocumented aliens for profit, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i). Counts 2 through 70 charged the movant with harboring and aiding and abetting the harboring of undocumented aliens for profit, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(A)(iv), 1324(a)(1)(A)(v)(II) and 1324(a)(1)(B)(i). Count 71 charged the movant with conspiracy to commit document fraud, in violation of 18 U.S.C. § 371. Count 72 charged the movant with aiding and abetting document fraud, in violation of 18 U.S.C. §§ 1546(a) and 2. Counts 73 through 86 charged the movant with bank fraud, in violation of 18 U.S.C. § 1344. Counts 87 through 110 charged the movant with the making of false statements and reports to a bank, in violation of 18 U.S.C. § 1014. Counts 111 through 124 charged the movant with wire fraud, in violation of 18 U.S.C. § 1343. Counts 125 through 133 charged the movant with mail fraud, in violation of 18 U.S.C. § 1341. Counts 134 through 143 charged the movant with money laundering and aiding and abetting money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) and 2. Counts 144 through 163 charged the movant with willful violation of an order of the secretary of agriculture and aiding and abetting a willful violation of an order of the secretary of agriculture, in violation of 7 U.S.C. § 195 and 18 U.S.C. § 2.

Pursuant to the movant's motion (criminal docket no. 497), the court ordered separate trials on counts 1 through 72 ("Immigration Counts") and counts 73 through 143 ("Financial Counts").[4] *Id.* Also upon the movant's motion for a change in venue

---

[4] The government filed the seventh superseding indictment after the court granted the movant's motion for separate trial. *See* June 25, 2009 Order (criminal docket no.
(continued...)

(criminal docket no. 624), the court ordered the trial to take place in South Dakota.  *See* Sept. 1, 2009 Order (criminal docket no. 656).  From October 13, 2009 to November 12, 2009, a jury trial on the Financial Counts, which the court renumbered as counts 1 through 91,[5] took place.  *See* Minute Entries (criminal docket nos. 700-01, 704, 708-11, 715-18, 725, 727-32 & 734).

> [The movant's] trial on the [Financial Counts] focused on Agriprocessors' fraudulent inflation of collateral.  The government also introduced some evidence related to immigration violations which was relevant to the fraud charges.  The [seventh superseding] indictment alleged that Agriprocessors had fraudulently told [First Bank Business Capital, Inc. ("FBBC"),[6] a wholly-owned subsidiary of St. Louis based First Bank,] it was not "in violation of any law, statute, [or] regulation . . . which . . . would in any respect materially and adversely affect the collateral . . . or [Agriprocessors'] property, business, operations, or condition."  The immigration evidence both provided an alternative theory of bank fraud and formed the basis for fifteen counts of false statements to a bank.  18 U.S.C. § 1014.

*Rubashkin*, 655 F.3d at 855 (fourth through ninth alteration in original).  On November 12, 2009, the jury returned guilty verdicts on renumbered counts 1 through 71, 73 through 80, 84 through 89 and 91—fourteen counts of bank fraud, twenty-four counts of making

---

[4](…continued)
519).  The seventh superseding indictment altered the numbering of the Immigration Counts and Financial Counts and added counts 144 through 163, which were tried with the Financial Counts.

[5] The renumbered counts were as follows: counts 73 through 86 became counts 1 through 14, counts 87 through 110 became counts 15 through 38, counts 111 through 124 became counts 39 through 52, counts 125 through 133 became counts 53 through 61, counts 134 through 143 became counts 62 through 71 and counts 144 through 163 became counts 72 through 91.

[6] FBBC frequently did business as FB Commercial Finance, Inc.

false statements and reports to a bank, fourteen counts of wire fraud, nine counts of mail fraud, ten counts of money laundering and fifteen counts of violating an order of the Secretary of Agriculture to timely pay suppliers of livestock. *See* Verdict Forms (criminal docket no. 736). The jury returned not guilty verdicts on renumbered counts 72, 81, 82, 83 and 90—five counts of violating an order of the Secretary of Agriculture to timely pay suppliers of livestock. *Id.* On November 19, 2009, the court granted the government's motion to dismiss without prejudice the Immigration Counts and related criminal forfeiture provisions. *See* Nov. 19, 2009 Order (criminal docket no. 746). The allegations underlying the Immigration Counts dealt with the May 12, 2008 worksite enforcement action by Immigration and Customs Enforcement ("ICE").

On February 22, 2010, the probation office filed a draft presentence report. *See* Draft Presentence Report (criminal docket no. 845). On March 1, 2010, the court denied the movant's motion for judgment of acquittal and combined motion for judgment of acquittal and motion for new trial. *See* Mar. 1, 2010 Order (criminal docket no. 854).

On March 8, 2010, the parties filed objections to the draft presentence report. *See* Gov't Objection (criminal docket no. 859); Defendant Objection (criminal docket no. 860). On April 12, 2010, the movant filed a sentencing memorandum (criminal docket no. 879), and a motion for downward departure and/or variance (criminal docket no. 880). On that same date, the government filed a sentencing memorandum (criminal docket no. 883). On April 14, 2010, the probation office filed the final presentence report (criminal docket no. 887).[7] On April 20, 2010, the government filed a response to the movant's motion for downward departure and/or variance (criminal docket no. 892). On April 21, 2010, the movant filed an amended sentencing memorandum (criminal docket no. 895) and an amended motion for downward departure and/or variance (criminal docket no. 896).

---

[7] After the court entered judgment against the movant, the probation office filed a revised final presentence report (criminal docket no. 930).

From April 28 to April 29, 2010, the court held a sentencing hearing. The court heard evidence and gave the movant his right of allocution. *See* Minute Entries (criminal docket nos. 910 & 912). The court took the sentencing issues, including the issue that the loss amount was too high because the government threatened forfeiture of Agriprocessors' assets, which allegedly reduced the sale price of Agriprocessors' assets during bankruptcy proceedings, under advisement. On June 21, 2010, the court filed a sentencing memorandum, detailing the court's interpretation and computation of the Guidelines, revealing the sentence the court intended to impose after considering all of the factors under 18 U.S.C. § 3553(a), discussing the evidence supporting the court's sentence and declining to vary from the advisory Guidelines range. *See* Sentencing Memorandum (criminal docket no. 927). On June 22, 2010, the sentencing hearing reconvened, and the court imposed a sentence at the low end of the advisory Guidelines range. *See* Minute Entry (criminal docket no. 928); Judgment (criminal docket no. 929). On that same date, judgment entered against the movant. *See* Judgment (criminal docket no. 929). On July 2, 2010, the movant filed a notice of appeal. *See* Notice of Appeal (criminal docket no. 932).

On August 5, 2010, the movant filed a motion for a new trial under Federal Rule of Criminal Procedure 33(b)(1). *See* Motion for New Trial (criminal docket no. 942). On October 27, 2010, the court denied the movant's motion for a new trial. *See* Oct. 27, 2010 Order (criminal docket no. 958). On November 8, 2010, the movant filed an additional notice of appeal. *See* Second Notice of Appeal (criminal docket no. 959).

On September 16, 2011, the Eighth Circuit Court of Appeals addressed several issues, including: (1) whether the court's meetings with ICE and the United States Attorney's Office created an appearance of partiality that necessitated recusal; (2) whether the court erred in ordering the jury trial on the Financial Counts to commence first, deciding a number of evidentiary issues and instructing the jury; (3) whether the court correctly determined that there was sufficient evidence of money laundering; and (4)

whether the court miscalculated the loss involved in the movant's fraud and failed to consider all of the sentencing factors under 18 U.S.C. § 3553(a). *See Rubashkin*, 655 F.3d at 857-69. After the Eighth Circuit Court of Appeals resolved the movant's claims on direct appeal, the movant filed a petition for a writ of certiorari. *See* Notice of Petition for Writ of Certiorari (criminal docket no. 972). The Supreme Court denied such petition on October 1, 2012. *See Rubashkin v. United States*, ___ U.S. ___, 133 S. Ct. 106 (2012).

On October 4, 2013, the court considered the parties' proposed scheduling of the proceedings under 28 U.S.C. § 2255 and directed them to respond in a particular manner. *See* Oct. 4, 2013 Order (civil docket no. 4). On November 22, 2013, the government filed a motion to dismiss and an answer. *See* Motion to Dismiss (civil docket no. 5); Answer (civil docket no. 6). On December 11, 2013, the government filed an amended answer. *See* Amended Answer (civil docket no. 10). On January 29, 2014, the movant filed a motion to recuse. *See* Motion to Recuse (civil docket no. 12). On March 18, 2014, the movant filed a motion to amend his motion pursuant to 28 U.S.C. § 2255. *See* Motion for Leave to Amend (civil docket no. 27). On January 20, 2016, the court denied the movant's motion to recuse. *See* Jan. 20, 2016 Order (civil docket no. 42). On that same date, the court granted the movant's motion to amend his motion pursuant to 28 U.S.C. § 2255, denied the government's motion to dismiss and established a briefing schedule. *See* Jan. 20, 2016 Order (civil docket no. 43).

On March 21, 2016, the movant filed a merits brief, a motion for leave to take discovery and a motion for an evidentiary hearing. *See* Merits Brief (civil docket no. 44); Motion for Leave to Take Discovery (civil docket no. 45); Motion for Evidentiary Hearing (civil docket no. 46). In addition, the movant submitted an appendix. *See* Movant App'x (civil docket no. 44-1). On May 19, 2016, the government filed a responsive brief opposing the motion pursuant to 28 U.S.C. § 2255, the motion for leave to take discovery and the motion for an evidentiary hearing. *See* Responsive Brief (civil docket no. 52).

In addition, the government submitted an appendix.  *See* Gov't App'x (civil docket no. 52-1).  On June 20, 2016, the movant filed a reply brief.  *See* Reply Brief (civil docket no. 53).  On that same date, he submitted a supplemental appendix.  *See* Movant Supplemental App'x (civil docket no. 53-1).  The motion pursuant to 28 U.S.C. § 2255 and related issues are fully submitted and ready for decision.

### III.  PARTIES' ARGUMENTS

### A.  The Movant's Merits Brief

#### 1.    Ground one

The movant generally asserts that he presented evidence of the government's improper use of forfeiture and interference in the bankruptcy case during the sentencing hearing and, after hearing the testimony of a rebuttal witness, the court incorrectly calculated the loss amount.  The movant alleges that previously undisclosed evidence proves that the government knowingly presented false and/or misleading sentencing testimony.  He states that detailed notes from a meeting involving prosecutors and the bankruptcy trustee indicate that prosecutors did in fact impose restrictions that they denied imposing during the sentencing hearing.  He also states that the government failed to disclose information regarding the impact that the government's assertion of its rights to criminal forfeiture had on the bankruptcy process and information regarding the nature and extent of its role in the bankruptcy process.  He maintains that, if the government had disclosed the truth, it is likely that the court: (1) would have found that the government's pursuit of criminal forfeiture depressed the bankruptcy auction sale process such that the bankruptcy trustee could not realize a sale price in excess of the fraud victims' debt and (2) would have calculated a sentencing Guidelines range between thirty and thirty-seven months imprisonment.  The movant asserts that the court must vacate his sentence and resentence him in a hearing that is free from false and/or misleading testimony and that fully takes into account the effects of the government's conduct on the loss amount.

The movant asserts that the government cannot plausibly claim that it pursued forfeiture to protect against the dissipation of assets. He maintains that it is clear that: (1) the government used forfeiture to impose restrictions on the future ownership and operation of Agriprocessors, that is, to prevent the movant's father, Aaron Rubashkin, from having a role even though the government never charged him; (2) the government's use of criminal forfeiture hurt the victims it is duty-bound to protect; (3) the government focused on punishing Aaron Rubashkin rather than protecting the victims of the fraud offense; and (4) neither FBBC nor the bankruptcy trustee wanted the government to pursue forfeiture.

After observing that the government's use of forfeiture suffered from numerous defects and noting that the government unlawfully sought to forfeit either assets that an uncharged third-party held or assets that had no nexus to criminal offenses, the movant makes numerous assertions relating to the purpose for pursing forfeiture, the effect it had on potential bidders, the sale price and the sentencing Guidelines range, the government's misconduct, the testimony of Paula Roby and the need to readdress the calculation of loss. The court summarizes them below.

> The government pursued forfeiture because it did not want to rely on the bankruptcy process to determine a good faith purchaser and because it sought to punish Aaron Rubashkin. The government's interference in the bankruptcy process undermined the Bankruptcy Code's goal of protecting creditors. Throughout bankruptcy proceedings and even after it became clear that the sale of Agriprocessors' assets would not generate sufficient revenue to satisfy creditors, the government used the threat of forfeiture to prevent Aaron Rubashkin and his family from having a role in Agriprocessors.

> The government's forfeiture threats and attempts to dictate who could own and operate Agriprocessors scared off potential bidders, prevented the bankruptcy trustee from maximizing the value of the bankruptcy estate, drove the sale price down, caused FBBC's losses to increase and impacted

the sentencing Guidelines range. The government interrupted the free operation of market forces, which includes having a prior owner with valuable expertise and experience participate in the reorganization effort, and it played a key role in causing considerable shortfall in value.

Rather than accept responsibility for its role in causing the loss amount to increase, the government withheld evidence and presented false and misleading testimony during the sentencing hearing. Defense counsel relied on incomplete information when asserting that the government's interference had an effect on the bankruptcy process. And, the government neither corrected testimony that it knew was false nor corrected the court when it relied on the false testimony.

Paula Roby falsely stated that: she was unaware of any prohibition on the involvement of Rubashkins in Agriprocessors after any sale; the rumors regarding a prohibition on the future involvement of Rubashkins in Agriprocessors were very unreliable; the bankruptcy trustee "worked very, very hard to dispel rumors that were in the community"; the government's use of forfeiture had no impact on the bankruptcy sale process; a key meeting with a potential bidder occurred in January of 2009 or prior to meeting with the government; and she did not know whether a potential bidder could include Aaron Rubashkin as a minority investor because that question was never posed. Paula Roby offered misleading testimony about the purpose of related party disclosures in bankruptcy proceedings, claimed not to know the government's position regarding whether Rubashkins could be involved in Agriprocessors, suggested that potential bidders who were concerned about a "no Rubashkin rule" were acting unreasonably or fabricating their stories and gave the false impression that the government did not improperly interfere in the bankruptcy process. Paula Roby's testimony undermined the argument that the related party disclosure requirement played a part in the government's enforcement of its "no Rubashkin rule." Paula Roby had an undisclosed bias.

It would have been futile to challenge the court's credibility finding regarding Paula Roby. The government's failure to disclose evidence and presentation of false testimony

violated the Constitution. The court relied on false evidence and/or incomplete information when it rejected the argument about the government's wrongful use of criminal forfeiture to punish Aaron Rubashkin and increase the loss amount. It is self-evident that Paula Roby's testimony was material because the court relied on it when finding that the sale of Agriprocessors did not include a condition that no purchaser of Agriprocessors could have any involvement with the Rubashkins. The government had actual and constructive knowledge of the "no Rubashkin rule" because prosecutors came up with such rule.

In support of his assertions, the movant refers to: the December 4, 2008 meeting that government counsel referred to in the government's December 8, 2008 letter to Lloyd Palans; the December 5, 2008 meeting that included the bankruptcy trustee, the bankruptcy trustee's criminal counsel, the bankruptcy trustee's other counsel, including Paula Roby, and government counsel, *see* Movant App'x (civil docket no. 44-1) at 88-98, 170-77; the December 9, 2008 letter that Lloyd Palans sent government counsel in response to the government's December 8, 2009 letter, *see id*. at 86-87; the affidavit of the bankruptcy trustee, *see id*. at 43-45; the affidavit of Eli Soglowek, *see id*. at 99-100; the affidavits of individuals on behalf of prospective bidders, *see id*. at 46-54, 103-112, 123-24; the March 24, 2009 default letter that FBBC's counsel sent the bankruptcy trustee, *see id*. at 113-15; the July 16, 2009 seventh superseding indictment, *see* Seventh Superseding Indictment (criminal docket no. 544); the July 14, 2009 letter to Anita Shodeen, *see* Movant App'x (civil docket no. 44-1) at 118-19; the July 15, 2009 correspondence between the Deputy Attorney General of Iowa and the government, *see id*. at 116-17; the July 30, 2009 letter from Jay Eaton, on behalf of SHF Industries, LLC, *see id*. at 120-22; the testimony of Paula Roby, *see id*. at 30-42; and the June 10, 2011 valuation report of Triax Capital Advisors, LLC, *see id*. at 55-83.

## 2.    Ground three

The movant alleges that the government withheld exculpatory information regarding the purpose of financial transactions that the government characterized as money laundering. The movant states that the relevant time period included hundreds of financial transactions that undermined the government's assertion that he laundered money and admissions from a key cooperating witness would have established that the financial transactions that support his money laundering convictions facilitated something other than money laundering. The movant claims that the government failed to disclose information that addressed his intent when transferring money among accounts. The movant cites to Mitchel Meltzer's January 29, 2014 statement, in which he states that he recalled mentioning to prosecutors and agents that the movant moved money between accounts to play the float and that he did not believe that the movant intended to defraud FBBC when doing so. *See id.* at 164-65.

## B.    The Government's Responsive Brief

### 1.    Ground one

The government denies that it failed to disclose information that demonstrates it influenced the bankruptcy trustee and prospective buyers or elicited perjury when Paula Roby testified about the existence of an agreement not to hire Rubashkins, bidding procedures and other matters related to the sale of Agriprocessors' assets during bankruptcy proceedings. The government argues that the movant conflates key terminology, shamelessly omits dispositive facts and furtively relies upon documentary evidence that the government disclosed prior to the sentencing hearing to support his assertion that a constitutional violation occurred. The government asserts that it never claimed that it did not intend to pursue forfeiture if the Rubashkins regained control of Agriprocessors, publicly announced its intention in pursuing forfeiture within days of including a forfeiture allegation in the December 11, 2008 third superseding indictment and disclosed to the movant documents that reiterated the forfeiture position that it had

publicly disclosed. The government points out that the movant fails to mention the documents that the government disclosed prior to the sentencing hearing and relies on a disingenuous and inaccurate reading of the sentencing record when asserting that the government committed misconduct by knowingly presenting false testimony. The government emphasizes that the movant's latest attempt to rewrite the history of his case and cast his convictions and sentences as unjust is not a proper basis to grant relief.

In response to the movant's arguments, the government makes a plethora of arguments relating to: (1) the disclosure of the government's forfeiture position and the movant's reliance on newly discovered evidence; (2) the legality of the government's forfeiture position; (3) the testimony of Paula Roby; (4) the impact of the government's forfeiture position on the loss amount; and (5) the inability to establish cause and prejudice to overcome procedurally defaulted assertions. The court summarizes them below.

### a. Disclosure of forfeiture position and reliance on newly discovered evidence

Despite being under no duty to disclose information that cannot be characterized as exculpatory, the government endeavored to provided the movant with complete information. The government's willingness to produce such information contradicts his assertion that the government engaged in misconduct.

The government consistently asserted that it would seek to use forfeiture to prevent Aaron Rubashkin from regaining equity in or control over Agriprocessors through the bankruptcy process or otherwise. The government's discovery production prior to the movant's sentencing hearing confirmed that it had publicly and consistently proclaimed shortly after Agriprocessors filed for bankruptcy that it would be notifying prospective buyers that it would vigorously assert its forfeiture rights, if necessary, to ensure that those involved in previous criminal wrongdoing would not be allowed to continue to financially benefit from assets subject to forfeiture. For example, in the December 8, 2008 letter to Lloyd Palans, the government expressed that it had no intention of pursing

forfeiture if a purchaser had no connection to the current owner of Agriprocessors or connection with the managers that were in place at the times of the offenses.

Aside from being fully informed of the government's forfeiture position prior to the sentencing hearing as a result of documents that the government disclosed, the movant could have conducted an investigation, sought additional information from the government and/or gathered more information through other channels. For example, the government's forfeiture position was discussed on the record in bankruptcy proceedings and acknowledged by the bankruptcy trustee in bankruptcy filings. After the government disclosed documents that set forth its forfeiture position, the movant made them part of the sentencing record and referred to them when asserting that the government insisted that Rubashkins could not be involved. Nothing prevented the movant from presenting additional evidence during the sentencing hearing, and the movant is precluded from relitigating the same issue that he previously raised.

The movant suggests that he had incomplete information regarding the extent of the government's interference in the bankruptcy process and the effect of it on the bankruptcy process, but the movant fails to establish that he is entitled to be resentenced based on newly discovered evidence. The movant did not exercise due diligence even though the government disclosed its forfeiture position, and the additional information does not substantially differ from the information that the movant already had.

The additional information disclosed by the movant in the instant proceeding indicates that the government expressed or described its forfeiture position in slightly different terms at different times, but the government always maintained that it would pursue forfeiture if any assets were ultimately controlled by or used for the benefit of the Rubashkins. Heshy Rubashkin's continued employment at Agri Star is more probative of the nature of the government's forfeiture position

than the terms used by the government.[8] The movant had evidence of the bankruptcy trustee's concerns and FBBC's concerns, and he presented such evidence during the sentencing hearing. The movant's additional information makes clear that the bankruptcy trustee and prospective buyers did not want the Rubashkins to be involved. It also indicates that the government's forfeiture position did not cause the bankruptcy trustee to believe that he would be unable to obtain in excess of $40,000,000 for Agriprocessors' assets. The movant's additional information regarding meetings that occurred with prospective buyers is consistent with what the government disclosed in the December 8, 2008 letter to Lloyd Palans, including that it would be willing to meet with prospective buyers. The movant's additional information fails to indicate that prospective bidders communicated to the government a clear desire to have Rubashkins involved or the significance of having them involved. Additional problems, such as potential buyers failing to disclose to the government why they did not bid, are associated with the additional information offered by the movant. The government disclosed the substance of its interactions with SHF Industries, LLC, and the content of the additional correspondence is consistent with the forfeiture position that the government always maintained.

Filings in the bankruptcy case confirm the existence of a requirement that bidders disclose their connections to related parties. While the bankruptcy court-approved bidding procedures included a requirement that bidders needed to disclose their connection to related parties to qualify as a bidder, no "agreement" prevented the Rubashkins, related parties or anyone else from purchasing assets through the bankruptcy process. The bidding procedures did not prohibit a prospective purchaser from associating with a particular person or include a no-Rubashkin edict.

In the July 14, 2009 letter to Anita Shodeen, the government expressed that it appreciated that SHF Industries, LLC, did not intend to be associated with any person involved

---

[8] Heshy Rubashkin, the movant's brother, is also known as Tzvi Rubashkin and Heshi Rubashkin.

in the previous "criminal wrongdoing" at Agriprocessors and made clear that its right to forfeit the assets being purchased by SHF Industries, LLC, would not be affected by the bankruptcy process. The government never imposed a no-Rubashkin edict on SHF Industries, LLC. The terms requested by the government only required SHF Industries, LLC to disclose any payment or other compensation to a related party as defined in the bid procedures and notified SHF Industries, LLC that the government reserved the right to seek forfeiture against the interests of a related party that had been involved in criminal wrongdoing.

### b.    Legality of forfeiture position

The government had a lawful prerogative to pursue forfeiture of all, some or none of Agriprocessors' assets. Any information regarding the government's decision not to exercise that prerogative under certain circumstances is not exculpatory and, therefore, cannot be characterized as *Brady* material; the movant's insistence that the government needed to disclose the circumstances pursuant to which it would not pursue the lawful forfeiture of assets is not material to the issue of punishment. The government may confiscate assets used in or gained from criminal activity to deter future crimes by depriving a criminal defendant of the fruits of illegal conduct. Rather than protect defendants, criminal forfeiture is meant to punish wrongdoing, prevent further illicit use of property and lessen the economic power of criminal enterprises.

The government lawfully pursued the forfeiture of assets owned by Aaron Rubashkin. Although the government did not charge Aaron Rubashkin, he could not successfully assert an innocent owner claim; Agriprocessors, which was wholly owned by Aaron Rubashkin, faced criminal charges and allegations; Agriprocessors' facilitating property could be forfeited because of its nexus to illicit activity; forfeited property is not always owned by a defendant. Nothing prevented the government from pursuing criminal forfeiture and/or civil forfeiture against the movant's assets or Agriprocessors' assets, and the government could have

pursued substitute assets in the event that property subject to forfeiture could not be located.

The government acted in accordance with 21 U.S.C. § 853 and only to make potential purchasers aware of the fact that Agriprocessors' assets were subject to forfeiture. Nothing that the government did can be characterized as a veiled attempt to diminish the value of Agriprocessors' assets prior to their sale in bankruptcy proceedings. By publicly asserting its right to forfeiture, the government put potential buyers on notice that assets acquired in the bankruptcy process were subject to its potential claims. The government acted in a manner that ensured prospective buyers could make an informed decision as to acquisition of Agriprocessors' distressed assets. Prior to the bankruptcy sale, the government appropriately informed prospective buyers that any asset acquired with or for a defendant and any money paid to a defendant could be subject to forfeiture.

### c. Testimony of Paula Roby

Defense counsel's imprecise questioning, including but not limited to the existence of an agreement, rumors in the community and potential offers that included ownership by Aaron Rubashkin, resulted in broad answers, and Paula Roby cannot be faulted for defense counsel's imprecision in formulating questions and his choice of words. No evidence of any agreement exists. The movant impermissibly conflates the term "agreement" with the government's forfeiture position; the movant cannot sustain a claim that Paula Roby committed perjury by lifting her statements out of context and giving them meanings that are wholly different than that which their context clearly shows.

Paula Roby offered truthful and accurate testimony. Paula Roby did not purport to know the exact date that she and others met with Eli Soglowek and, given the questions that were being asked, it is not surprising that she could not pinpoint an exact date. It is possible that she was confused about when a meeting occurred, and her misreference to a time that preceded the date that Eli Soglowek entered into a term sheet can only be described as innocent.

Paula Roby never misled the court when she testified regarding related party disclosure requirements in bankruptcy sales. Rather than testify about the purpose of the disclosure requirements, Paula Roby testified that disclosure requirements existed in prior bankruptcies and the question of related parties is a concern of bankruptcy courts, which want to ensure that there is no collusion between a creditor and a debtor that might depress the sale price and harm other creditors.

Paula Roby provided accurate testimony and recognized an important distinction between Aaron Rubashkin serving as an advisor for a new company and Aaron Rubashkin obtaining an ownership interest in a new company. The prospect of Aaron Rubashkin attempting to regain control of Agriprocessors through another purchaser was a primary factor that led the government to allege forfeiture in its indictments. The government's forfeiture interest never led to an agreement during the bankruptcy process or at any other time, and Paula Roby correctly testified that the government's forfeiture interest never resulted in an agreement during the bankruptcy process or at any other time. The questions that the government asked Paula Roby were designed only to establish that no agreement about hiring Rubashkins existed. A fair characterization of Paula Roby's testimony indicates that she thought the government was concerned about Aaron Rubashkin becoming an owner but it would not pursue forfeiture against the assets of the company if Aaron Rubashkin served in an advisory role. Paula Roby's testimony is consistent with the December 5, 2008 notes that indicate Rubashkins could not have any involvement from a control or benefit standpoint, and it is consistent with government counsel's representation in early December of 2008 that no Rubashkins could be involved and representation in early February of 2009 that Aaron Rubashkin could serve as an advisor.

Even if the movant could establish that Paula Roby provided false testimony, nothing indicates that the government should have corrected testimony that it did not know was false. If ambiguity in Paula Roby's testimony existed, the movant could have asked additional questions to clarify her testimony

and used exhibits, such as the December 8, 2008 letter that the government sent to Lloyd Palans, to clarify her beliefs regarding the government's forfeiture position. In addition, he could have called additional witnesses, such as the bankruptcy trustee.

### d. *Impact of forfeiture on loss amount*

No constitutional violation occurred, and ordinary questions of Guideline interpretation may not be asserted in a § 2255 proceeding. The movant knew of the government's intention to pursue forfeiture if the Rubashkins reclaimed control of Agriprocessors through the bankruptcy process and no prosecutorial misconduct, including but not limited to offering or failing to correct false testimony, caused his advisory sentencing range to be erroneously enhanced. Prior to sentencing, the movant articulated the precise argument that he claims he could not make due to the government's misconduct.

Despite being fully apprised of the government's forfeiture position, the movant elected not to call any prospective bidders to testify that the government's position caused them not to bid or reduce their bid amounts. The February 11, 2009 letter that Soglowek Nahariya, Ltd. sent the bankruptcy trustee contradicts the movant's claim that the government's threat of forfeiture at the February 6, 2009 meeting caused Soglowek Nahariya, Ltd. to withdraw its $40,000,000 bid to buy Agriprocessors. Such letter does not support the movant's position because it explicitly refers to the valuation of accounts receivable and inventory as the reason for withdrawing its bid and indicates that Soglowek Nahariya, Ltd. remained interested in buying Agriprocessors under different terms. Eli Soglowek's September 29, 2013 declaration does not claim that he ever intended to "re-install" Aaron Rubashkin or claim that he decided not to complete the purchase of Agriprocessors due to the government's forfeiture position.

The government sought the forfeiture of Agriprocessors' assets only because the movant and Agriprocessors committed crimes. It is unsurprising that

Agriprocessors' criminal conduct, which the movant facilitated, substantially compromised FBBC's collateral, and the loss attributable to the unlawful actions of Agriprocessors and the movant can only be described as direct and foreseeable. This case is no different than other fraud cases where the very act of bringing criminal charges may inhibit the ability to reduce the amount of loss.

The movant is not entitled to second-guess the decisions of others that may have impacted the loss calculation under the sentencing Guidelines. Because the movant engaged in a massive fraud scheme, the court properly calculated the loss amount by not taking into account any increase in the loss amount based on the government's insistence that Aaron Rubashkin not be permitted to regain control of Agriprocessors, other positions that the government took when asserting its forfeiture rights and/or other actions by the government or others.

### e.    *Cause and prejudice to overcome procedural default*

Being fully informed of the government's forfeiture position, the movant made arguments that the court rejected. Like he did with respect to other issues, the movant could have either asked the court to reconsider its findings if he believed the court made an error or pursued all of his arguments on direct appeal. He is unable to raise related loss claims in this proceeding because nothing prevented him from raising them on direct appeal and he does not offer cause for failing to do so. The movant is unable to assert that the law regarding findings of credibility made it unlikely that he would be successful on direct appeal as a basis to excuse his procedural default. With respect to prejudice, the movant is unable to show that there is a reasonable probability that his sentence would have been different. The movant's reliance on a flawed valuation of Agriprocessors and speculation that a prospective buyer would have actually paid more for Agriprocessors' assets under different circumstances does not establish a constitutional violation.

The post-sentencing evaluation conducted by Triax Capital Advisors, LLC, had the limited purpose of determining

whether Agriprocessors was solvent between June 30, 2006 and June 27, 2008, stated that the estimate of values, including the $68,662,617 number, should not be used for any other purpose, reached the conclusion that Agriprocessors was insolvent even though it accepted the claimed value of assets at the maximum declared value, did not provide a fair market value, qualified the numbers that it reached, bore little or no relation to the actual value of the assets, accepted Agriprocessors' financial statements and other related information without any verification and stated Agriprocessors' inventory and accounts receivable collectively accounted for $32,670,326 of the $68,662,617.

The court correctly calculated the loss amount regardless of the government's actions. Despite making arguments regarding the impact that the government's forfeiture position had on the loss amount, the movant acknowledged that an 18-level upward adjustment applied in light of loss that exceeded $4,500,000 and then conceded on direct appeal that a 20-level upward adjustment applied in light of a loss that exceeded $7,000,000. The court would have imposed the same sentence even if an error in calculating the sentencing Guidelines occurred and strongly indicated that no variance was warranted in light of the circumstances.

## 2. *Ground three*

The government denies that it violated *Brady* by withholding information that Mitchel Meltzer disclosed prior to trial. The government points out that it disclosed Mitchel Meltzer as an individual who cooperated with law enforcement and it provided the movant with the September 9, 2009 FBI report of the interview of Mitchel Meltzer, which indicated that: Mitchel Meltzer was aware of the larger fraud scheme within Agriprocessors; Mitchel Meltzer was surprised when he learned that Agriprocessors' checks were being deposited into the depository account to cover prior diversions; the author of the report stepped out of the interview when certain topics were discussed, and the author was given a summary of what was discussed during his absence; the movant lost the two-day float when banking laws changed; the two-day float was critical to the movant;

and Mitchel Meltzer understood how the movant was creating float when he saw checks written for Torah Education and Kosher Community Grocery. *See* Gov't App'x (civil docket no. 52-1) at 164-75. The government contends that no *Brady* violation occurred given what occurred prior to and during trial and what Mitchel Meltzer included in his January 20, 2014 statement.

In support of its position that no *Brady* violation occurred, the government makes a number of arguments. First, the government argues that Mitchel Meltzer's statement is inculpatory, rather that exculpatory, in that it made clear that the movant was check-kiting. The government emphasizes that Mitchel Meltzer's opinion regarding the movant's check-kiting is just another way of defrauding a financial institution. The government maintains that the movant's desire to check-kite and his desire to launder money were not mutually exclusive and that playing the float some of the time does not prove that he failed to launder money at other times.

Second, the government argues that Mitchel Meltzer's opinion that the movant did not intend to defraud FBBC when transferring money among accounts lacks foundation because Mitchel Meltzer testified at trial that he was first made aware of the transfers between accounts at Agriprocessors, Torah Education and Kosher Community Grocery only when the FBI asked him questions about them. It states that Mitchel Meltzer's speculative opinion about the movant's intent when making transfers between accounts would have been inadmissible at trial and of little assistance to the jury because Mitchel Meltzer only formed such opinion after the FBI questioned him. Given the nature of Mitchel Meltzer's opinion, the government maintains that it falls short of being material to the issue of guilt.

Third, the government argues that Mitchel Meltzer's statement is cumulative of information that the government disclosed prior to trial and cumulative of evidence that the jury considered. The government points to a report of the July 31, 2009 interview with Yomtov Bensasson, Agriprocessors' chief financial officer, and his testimony during trial.

The government contends that the facts supporting the use of the float for business purposes was well-known to the movant and he cannot credibly claim that his own intent in moving money between accounts was hidden from him by the government. Regarding the former contention, the government emphasizes that: (1) Yomtov Bensasson testified that Agriprocessors played the float and by doing so automatically left Agriprocessors' receivables higher and (2) the movant maintained during closing argument that no money was diverted when taking advantage of the float. Regarding the latter contention, the government emphasizes that the movant testified that he did not see the whole purpose for the whole thing, that is, the "rounding up" of checks and transferring money between accounts, and it could have been Mitchel Meltzer or Yomtov Bensasson who had a reason for doing so.

Fourth, the government argues that the movant knew of the float and who had information about it and, if he thought Mitchel Meltzer possessed information favorable to him, he should have sought testimony from Mitchel Meltzer or presented other evidence. The government emphasizes that the movant's assertion that Mitchel Meltzer's statements are favorable to his defense is dubious in light of the fact that the movant disclaimed any understanding of the purpose behind rounding up deposits and attempted to blame the transactions on Mitchel Meltzer or Yomtov Bensasson.

Lastly, the government argues that Mitchel Meltzer's statement fails to account for the evidence that showed the movant intended to conceal his fraud by manipulating the amounts of the transfers between accounts to make customer cash diversions look like round-number transfers and to make replacement transfers look like customer payments. The government maintains that: (1) the movant fails to offer any explanation as to why he thought it was necessary to manipulate financial transactions at all and (2) the inclusion of a rounded-up check with other deposits to hide the fact that the deposits contained diverted customer payments clearly constitutes money laundering. The government emphasizes that the movant has offered no defense to the more than $25,000,000 that he laundered by

concealing the fact that he rounded checks up before depositing them into Agriprocessors' operating account.

In sum, the government maintains that Mitchel Meltzer's opinion is neither exculpatory nor material and it is cumulative of information that the government disclosed and evidence that the movant presented. Additionally, the government maintains that, regardless of Mitchel Meltzer's opinion, the movant is unable to establish that he suffered any prejudice because the jury would have returned the same verdicts.

### C. The Movant's Reply Brief

In his reply brief, the movant reiterates assertions that he made in his merits brief and makes numerous arguments. The court summarizes those arguments below.

### 1. Ground one

On and after December 5, 2008, the government maintained that it would pursue forfeiture if any of Agriprocessors' assets were ultimately controlled by or used for the benefit of the Rubashkins. The government admits that it did not disclose evidence, such as the discussion that occurred at the December 5, 2008 meeting, the December 9, 2008 letter from Lloyd Palans and the March of 2009 discussions with potential bidders and FBBC, and makes significant admissions that entitle the movant to relief.

The government misstates the law, including the law that relates to *Napue*[9] and *Brady*, misunderstands the movant's arguments and distracts the court from the relevant issues. The government twists words and splits hairs when asserting that the court's loss calculation and Paula Roby's testimony are correct, and the movant cannot be denied due process based on semantics. The government permitted Paula Roby to provide false and/or misleading testimony about agreements, prohibitions, edicts, restrictions, dates and rumors and did not correct it.

---

[9] *Napue v. Illinois*, 360 U.S. 264 (1959).

The government's disclosure of some evidence but not all of the evidence is either an act of deception or a remarkably convenient oversight. *Brady* disclosures do not vitiate a *Napue* violation, which occurs when the government presents false or misleading information on a material issue. The materiality standard under *Brady* and *Napue* is not the same. Under *Napue*, perjured testimony is considered material unless the failure to disclose it would be harmless beyond a reasonable doubt.

Although the knowing use of perjury is sufficient to establish a due process violation, the movant only needs to establish that Paula Roby's testimony was substantially misleading. The government cannot lead a factfinder to an incorrect factual conclusion on the basis of testimony that is substantially misleading but not literally false.

A *Napue* violation occurred when the government failed to correct the false impression that it created after Paula Roby provided testimony about the government's forfeiture position. The government's fixation on the word "agreement" in Paula Roby's testimony is, at best, a response to an argument that the movant never made and, at worst, a carefully-planned attempt to mislead the court. The manner in which the government asked Paula Roby about an agreement demonstrates its intent to create a false impression. Any reasonable observer would have understood that the government's reference to "some agreement not to hire Rubashkins" meant some restriction or prohibition on Aaron Rubashkin having an ownership or management role in the new entity. Paula Roby's denial of an "agreement" repudiated Meyer Eichler's accurate description of the government's forfeiture position. The court erroneously discredited Meyer Eichler's affidavit and mistakenly concluded that the government did not take the position that no purchaser of Agriprocessors could have any involvement with the movant or the movant's family.

When asked whether the government had a condition that no buyer could have any involvement with the movant or any other members of his family, FBI Special Agent Randy Van Gent stated that the government had a "concern" that a

future buyer "may be bidding on behalf of the [movant] and/or his family" and falsely declared that he would not describe one of the conditions of disposition of the plant as a no-Rubashkin edict. The government cannot sit idly when a witness unintentionally creates a misleading impression.

The movant never limited his arguments concerning the Rubashkins' involvement to a claim that the government imposed a formal restriction in bankruptcy proceedings. The movant argued without limitation as to time, form and place that the government's forfeiture position and conduct with respect to Aaron Rubashkin depressed the sale price for Agriprocessors' assets. The movant's position did not hinge on whether the government's conditions were formal or informal. The court accurately recognized the movant's position when it stated in its sentencing memorandum that the movant was arguing that the government attached a condition to the sale of Agriprocessors' assets that no purchaser of Agriprocessors could have any involvement with the movant or the movant's family. The point of the movant's argument was that the government injected itself into the bankruptcy process and used its forfeiture allegations to impose conditions on the future ownership and operation of Agriprocessors. The government's actions scared bidders, did not allow the bankruptcy process to operate in a normal way and reduced the sale price of Agriprocessors.

The court relied on Paula Roby's testimony to conclude that Meyer Eichler and Steve Cohen lied or were confused with respect to the government's forfeiture position. But, Meyer Eichler and Steve Cohen provided accurate descriptions of the government's forfeiture position.

The government impermissibly asked Paula Roby whether she held an opinion about whether the government's forfeiture allegation affected potential bidders. Paula Roby attempted to bolster her opinion that the government's forfeiture position did not have an impact on potential bidders by volunteering that a meeting with Eli Soglowek occurred prior to the date he submitted his $40,000,000 bid. She implied that the February 6, 2009 meeting did not discourage Soglowek Nahariya, Ltd. from making a bid.

The timing of the February 11, 2009 letter that Soglowek Nahariya, Ltd. sent the bankruptcy trustee strongly supports Eli Soglowek and Nathan Tzivin's statements that the government's conduct during the February 6, 2009 meeting was the primary reason for withdrawing the $40,000,000 bid. Given the government's threats and demands concerning who Soglowek Nahariya, Ltd. could and could not do business, it is not surprising that the letter would only identify the results of due diligence as the basis for withdrawing the bid.

Paula Roby's testimony regarding rumors and the grapevine could have caused the court to conclude that a restriction regarding Rubashkins did not exist. Rather than work hard to dispel rumors as Paula Roby testified, the bankruptcy trustee conveyed the government's forfeiture position to prospective buyers. Based on what occurred during the December 5, 2008 meeting, Paula Roby knew that Aaron Rubashkin could not have an ownership role in Agriprocessors, but she testified that she did not know whether it would be permissible to "re-install" Aaron Rubashkin if a purchaser wanted him.

Paula Roby's testimony concerning whether the government restricted the ability of the Rubashkins to have an equity interest or management role is not consistent with the position that the government advanced during the December 5, 2008 meeting. Paula Roby's testimony suggested that the bankruptcy trustee's initial concern was dispelled. His concerns, however, remained throughout the bankruptcy process.

The government acted in an unreasonable and unforeseeable manner. The government improperly asserted forfeiture, interfered in the bankruptcy process by unilaterally imposing its own definition of "good faith purchaser" and failed to disclose that FBBC and the bankruptcy trustee conveyed their concerns about its forfeiture position. It is likely that the government elected not to call a witness from FBBC so as to avoid the issue of loss causation.

The government's disclosure does not cure the falsity of Paula Roby's testimony. The government may not use false

testimony so long as it makes disclosures. The government has a duty to correct false testimony that it reinforced. The government falsely implied that the related party disclosure requirement was a routine part of bankruptcy proceedings and not connected to the government's forfeiture restriction. It covered up its inappropriate conduct by asking questions about what is required in bankruptcy proceedings.

The government suppressed evidence that addressed whether a restriction of the Rubashkins' involvement existed and what effect the government's forfeiture position had on loss amount. The movant could not make a full and complete argument regarding the extent to which the government's forfeiture position drove up the loss amount. The government probably caused the entire loss that FBBC suffered. The information that the government did disclose prior to the sentencing hearing misled the movant, and the government's reference to the bankruptcy record further demonstrates an intentional effort by the government to mislead the court regarding the impact that the government's restrictions had on the bankruptcy estate.

Prospective bidders felt so strongly about Aaron Rubashkin's involvement that they made arrangements to have Aaron Rubashkin serve as a minority owner. FBBC called its post-petition loan into default in light of its March 24, 2009 discussion with the government about its forfeiture position.

The government's use of forfeiture was unlawful and unforeseeable. The government could not establish a nexus between the criminal conduct and the assets subject to forfeiture. The government did not have a right to pursue forfeiture of Agriprocessors' assets, and the impact of the government's actions on the bankruptcy sale price cannot be attributed to the movant. Losses caused by legitimate conduct of the government or a third-party in response to fraud cannot be held against a criminal defendant if the conduct was unforeseeable. It was unforeseeable that the government would pursue forfeiture in the manner that it did and seek forfeiture over the objections of the victim and the bankruptcy trustee. The government must accept loss as it finds it. The government cannot suppress a sale price by interfering in a

bankruptcy process, imposing conditions on who can own and operate a private company, preventing a bankruptcy judge from applying bankruptcy law and/or taking other steps over the objections of interested parties.

The movant suffered prejudice. Agriprocessors had value, as indicated by the valuation report of Triax Capital Advisors, LLC showing $68,662,617 in assets, Eli Soglowek's offer of $40,000,000, the offer of almost $16,000,000 during the March auction, the offer of $17,000,000 plus rent of $3,000,000 per year, the bankrutpcy trustee's assertion that one could expect to earn $25,000,000 per year and the interest of another party that valued Agriprocessors' assets at $45,000,000. Such values indicate that the government likely caused a loss in excess of the outstanding debt to FBBC. So, a reasonable probability that the result of the sentencing hearing "could have" or "would have" been different exists. At a minimum, the government's forfeiture position caused a loss of at least $7,500,000, which is the difference between the bid of almost $16,000,000 during the March auction and the $8,500,000 paid by SHF Industries, LLC, and total loss would have been $19,500,000, which would have reduced the movant's sentencing Guidelines range by two levels.

The government ignores that its aggressive forfeiture position interrupted the market and caused bidders not to participate. The government misstates the law when arguing that the movant is not entitled to second-guess the decisions of others that may have impacted his loss calculation under the sentencing Guidelines. The court should take into consideration that the movant believed $68,662,617 served as collateral for, and would revert to, FBBC. If unforeseen action by a third-party causes collateral to yield less than full value, only the portion of the loss that is reasonably foreseeable can be attributed to him. No reasonable person would foresee the impairment of collateral in the manner that the government caused.

It would have been absurd to seek reconsideration in light of the record. The movant's claim is not procedurally defaulted because the government's conduct impeded defense

counsel's access to the factual basis for making the claim on direct appeal.

The government cannot assert that the court would have imposed the same sentence because the government denied the movant due process. The court's statement regarding imposition of the same sentence even if it erred in calculating the sentencing Guidelines cannot account for the government's misconduct. The court relied on the accuracy of testimony that a no-Rubashkin restriction did not exist and altogether declined to consider the impact of that restriction on loss amount. Given the falsity of the testimony on which the court relied and the suppressed information regarding the impact of the government's forfeiture position on the sale of Agriprocessors' assets, there is no basis to conclude that the court would have imposed the same sentence. The court failed to provide sufficient justification for an alternative sentence, including one based on the harboring of illegal aliens.

### 2. *Ground three*

With respect to his contention that the government withheld information that indicated Mitchel Meltzer thought the movant moved money between accounts to play the float and believed he did not intend to defraud FBBC when doing so, the movant asserts that the government does not deny that Mitchel Meltzer made statements concerning the float and his intent and these statements are material for purposes of *Brady*. The movant asserts that the government overlooks the fact that the non-disclosure of Mitchel Meltzer's statements had an effect on calculating his Guidelines sentencing range and calls into doubt the validity of the movant's money laundering convictions.

In support of his assertions regarding punishment, the movant argues that: (1) the government previously stated that the third-party accounts, that is, the Torah Education and Kosher Community Grocery accounts, were only being used for the specific purpose of allowing repayments to be made to FBBC from some source other than Agriprocessors itself; (2) the government had to characterize the transactions from the Torah Education and Kosher Community Grocery accounts in this way to prove "sophisticated laundering"

under USSG §2S1.1(b)(3); (3) Mitchel Meltzer's undisclosed statements undermine the basis for a two-level enhancement because they establish that the use of the Torah Education and Kosher Community Grocery accounts had nothing to do with concealment and only were designed to "play the float"; and (4) there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the sentencing proceeding would have been different.

Concerning the validity of his money laundering convictions, the movant maintains that additional evidence of relatively minor importance might have been sufficient to create reasonable doubt because the government presented a "flimsy" money laundering case based on checks being written in odd amounts. He states that some transactions are inconsistent with the government's theory that he used the Torah Education and Kosher Community Grocery accounts to conceal the fact that Agriprocessors was the source of funds and there is at least a reasonable probability that testimony from a longtime employee of Agriprocessors would have caused the jury to return not guilty verdicts on the money laundering charges. The movant asserts that Yomtov Bensasson's statement to the FBI and testimony during trial does not render Mitchel Meltzer's statements immaterial or cumulative because Mitchel Meltzer's statements are different in that they do not provide an unlawful purpose for transferring funds. He emphasizes that Mitchel Meltzer's statements provide that extending the time of the float and helping with short-term cash flow management were the only reasons for moving funds to the Torah Education and Kosher Community Grocery accounts.

Additionally, with respect to Mitchel Meltzer's opinion about the lack of intent to defraud when transferring funds, the movant contends that: (1) courts have admitted such testimony; (2) the government's narrow focus on admissibility ignores how Mitchel Meltzer's opinion would have allowed defense counsel to understand what to expect when cross-examining him, especially considering that cross-examination of a witness who is sympathetic is very different that cross-examination of a witness who is hostile; and (3) the

government cannot reasonably maintain that the movant should have asked blind questions without knowing what Mitchel Meltzer disclosed, especially considering that Mitchel Meltzer was an admitted liar and had an incentive to offer testimony that favored the government.

Lastly, the movant takes issue with the government's assertion that the inclusion of an inculpatory opinion nullifies the duty to disclose information. He emphasizes that Mitchel Meltzer's opinion about the movant's lack of any intent to defraud FBBC relates to all of the charges, not just the money laundering charges, and reiterates that there is a substantial difference between being punished for convictions based solely on fraud charges and being punished for convictions based on fraud charges and money laundering charges. The movant states that the government clearly recognizes such differences because it went to great lengths to defend the validity of the money laundering convictions on direct appeal. He maintains that the government should not be permitted to take inconsistent positions—that is, argue that the money laundering charges did not rely on the same financial transactions as the bank fraud transactions on direct appeal and argue that the money laundering charges and bank fraud charges are equivalent in this proceeding.

## IV. *MOTION FOR LEAVE TO TAKE DISCOVERY*

"A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(a), Rules Governing Section 2255 Proceedings for the United States District Courts. In order to establish "good cause," the movant must demonstrate that the record, supplemented by the discovery requested, may entitle the movant to relief. *See Dyer v. United States*, 23 F.3d 1421, 1424 (8th Cir. 1994) ("We find no abuse of discretion in the district court's denial of [the movant's] motions for discovery because [the movant] did not show how the evidence he sought would establish his innocence."); *see also United States v. Fields*, 761 F.3d 443, 478 (5th Cir. 2014) ("A petitioner demonstrates 'good cause' under Rule 6(a) 'where specific allegations before the

court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" (quoting *Bracy v. Gramley*, 520 U.S. 899, 904 (1997))).

The court finds that the movant has not demonstrated the requisite "good cause" to conduct discovery. The current record adequately allows the court to evaluate the movant's remaining grounds for relief, and the discovery requested, if produced, would not entitle the movant to relief. Accordingly, the court shall deny the motion for leave to take discovery.

## V. MOTION FOR AN EVIDENTIARY HEARING

A district court is given discretion in determining whether to hold an evidentiary hearing on a motion under 28 U.S.C. § 2255. *See United States v. Oldham*, 787 F.2d 454, 457 (8th Cir. 1986). In exercising that discretion, the district court must determine whether the alleged facts, if true, entitle the movant to relief. *See Payne v. United States*, 78 F.3d 343, 347 (8th Cir. 1996). Accordingly, a district court may summarily dismiss a motion brought under 28 U.S.C. § 2255 without an evidentiary hearing "if (1) the . . . allegations, accepted as true, would not entitle the [movant] to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Engelen v. United States*, 68 F.3d 238, 240-41 (8th Cir. 1995) (citations omitted); *see also Delgado v. United States*, 162 F.3d 981, 983 (8th Cir. 1998) (stating that an evidentiary hearing is unnecessary where allegations, even if true, do not warrant relief or allegations cannot be accepted as true because they are contradicted by the record or lack factual evidence and rely on conclusive statements); *United States v. Hester*, 489 F.2d 48, 50 (8th Cir. 1973) (stating that no evidentiary hearing is necessary where the files and records of the case demonstrate that relief is unavailable or where the motion is based on a question of law). Stated differently, the court can dismiss a 28 U.S.C. § 2255 motion without a hearing where "the files and records of the case conclusively show that the prisoner is entitled to no relief."

28 U.S.C. § 2255(b); *accord Standing Bear v. United States*, 68 F.3d 271, 272 (8th Cir. 1995) (per curiam).

The court concludes that it is able to resolve ground one and ground three from the record. *See Rogers v. United States*, 1 F.3d 697, 699 (8th Cir. 1993) (holding that "[a]ll of the information that the court needed to make its decision with regard to [the movant's] claims was included in the record" and, therefore, the court "was not required to hold an evidentiary hearing" (citing Rule Governing Section 2255 Proceedings 8(a) and *United States v. Raddatz*, 447 U.S. 667, 674 (1980))). The evidence of record conclusively demonstrates that the movant is not entitled to the relief sought. Specifically, it indicates that the movant's assertions are meritless, frivolous and/or malicious. As such, the court finds that there is no need for an evidentiary hearing. The court shall deny the movant's motion for an evidentiary hearing.

## VI. ANALYSIS

### A. Proceedings Under 28 U.S.C. § 2255

A prisoner in custody under sentence of a federal court is able to move the sentencing court to vacate, set aside or correct a sentence. *See* 28 U.S.C. § 2255(a). To obtain relief pursuant to 28 U.S.C. § 2255, a federal prisoner must establish: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction to impose such sentence"; (3) "that the sentence was in excess of the maximum authorized by law"; or (4) "[that the judgment or sentence] is otherwise subject to collateral attack." *Id.*; *see also Hill v. United States*, 368 U.S. 424, 426-27 (1962) (listing four grounds upon which relief under 28 U.S.C. § 2255 may be claimed); *Watson v. United States*, 493 F.3d 960, 963 (8th Cir. 2007) (same); *Lee v. United States*, 501 F.2d 494, 499-500 (8th Cir. 1974) (clarifying that subject matter jurisdiction exists over enumerated grounds within the statute); Rule 1, Rules Governing Section 2255 Proceedings (specifying scope of 28 U.S.C. § 2255). If any one of the four grounds is established, the court is required "to vacate and set the judgment aside and [it

is required to] discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

When enacting 28 U.S.C. § 2255, Congress "intended to afford federal prisoners a remedy identical in scope to federal habeas corpus." *Sun Bear v. United States*, 644 F.3d 700, 704 (8th Cir. 2011) (en banc) (quoting *Davis v. United States*, 417 U.S. 333, 343 (1974)). Although it appears to be broad, 28 U.S.C. § 2255 does not provide a remedy for "all claimed errors in conviction and sentencing." *Id*. (quoting *United States v. Addonizio*, 442 U.S. 178, 185 (1979)). Rather, 28 U.S.C. § 2255 is intended to redress constitutional and jurisdictional errors and, apart from those errors, only "fundamental defect[s] which inherently result[] in a complete miscarriage of justice" and "omission[s] inconsistent with the rudimentary demands of fair procedure." *Hill*, 368 U.S. at 428; *see also Sun Bear*, 644 F.3d at 704 (clarifying that the scope of 28 U.S.C. § 2255 is "severely limited" and quoting *Hill*, 368 U.S. at 428); *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996) ("Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice." (citing *Poor Thunder v. United States*, 810 F.2d 817, 821 (8th Cir. 1987))). A collateral challenge under 28 U.S.C. § 2255 is not interchangeable or substitutable for a direct appeal. *See United States v. Frady*, 456 U.S. 152, 165 (1982) (making clear that a motion pursuant to 28 U.S.C. § 2255 will not be allowed to do service for an appeal). Consequently, "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Id*. (quoting *Addonizio*, 442 U.S. at 184).

The law of the case doctrine has two branches. *See Ellis v. United States*, 313 F.3d 636, 646 (1st Cir. 2002). The first branch involves the "mandate rule (which, with only a few exceptions, forbids, among other things, a lower court from relitigating issues that were decided by a higher court, whether explicitly or by reasonable implication, at an earlier stage of the same case)." *Id*. The second branch, which is somewhat more

flexible, provides that "a court ordinarily ought to respect and follow its own rulings" throughout subsequent stages of the same litigation. *Id.*; *see also United States v. Bloate*, 655 F.3d 750, 755 (8th Cir. 2011) ("The [law of the case] doctrine applies only to actual decisions—not dicta—in prior stages of the case."); *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 602 (8th Cir. 1995) ("Law of the case applies only to issues actually decided, either implicitly or explicitly, in the prior stages of a case."). "[R]ulings are the law of the case and will not be disturbed absent an intervening change in controlling authority." *Baranski v. United States*, 515 F.3d 857, 861 (8th Cir. 2008); *see also Davis*, 417 U.S. at 342 (observing that law of the case did not preclude relief under 28 U.S.C. § 2255 because of intervening change in the law).

Hence, in collateral proceedings based on 28 U.S.C. § 2255, "[i]ssues raised and decided on direct appeal cannot ordinarily be relitigated." *United States v. Wiley*, 245 F.3d 750, 752 (8th Cir. 2001) (citing *United States v. McGee*, 201 F.3d 1022, 1023 (8th Cir. 2000)); *see also Lefkowitz v. United States*, 446 F.3d 788, 790-91 (8th Cir. 2006) (concluding that the same issues that have been raised in a new trial motion and decided by the district court cannot be reconsidered in a subsequent collateral attack); *Bear Stops v. United States*, 339 F.3d 777, 780 (8th Cir. 2003) ("It is well settled that claims which were raised and decided on direct appeal cannot be relitigated on a motion to vacate pursuant to 28 U.S.C. § 2255." (quoting *United States v. Shabazz*, 657 F.2d 189, 190 (8th Cir. 1981))); *Dall v. United States*, 957 F.2d 571, 572-73 (8th Cir. 1992) (per curiam) (concluding that claims already addressed on direct appeal could not be raised); *United States v. Kraemer*, 810 F.2d 173, 177 (8th Cir. 1987) (concluding that a movant could not "raise the same issues . . . that have been decided on direct appeal or in a new trial motion"); *Butler v. United States*, 340 F.2d 63, 64 (8th Cir. 1965) (concluding that a movant was not entitled to another review of his question). With respect to a claim that has already been conclusively resolved on direct appeal, the court may only consider the

same claim in a collateral action if "convincing new evidence of actual innocence" exists. *Wiley*, 245 F.3d at 752 (citing cases and emphasizing the narrowness of the exception).

Further, movants ordinarily are precluded from asserting claims that they failed to raise on direct appeal. *See McNeal v. United States*, 249 F.3d 747, 749 (8th Cir. 2001); *see also Ramey v. United States*, 8 F.3d 1313, 1314 (8th Cir. 1993) (per curiam) (citing *Frady*, 456 U.S. at 167-68, and noting that a movant is not able to rely on 28 U.S.C. § 2255 to correct errors that could have been raised at trial or on direct appeal); *United States v. Samuelson*, 722 F.2d 425, 427 (8th Cir. 1983) (concluding that a collateral proceeding is not a substitute for a direct appeal and refusing to consider matters that could have been raised on direct appeal). "A [movant] who has procedurally defaulted a claim by failing to raise it on direct review may raise that claim in a [28 U.S.C. §] 2255 proceeding only by demonstrating cause for the default and prejudice or actual innocence." *McNeal*, 249 F.3d at 749 (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998)); *see also Massaro v. United States*, 538 U.S. 500, 504 (2003) ("[T]he general rule [is] that claims not raised on direct appeal may not be raised on collateral review unless the [movant] shows cause and prejudice."). "'[C]ause' under the cause and prejudice test must be something *external* to the [movant], something that cannot fairly be attributed to him . . . ." *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). "Prejudice" that is necessary to excuse procedural default means that the alleged error worked to the movant's actual and substantial disadvantage. *See Frady*, 456 U.S. at 170; *Johnson v. United States*, 278 F.3d 839, 844 (8th Cir. 2002); *Swedzinski v. United States*, 160 F.3d 498, 501 (8th Cir. 1998). If a movant fails to show cause, a court need not consider whether actual prejudice exists. *See McCleskey v. Zant*, 499 U.S. 467, 502 (1991). Actual innocence under the actual innocence test "means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623; *see also Sawyer v. Whitley*, 505 U.S. 333, 339-40 (1992) (equating fundamental miscarriage of justice with factual innocence); *McNeal*, 249 F.3d at 749 ("[A movant] must show factual innocence, not simply legal insufficiency of

evidence to support a conviction."). To establish actual innocence, a movant "must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995)) (internal quotation marks omitted); *see also Sawyer*, 505 U.S. at 339 (clarifying that a fundamental miscarriage of justice can be demonstrated by "establish[ing] that under the probative evidence [the movant] has a colorable claim of factual innocence" (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986))).[10]

Lastly, "not all constitutional violations amount to reversible error." *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988). Reversal is required where a "structural defect affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Thus far, an error has been found to be structural only in cases where there is a complete denial of counsel, a biased trial judge, an unlawful exclusion of grand jurors based on race, a denial of self-representation at trial, a denial of a public trial or a defective reasonable doubt jury instruction. *See Johnson v. United States*, 520 U.S. 461, 468-69 (1997) (collecting cases); *see also United States v. Marcus*, 560 U.S. 258, 263 (2010) (reaffirming that structural error has been found only in a very limited class of cases); *Washington v. Recuenco*, 548 U.S. 212, 218-19 (2006) (same). On the other hand, if no structural constitutional error occurred and "the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 579 (1986); *accord Fulminante*, 499 U.S. at 306-07 (reiterating that constitutional errors that are not structural defects are subject to a harmless error review). In that situation, the test is whether the

---

[10] The procedural default rule applies to a conviction obtained through trial or through the entry of a guilty plea. *See, e.g.*, *Matthews v. United States*, 114 F.3d 112, 113 (8th Cir. 1997); *Thomas v. United States*, 112 F.3d 365, 366 (8th Cir. 1997); *Reid v. United States*, 976 F.2d 446, 448 (8th Cir. 1992).

error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *accord United States v. Clay*, 720 F.3d 1021, 1027 (8th Cir. 2013).[11]

---

[11] On direct appeal, courts consider whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) (stating that errors determined to be "'harmless' in terms of their effect on the factfinding process at trial" are excused under *Chapman*); *United States v. Barnhart*, 979 F.2d 647, 652 (8th Cir. 1992) (observing that a conviction will not be overturned if an error is deemed to be harmless beyond a reasonable doubt). It, however, is unclear what harmless error review standard applies in collateral proceedings under 28 U.S.C. § 2255. The court must either be able to declare a belief that the error was harmless beyond a reasonable doubt, *see Chapman*, 386 U.S. at 24, or be able to decide that the error "had substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623 (quoting *Kotteakos*, 328 U.S. at 776). In the 28 U.S.C. § 2254 context, it is clear that the less onerous standard applies. *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (holding that the "substantial and injurious effect" standard set forth in *Brecht* applies in proceedings under 28 U.S.C. § 2254). But, the Supreme Court has not directly decided whether that same standard applies in proceedings under 28 U.S.C. § 2255. *Cf. id.*; *Frady*, 456 U.S. at 164-66 (holding that the "plain error" standard is out of place when a prisoner collaterally attacks a criminal conviction under 28 U.S.C. § 2255). Most circuit courts of appeals, however, have held that the *Brecht* harmless error standard applies when a conviction is collaterally attacked under 28 U.S.C. § 2255. *See United States v. Smith*, 723 F.3d 510, 517 (4th Cir. 2013) (listing cases, including *United States v. Dago*, 441 F.3d 1238, 1245-46 (10th Cir. 2006), *United States v. Montalvo*, 331 F.3d 1052, 1057-58 (9th Cir. 2003), *Ross v. United States*, 289 F.3d 677, 682 (11th Cir. 2002), and *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000)); *Clay*, 720 F.3d at 1027 n.5 (citing *Dago*, 441 F.3d at 1246); *see also Peck v. United States*, 106 F.3d 450, 454 (2d Cir. 1997) (observing that a court must determine whether the constitutional error substantially influenced the jury's decision). Other circuit courts of appeals assume that the more demanding standard applies. *See, e.g.*, *Herrin v. United States*, 349 F.3d 544, 547-49 (8th Cir. 2003) (Riley, J., concurring) (concluding that a prosecutor's improper remarks were harmless beyond a reasonable doubt); *Monsanto v. United States*, 348 F.3d 345, 349 (2d Cir. 2003) (finding no reversible error in the district court's application of *Chapman*); *Santana-Madera v. United States*, 260 F.3d 133, 140 (2d Cir. 2001) (finding

(continued...)

## B. The Movant's Grounds

### 1. Sentencing Error

The movant contends that a sentencing error occurred. But, the movant fundamentally misstates or misunderstands the nature of proceedings after a jury renders its verdicts, the extent of due process protection in the context of different phases of a criminal case and the scope of proceedings under 28 U.S.C. § 2255. He also repeatedly mischaracterizes the record and misunderstands the law.

#### a. Background

##### (1) Judicial proceedings

During sentencing proceedings, a probation officer prepared a presentence report which calculated an advisory sentencing Guidelines range of life imprisonment for the Financial Counts, that is, the fraud counts, the false statement counts and the money laundering counts, and the movant raised multiple objections regarding the probation officer's application of the Guidelines. Ultimately, the movant contended that his total offense level should be either 28 (7 (base offense level) + 18 (loss between $2,500,000 and $7,000,000) + 3 (role)) for the fraud counts and false statement counts or 30 (25 (base offense level) + 2 (18 U.S.C. § 1956) + 3 (role)) for the money laundering counts. And, he asked the court to vary and/or depart downward and impose a term of imprisonment that did not exceed seventy-two months. In April of 2010, the court held a sentencing hearing and the parties presented evidence and argument in support of their positions.

Approximately two months after it heard from the parties, the court detailed its findings and conclusions in a sentencing memorandum. The court determined that the movant fell within criminal history category I. And, it calculated separate total adjusted offense levels for the fraud and false statement counts, that is, bank fraud counts, and the money laundering counts.

---

[11](…continued)
error to be harmless under either standard).

With respect to the fraud counts and false statement counts, the court: (1) relied on USSG §2B1.1(a)(1) to determine that a base offense level of 7 applied; (2) applied USSG §2B1.1(b)(1)(L) to increase the offense level by 22 levels because the loss exceeded $20,000,000; (3) applied USSG §2B1.1(b)(9)(C) to increase the offense level by 2 levels because the bank fraud offenses involved the use of sophisticated means; (4) applied USSG §3B1.1(a) to increase the offense level by 4 levels because the movant was an organizer or leader in the bank fraud offenses; and (5) applied USSG §3C1.1 to increase the offense level by 2 levels because the bank fraud offenses involved the obstruction of justice. A criminal history category of I and a total adjusted offense level of 37 for the bank fraud counts resulted in an advisory sentencing range of 210 to 262 months imprisonment.

For the money laundering counts, the court: (1) relied on USSG §2S1.1(a)(2) to determine that a base offense level of 31 applied; (2) applied USSG §2S1.1(b)(2)(B) to increase the offense level by two levels because the movant was convicted under 18 U.S.C. § 1956; (3) applied USSG §2S1.1(b)(3) to increase the offense level by two levels because the money laundering offenses involved the use of sophisticated means; (4) applied USSG §3B1.1(a) to increase the offense level by 4 levels because the movant was an organizer or leader in the money laundering offenses; and (5) applied USSG §3C1.1 to increase the offense level by 2 levels because the money laundering offenses involved the obstruction of justice. A criminal history category of I and a total adjusted offense level of 41 for the money laundering counts resulted in an advisory sentencing range of 324 to 405 months imprisonment.

Before it arrived at a total adjusted offense level for the bank fraud offenses and the money laundering offenses, the court considered whether the facts and the law justified upward adjustments under Chapter 2 and Chapter 3 of the Guidelines. When considering the specific characteristics of the bank fraud offenses, the court did not adjust the offense level under USSG §2B1.1(b)(2)(A)(i) for the number of victims in the case. And, the

court did not adjust the offense level for either the bank fraud offenses or the money laundering offenses under USSG §3B1.3 for abusing a position of trust.

In addition, the court explicitly considered and rejected the government's arguments for an upward departure under USSG §5K2.0(a)(3) for extraordinary obstruction of justice and USSG §5K2.21 for failure of the Guidelines to account for criminal conduct. Before rejecting the government's bases for departing upward, the court observed that an upward departure would be permitted in light of the fact that the movant's obstructive conduct was more excessive than the conduct that is involved in a typical criminal case and the Guidelines failed to account for a large amount of the movant's criminal conduct. Nonetheless, it noted that a sentence within the sentencing range established by the Guidelines was sufficient to satisfy the goals of sentencing and that it would consider the facts underlying the potential upward departures in conjunction with its analysis of the factors enumerated in § 3553(a).

Similarly, the court explicitly considered and rejected the movant's arguments for a downward departure under USSG §5K2.0. The court also considered and rejected the movant's arguments for a downward variance from the advisory sentencing range in accordance with the sentencing factors under § 3553(a). Before declining to vary, the court made clear that the circumstances surrounding the movant's case, such as the reasonableness of a sentence for the movant under the Guidelines, the movant's motive for committing the offenses, the movant's extraordinary charitable and civic contributions, the movant's relationship with his developmentally-disabled minor son and/or the movant's mental health history, did not warrant a downward variance and unaccounted for conduct justified an upward variance. It also emphasized that, even if it inadvertently erred in computing the Guidelines, it would still impose a sentence of 324 months imprisonment after considering the factors under § 3553(a). And, when formally imposing the movant's sentence, the court clarified that it considered every argument and subargument that the parties' made.

On direct appeal, the movant, among other things, argued that the court erroneously calculated his total adjusted offense level. More specifically, he asserted that the court should not have calculated a sentencing range for the money laundering counts and the court should not have included in its actual loss figure approximately $15,000,000 of loss that he asserted he did not cause. Concerning the latter assertion, the movant maintained that the actual loss to FBBC that was attributable to his fraudulent acts or omissions was only about $12,000,000 because that is the amount of money that FBBC loaned to Agriprocessors after he falsely inflated the value of collateral and fraudulently diverted customer payments. He asserted that his crime was that he inflated the value of collateral to enable Agriprocessors to obtain more money than it was entitled to obtain under the terms of its loan agreement and that FBBC's inability to collect additional amounts was independent of his fraudulent acts or omissions.

The movant pointed out that any number of independent factors, such as deteriorating market conditions, bad business planning or poor management by the bankruptcy trustee, could have caused Agriprocessors to become unable to repay $15,000,000 of its loan. With respect to the bankruptcy trustee, the movant asserted that the record established that the shortfall on the balance of the loan was caused in no small part by the bankruptcy trustee's insistence that no member of the Rubashkin family be involved in the new management of the company, refusal to seriously consider an offer to purchase the company for $22,000,000[12] and mishandling and destruction of frozen inventory. The movant claimed that the loss figure could not include $15,000,000 because

---

[12] In his appellate brief, the movant faulted the bankruptcy trustee for refusing to seriously consider an offer to purchase Agriprocessors for $22,000,000. In his sentencing memorandum, the movant argued that a substantial portion of the total loss amount could be attributed to FBBC's malfeasance with respect to Mordechai Korf's $22,000,000 offer. It appears that the movant mistakenly referred to the bankruptcy trustee's involvement in rejecting the $22,000,000 offer. It, however, is possible that the movant meant to fault the bankruptcy trustee for refusing to seriously consider Soglowek Nahariya, Ltd.'s April 19, 2009 offer of $23,000,000 ($6,000,000 in rent + $17,000,000).

FBBC relied on legitimate collateral to loan such amount to Agriprocessors and FBBC's inability to collect such amount upon liquidation of collateral during bankruptcy proceedings should not have been a factor that impacted the actual loss figure. According to the movant, the actual loss amount could only include the difference between the amount of credit FBBC extended based on his false representations and the amount of credit FBBC would have extended had it known Agriprocessors' true financial condition.

In response, the government asserted that the court did not err when it increased the movant's offense level by 22 levels, rather than 20 levels. Relying on USSG §2B1.1 cmt. n.3(E)(ii), the government claimed that the court correctly calculated the actual loss amount by taking the outstanding principal on the loan and reducing it by the amount recovered from the sale of collateral and the fair market value of any unsold collateral. It asserted that, after accounting for the sale of collateral, Agriprocessors still owed approximately $30,000,000, and, after accounting for the fair market value of unsold collateral and other credits, Agriprocessors still owed approximately $27,000,000. The government emphasized that the court's actual loss amount appropriately accounted for FBBC's inability to recover the full outstanding balance on the loan after the movant perpetrated a massive fraud and caused Agriprocessors to file for bankruptcy.

The Eighth Circuit Court of Appeals affirmed the court's calculations under the Guidelines. *See Rubashkin*, 655 F.3d at 869. Before doing so, it addressed the movant's arguments concerning the court's calculation of loss. *Id*. at 867-68.

> The . . . court calculated the loss amount as the unpaid balance on the Agriprocessors loan minus [FBBC's] recovery in bankruptcy proceedings. That amounted to about $27 million. [The movant] contends that the correct figure would be $12 million—the difference between what [FBBC] would have lent Agriprocessors without inflated collateral and what it actually lent. His calculation fails to account for an additional $15 million [FBBC] lost due to Agriprocessors' insolvency and related bankruptcy.

The formula [the movant] proposes applies to calculations of *intended* loss under the sentencing [G]uidelines. [*United States v. Miller*, 588 F.3d 560, 566 (8th Cir. 2009)]. We have never extended that formula to determine *actual* loss. *See* [USSG §2B1.1] cmt. n.3(A)(i)-(ii) (defining actual and intended loss). The government suggests that the more relevant [G]uideline is [USSG §2B1.1] cmt. n.3(E)(ii). The commentary to that [G]uideline provides that in cases involving pledged collateral (such as in a bank fraud), loss shall be reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing."

The relevant [G]uideline commentary and the weight of authority interpreting it are contrary to [the movant's] argument. The purpose of collateral is to protect a lender in the event of a borrower's default. *See Black's Law Dictionary* 278 (8th ed. 1999). The relevant [G]uideline commentary provides that our first consideration should be how much protection the collateral actually provided. [USSG §2B1.1] cmt. n.3(E)(ii). If a district court were to find that the outstanding debt less the collateral would overstate the loss that foreseeably resulted from fraud, it could depart downward.

Other circuit courts considering this issue have concluded that loss is simply the unpaid balance on a fraudulently obtained loan, less the realized or fair market value of any pledged collateral. *See, e.g.*, *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) ("[A] defendant may not reasonably count on the expected sale value of collateral to save himself from the foreseeable consequences of his fraudulent conduct"); *United States v. Serfling*, 504 F.3d 672, 679 (7th Cir. 2007).

[The movant] argues that changed market conditions, unreasonable negotiating by [FBBC], and mismanagement by the bankruptcy trustee combined to cause the default on otherwise secured loans. The . . . court considered this argument before making the specific factual finding that all $27 million of the default foreseeably resulted from [the movant's] actions. It rejected [the movant's] argument as "fail[ing] to consider the impact of a massive fraudulent

> scheme on the value of a company." We agree. Any reasonable person could have foreseen that large scale fraud could lead to collapse and insolvency if discovered. We see no error in the . . . court's loss calculation.

*Id.* (fifteenth and twenty-first alterations in original).

### (2)  *Record in relation to bankruptcy matters*[13]

The movant exercised day-to-day control over Agriprocessors prior to and after the May 12, 2008 ICE enforcement action. *See* Presentence Report (criminal docket no. 887) at ¶ 112. Aaron Rubashkin had the only ownership or shareholder interest in Agriprocessors. *See* Chapter 11 Affidavit (bankr. docket no. 3-2). Except for daily operations, every major decision regarding Agriprocessors was discussed and approved by Aaron Rubashkin. *See* Dec. 1, 2008 Hearing Transcript (bankr. docket no. 129) at 119-21, 161-62. Aaron Rubashkin had the ultimate decision-making authority and had familiarity with the operations, business and financial affairs of Agriprocessors. *See* Chapter 11 Affidavit (bankr. docket no. 3-2).

Agriprocessors experienced financial difficulties as a result of difficult circumstances brought about by the ICE enforcement action. *Id.* After the ICE enforcement action, Yomtov Bensasson recommended to the movant that Agriprocessors file for bankruptcy. *See* Presentence Report (criminal docket no. 887) at ¶ 294. At that time, Agriprocessors owed FBBC approximately $28,000,000 to $29,000,000. *Id.* Even though production at Agriprocessors greatly decreased after the ICE enforcement action, the amount of receivables that Agriprocessors reported to FBBC increased. *Id.* As of November of 2008, Agriprocessors employed between 250 and 300 people at its plant in Postville, Iowa, but, prior to its legal troubles, Agriprocessors had approximately 1000 employees. *See* Chapter 11 Affidavit (bankr. docket no. 3-2).

---

[13] References to "bankr. docket" are associated with In re *Agriprocessors, Inc.*, Case No. 08-02751 (Bankr. N.D. Iowa 201_).

To restructure its overall business, Agriprocessors actively sought new sources of financing, and, as a result of labor issues, Agriprocessors engaged new supervisory personnel to oversee plant operations. *Id*. Mordechai Korf's company was interested in purchasing Agriprocessors because it had "an extremely strong position in the kosher meat market." *See* Defense Sentencing Exhibit 11131 (criminal docket no. 912-268); *see also* Sentencing Transcript (criminal docket no. 936) at 139-54.[14] Mordechai Korf began investigating the possibility of purchasing Agriprocessors from the Rubashkin family in the summer of 2008. *See* Defense Sentencing Exhibit 11131 (criminal docket no. 912-268). At that time, Mordechai Korf prepared a proposal and brought a team, including outside counsel, an operations executive and a marketing executive, to tour Agriprocessors' plant, and the Rubashkin family told Mordechai Korf that the price for Agriprocessors was around $40,000,000, which Mordechai Korf was not prepared to pay. *Id*.

In September of 2008, Aaron Rubashkin appointed Bernard Feldman as the chief executive officer. *See* Chapter 11 Affidavit (bankr. docket no. 3-2). Despite such appointment, the movant continued to exercise day-to-day control over Agriprocessors' plant and finances until Agriprocessors filed for bankruptcy. *See* Presentence Report (criminal docket no. 887) at ¶ 112.

In the Fall of 2008, Mordechai Korf learned that it might be possible to purchase Agriprocessors directly from FBBC. *See* Defense Sentencing Exhibit 11131 (criminal docket no. 912-268).

On October 30, 2008, FBBC sued Agriprocessors, Aaron Rubashkin, certain related companies and the movant. In its lawsuit, FBBC alleged, among other things, that the defendants diverted FBBC's collateral, that is, its accounts receivable into an operating account rather than a deposit account, and sought the repayment of its loan balance, which

---

[14] The sentencing transcript (criminal docket nos. 936 & 937) has been filed with its own pagination scheme. For the purposes of this order, the court shall cite to such separate pagination.

exceeded $32,000,000, and the appointment of a receiver with expanded powers. *See* Chapter 11 Affidavit (bankr. docket no. 3-2); *see also* Trustee Motion (bankr. docket no. 676).

On November 4, 2008, Agriprocessors filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of New York. *See* Bankruptcy Petition (bankr. docket no. 3). As president of Agriprocessors, Aaron Rubashkin signed the voluntary petition for relief under the Bankruptcy Code. *Id*. Agriprocessors sought bankruptcy protection on an emergency basis due to pending litigation against it. *See* Chapter 11 Affidavit (bankr. docket no. 3-2). On November 5, 2008, Agriprocessors closed a slaughterhouse located in Gordon, Nebraska because of financial problems. *See* Presentence Report (criminal docket no. 887) at ¶ 107.

In November of 2008, Mordechai Korf offered to buy FBBC's interest in Agriprocessors for an amount between $21,500,000 to $22,000,000. *See* Defense Sentencing Exhibit 11131 (criminal docket no. 912-268); *see also* Sentencing Transcript (criminal docket no. 936) at 144-45. Mordechai Korf told FBBC that the value of Agriprocessors would drop dramatically if a bankruptcy trustee assumed control and altered the business in any way. *See* Defense Sentencing Exhibit 11131 (criminal docket no. 912-268). Mordechai Korf made it clear to FBBC that he wanted to buy Agriprocessors while it was still operating. *Id*. After informing Mordechai Korf that it had exposure in the amount of $27,000,000 to $29,000,000 and that it was not prepared to discount its note at all, FBBC rejected Mordechai Korf's offer. *Id*.; Sentencing Memorandum (criminal docket no. 927) at 18.

On November 20, 2008, the United States Bankruptcy Court for the Eastern District of New York appointed Joseph E. Sarachek as the bankruptcy trustee. *See* Amended Order Appointing Trustee (bankr. docket no. 57). On November 26, 2008, the bankruptcy trustee filed a notice that indicated he had held meetings with several parties, including with Assistant United States Attorneys for the Northern District of Iowa. *See* Statement

in Support of Venue Change (bankr. docket no. 104). On December 1, 2008, the bankruptcy trustee filed a declaration that indicated: (1) upon being appointed, he immediately confronted "an estate in financial extremis" due in part to Agriprocessors being shut down, certain principals of Agriprocessors facing federal criminal charges and Agriprocessors facing federal criminal charges; (2) he needed to use cash collateral and obtain emergency post-petition financing; (3) he determined that the prospect of locating any third party that would be willing to extend credit to Agriprocessors would be "wholly unrealistic" because of the government's indictment; and (4) he had held meetings with several parties, including with Assistant United States Attorneys for the Northern District of Iowa. *See* Declaration of Trustee (bankr. docket no. 108).

At a hearing to determine whether it was appropriate to transfer the bankruptcy action to the Northern District of Iowa, several individuals testified. The attorney for Agriprocessors informed the United States Bankruptcy Court for the Eastern District of New York that Agriprocessors would need at least $50,000,000 in new financing to satisfy its obligation to FBBC and to fund operations. *See* Dec. 1, 2008 Hearing Transcript (bankr. docket no. 129) at 36, 40, 43. He also asserted that FBBC's actions hindered Agriprocessors and acknowledged that, if Agriprocessors' obligations to FBBC could not be satisfied in a short period of time, then liquidation was the only option. *Id*. at 40.

Bernard Feldman, as Agriprocessors' chief executive officer, testified that: (1) Agriprocessors faced a multitude of problems, including the inability to replace the employees that had been arrested by ICE, the lack of cash flow and the expenses that had to be paid; (2) somebody would have to be prepared to come into Agriprocessors and spend approximately $75,000,000 to give it the "maximum opportunity to survive"; (3) it was imperative that Agriprocessors start operating at full capacity in the cattle category and the cooked or prepared products category, not just the chickens category, in the very immediate future, otherwise the value of Agriprocessors, which is structured as an oversized plant, would be devastated and it would lose its niche; (4) Agriprocessors needed

to secure additional financing through a new investor so that it could satisfy its obligation to FBBC and jump-start operations; and (5) Agriprocessors needed to reach an agreement with state and federal authorities because they were seeking to seize the plant and impose a multi-million dollar fine. *See* Dec. 1, 2008 Hearing Transcript (bankr. docket no. 129) at 159-60, 167, 171-74, 191-92. He also testified that: (1) the biggest issue facing Agriprocessors was its ability to satisfy FBBC and, if it could not do so within two to three weeks, the only alternative would be to go into liquidation; (2) the government would be willing to mitigate Agriprocessors' liability, including a fine of $9,600,000 and the possible seizure of assets; and (3) a lot of the concerns of the government would be satisfied if he could establish a new controlling interest, a new face or a new control of Agriprocessors. *Id*. at 172, 174, 188-94. Additionally, he: (1) observed that transferring the bankruptcy action to the Northern District of Iowa would be devastating because it would result in the loss of many, if not all, of the numerous potential investors that he had contacted and it would also negatively impact the reorganization or restart of Agriprocessors; (2) acknowledged that anyone financing Agriprocessors, merging with Agriprocessors or making an equity investment in Agriprocessors would (i) need to conduct due diligence, (ii) take into account the fact that Agriprocessors had been charged with immigration offenses and bank fraud offenses and (iii) ensure that a viable operation existed despite the accounting discrepancies; (3) stated that, although the bankruptcy trustee undertook efforts to obtain financing, his efforts and Aaron Rubashkin's efforts would probably be the only avenue towards financing because no institutional investor would be likely to help finance Agriprocessors in light of what happened; and (4) expressed that, even though Agriprocessors filed for bankruptcy, investors that he had met in August and September of 2008 expressed overall interest in Agriprocessors and told him to contact them at the appropriate time. *Id*. at 174-75, 178-79, 185-95. Lastly, Bernard Feldman expressed that potential investors preferred to be in New York because of certain things that happened in Iowa and that a concern with the administration of justice existed

in light of, among other things, the computation of the multi-million dollar fine and the potential seizure and displacement of Agriprocessors by the federal government. *Id*. at 187-88.

In addition to hearing the testimony of Bernard Feldman, the United States Bankruptcy Court for the Eastern District of New York received the testimony of Aaron Rubashkin, who emphasized that he had no part in the daily operations of Agriprocessors and stated that the movant, Heshy Rubashkin and Yossie Gourarie addressed the daily operations of Agriprocessors and all of them were equal to each other in terms of their corporate responsibility. *Id*. at 120-22.

On December 8, 2008, government counsel sent a letter to Lloyd Palans, then-counsel for FBBC, regarding the government's forfeiture allegation against Agriprocessors, and it provided courtesy copies of such letter to the bankruptcy trustee and his counsel. Such letter provided:

> This is a follow-up on our meeting of December 4, 2008.
>
> As we discussed, this office is considering bringing forfeiture claims which could impact certain property which is included in the bankruptcy estate of Agriprocessors, Inc. The assertion of such claims may well occur in the very near future. You have previously asked for this office's thoughts on the pursuit of such claims in view of their potential impact on a proposed sale under 11 U.S.C. § 363, and the impact on the rights of the creditors.
>
> While I wish to share some general thoughts in this regard, nothing stated in this letter should be taken as an agreement of any kind. As discussed below, any agreement would be reached at a later time with the appropriate parties.
>
> In general, this office does not wish to do anything that would impede a sale of Agriprocessors, Inc.'s assets to an appropriate purchaser. This is especially so if such a purchaser would intend to operate the Postville plant, in compliance with the law, into the future. In addition, this office does not wish to impede the distribution of the proceeds of such a sale to the

innocent creditors of the bankruptcy estate. Accordingly, any assertion of forfeiture rights should only be seen as an effort by this office to protect the ultimate interests of the United States and provide some level of certainty and predictability going forward. It is our belief that the public assertion of the government's forfeiture rights, along with clear communication with any potential purchasers or other interested parties as to the ultimate resolution of those rights, would provide the greatest level of certainty.

Against that backdrop, please be aware that this office has no present intention of executing forfeiture rights against assets which can be sold in a section 363 sale to an [arm's] length, good faith, purchaser who has no connection to the current owner of Agriprocessors, Inc., and no connection with the managers that were in place at the times of the offenses. If such a purchaser can be identified, this office would be willing to agree with that purchaser in writing to a conditional waiver of the government's forfeiture rights with regard to the assets at issue. In general, the conditions of such waiver would seek to prevent the future use of the Agriprocessors, Inc. company name and trademarks by anyone, and the future use of its assets by or for the benefit of the current owner or the managers in place at the times of the offenses. With regard to the company name and trademarks, to the extent a qualified buyer demonstrates a need to continue their use for a specified time, this office would be willing to negotiate the terms of such use.

This office has no present intention of executing forfeiture rights against any legitimate, good faith creditor seeking to assert a claim to the proceeds of a section 363 sale.

On a final note, during our December 4, 2008, meeting, you indicated that a certain potential buyer was interested in operating the Postville plant as part of [a going] concern. We have since been told that the same potential buyer would intend to close the Postville plant. As indicated above, to the extent feasible, our office remains interested in working towards a resolution that would permit the Postville plant to remain operational for years to come. Please keep us as informed as

> possible regarding the identity and interests of any potential
> purchasers.

Gov't App'x (civil docket no. 52-1) at 37-38, 90-91; Movant App'x (civil docket no. 44-1) at 84-85.

On December 10, 2008, the bankruptcy trustee filed an additional declaration that indicated: (1) he and his proposed counsel had met with the Assistant United States Attorney prosecuting the criminal case against Agriprocessors and certain of its former management; (2) he had a duty to maximize the value of the estate to afford its creditors the greatest possible recovery; (3) he believed maximum value could only be achieved through an open and transparent bankruptcy sale process that addressed the government's possible pursuit of forfeiture claims against Agriprocessors; (4) through proposed counsel, he "had been in direct and frequent communication with federal authorities . . . to discuss the parameters of a sale process that would obviate the need for the assertion of forfeiture claims"; and (5) the pending federal criminal charges and the Packers and Stockyards Act or trust fund claims by the providers of cattle and poultry to Agriprocessors would necessarily involve some compromise by the parties in interest. *See* Trustee Declaration in Support of Venue Change (bankr. docket no. 135) at 3.

On December 12, 2008, the United States Bankruptcy Court for the Eastern District of New York transferred the bankruptcy action to the United States Bankruptcy Court for the Northern District of Iowa. *See* Order Granting Transfer (bankr. docket no. 1). On December 17, 2008, the bankruptcy trustee filed a status report that disclosed: (1) he and his proposed counsel met with the United States Attorney for the Northern District of Iowa; (2) the government filed criminal charges against Agriprocessors and its December 11, 2008 superseding indictment added a forfeiture allegation which potentially put at risk Agriprocessors' assets if it was convicted of one or more offenses; (3) he and his proposed criminal counsel monitored initial federal criminal proceedings to protect the estate's interest concerning any fines or penalties that could be imposed; (4) he and his proposed

criminal counsel met with the United States Attorney for the Northern District of Iowa on several occasions to discuss the effect that the government's prosecution would have on the bankruptcy proceeding, including but not limited to a sale under 363 of the Bankruptcy Code; (5) he had been approached by no fewer than twelve parties that expressed an interest in undertaking due diligence in connection with acquiring Agriprocessors' assets; and (6) the interested parties expressed that they were concerned about the government's potential forfeiture remedy and the 363 sale process. *See* Dec. 17, 2008 Trustee Status Report (bankr. docket no. 148) at 3, 5-6.

On December 22, 2008, the government made clear that it intended to use criminal forfeiture as a means to ensure that Agriprocessors' assets did not end up being controlled by or used for the benefit of those who allowed Agriprocessors' assets to be used for criminal purposes in the past. *See* Dec. 17, 2008 Hearing Notice (bankr. docket no. 107); Gov't App'x (civil docket no. 52-1) at 119-122. Specifically, when addressing the United States Bankruptcy Court for the Northern District of Iowa, government counsel stated:

> There's been some talk about the government's forfeiture allegations and I just wanted to make clear that the government brought its forfeiture allegations because we thought it was a necessary step to, first of all, protect the government's interests going forward and provide some means so that the assets which might be subject to this 363 sale don't end up being controlled by or being used for the benefit of those who allowed these assets to be used for criminal purpose in the past.
>
> In addition, by sort of getting the issue out there we thought that this was a first step in getting the issue resolved. We've had good discussions with the [bankruptcy trustee] and [Lloyd] Palans for [FBBC] about what we see as far as a 363 sale going forward and we're confident that we're going to be able to come to terms with any potential buyer—appropriate buyer—in a way that would allow them sufficient comfort that the assets at issue aren't going to be subject to forfeiture in the future. We've also given substantial assurances to [FBBC]

> with regard to proceeds of any 363 sale—non-liquidation 363 sale.

> I do think that in general we're all on the same page and the United States doesn't want to do anything that's going to impede an appropriate sale to the appropriate purchaser under 363.

Dec. 17, 2008 Hearing Notice (bankr. docket no. 107); Gov't App'x (civil docket no. 52-1) at 119-120.

On December 23, 2008, the bankruptcy trustee sought to retain Triax Capital Advisors, LLC, for the purpose of accounting for the estate's inventory, evaluating strategic alternatives and formulating a business plan for selling and/or hypothecating the estate's assets. *See* Application to Retain Triax (bankr. docket no. 184) at 5. On January 9, 2009, Agriprocessors, through Aaron Rubashkin, filed schedules, including one that claimed the book value of its assets was $40,013,246.00 excluding depreciation. *See* Schedules and Statements (bankr. docket no. 243); Defense Sentencing Exhibit 11012 (criminal docket no. 912-313).

On January 25, 2009, the bankruptcy trustee sought an order that approved the sale of substantially all of Agriprocessors' assets, free and clear of all liens, claims and encumbrances. *See* Motion for Sale of Property (bankr. docket no. 329); *see also* Defense Sentencing Exhibit 11013 (criminal docket no. 912-314). When doing so, the bankruptcy trustee noted that he had been inundated with requests by third parties to undertake due diligence in connection with a potential transaction with the estate, entered into no less than twelve non-disclosure agreements with interested parties and endorsed Soglowek Nahariya, Ltd., which indicated it was prepared to acquire substantially all of Agriprocessors' assets for $40,000,000. *See* Motion for Sale of Property (bankr. docket no. 329). He also attached the term sheet of Soglowek Nahariya, Ltd., which was dated January 21, 2009. *See* Soglowek Term Sheet (bankr. docket no. 329-2). As a condition of purchase, Soglowek Nahariya, Ltd. stated that it would acquire Agriprocessors' assets free and clear

of all liens, claims, encumbrances, liabilities and interests, including the forfeiture allegations contained in the government's indictment dated December 11, 2008. *Id.* With respect to disclosures, Soglowek Nahariya, Ltd. stated:

> [Soglowek Nahariya, Ltd.] shall complete a disclosure statement, which shall be sworn to under the penalty of perjury . . . pursuant to 28 U.S.C. § 1746 setting forth any and all connections or affiliations of [Soglowek Nahariya, Ltd.], whether direct or indirect, express, implied, contingent or unmatured, with any creditors or other parties-in-interest in the case, including, without limitation, connections or affiliations with [Agriprocessors'] principals or members of current or former management (collectively, the "Related Parties"), including intention to employ or enter into consulting agreements with such parties post sale. The disclosure statement shall also (i) disclose whether and to what extent any Related Party will have an interest, directly or indirectly, in [Agriprocessors' assets] and/or the acquirer of [Agriprocessors' assets] following the consummation of any proposed sale transaction with [the bankruptcy trustee]; (ii) disclose [Soglowek Nahariya, Ltd.'s] post-sale intention with respect to operation of the Postville, Iowa plant and continuation of [Agriprocessors'] intellectual property, including, but not limited to, trade names and all trademarks; (iii) disclose any immigration compliance program that [Soglowek Nahariya, Ltd.] has in place or that it intends to implement post sale; and (iv) include a statement affirming that [Soglowek Nahariya, Ltd.] has not engaged in any improper conduct with actual or potential bidders for [Agriprocessors' assets].

*Id.* at 5 (footnote omitted) (formatting omitted). Soglowek Nahariya, Ltd. indicated that related parties included immediate members of the Rubashkin family and the spouses of immediate members of the Rubashkin family. *See id.*

On February 11, 2009, Soglowek Nahariya, Ltd. sent the bankruptcy trustee a letter. *See* Gov't App'x (civil docket no. 52-1) at 80; Gov't Sentencing Exhibit 5520 (criminal docket no. 912-289). In the letter, Soglowek Nahariya, Ltd. stated:

> Reference is made to the Term Sheet dated as of January 21,
> 2009 (the "Term Sheet") between you, in your capacity as
> Chapter 11 Trustee of Agriprocessors, Inc. (the "Debtor"),
> and Soglowek [Nahariya, Ltd.] setting forth the terms of the
> proposed sale of the Debtor's assets pursuant to sections 363
> and 365 of the Bankruptcy Code. The Due Diligence Period
> as to accounts receivable and inventory expires on February
> 11, 2009. Based upon the results of the due diligence
> concerning the valuation of the accounts receivable and the
> inventory, Soglowek [Nahariya, Ltd.] has concluded that it
> cannot proceed with the transaction as constituted in the Term
> Sheet. Notwithstanding this termination of the Term Sheet,
> Soglowek [Nahariya, Ltd.] remains firmly committed to
> further discussions and meetings with you to try to reach a
> mutually acceptable term sheet on terms that work for all
> parties in interest. We look forward to continuing our
> discussions with you on this important matter.

Gov't App'x (civil docket no. 52-1) at 80; Gov't Sentencing Exhibit 5520 (criminal docket no. 912-289).

On the same date, MLIC Asset Holdings, LLC,[15] a primary secured creditor, objected to the proposed sale price of $40,000,000 on the basis that it would not benefit all creditors who have seen their collateral seriously diminished or extinguished all together by Agriprocessors. *See* MLIC Objection (bankr. docket no. 425). On February 17, 2009, the U.S. Trustee also commented on the sale price of $40,000,000 and related fees. *See* U.S. Trustee Comment (bankr. docket no. 455).

On February 27, 2009, the United States Bankruptcy Court for the Northern District of Iowa entered an order approving the sale of Agriprocessors' assets at an auction. *See* Feb. 27, 2009 Order (bankr. docket no. 494). It included bid procedures, which set forth a disclosure requirement that mirrored the one that Soglowek Nahariya, Ltd. included in

---

[15] In addition to FBBC, MLIC Asset Holdings, LLC held a senior security interest that encumbered Agriprocessors' assets. Such interest amounted to approximately $10,000,000. MLIC Asset Holdings, LLC is also known as Metropolitan Life Insurance Company and MetLife.

its term sheet. *Id*. at 4. On March 4, 2009, the bankruptcy trustee submitted an asset purchase agreement form, which included a disclosure requirement as outlined in the February 27, 2009 order. *See* Asset Purchase Agreement (bankr. docket no. 507-1).

On March 17, 2009, MLIC Asset Holdings, LLC and the bankruptcy trustee entered into a stipulation concerning the right to enter a credit bid at the auction of Agriprocessors' assets. *See* Mar. 17, 2009 Stipulation (bankr. docket no. 567). Additionally, MLIC Asset Holdings, LLC renewed its objection to the sale of Agriprocessors' assets on the basis that it could not reasonably make a credit bid at auction because no mechanism operated to allow it to accurately determine how net proceeds of the sale would be allocated. *See* MLIC Conditional Objection (bankr. docket no. 568).

Several parties submitted bids in connection with an auction that occurred on March 23 and March 24, 2009, but FBBC and MLIC Assets Holdings, LLC made credit bids for their collateral in the amount of $20,000,000 and $6,500,000, respectively. *See* Sale Motion (bankr. docket no. 678); Supplemental Sale Motion (bankr. docket no. 802). The auction concluded upon the primary secured creditors making credit bids, which reflected their unwillingness to accept the consideration being offered by the bidders at the auction. Consequently, the bankruptcy trustee did not accept any of the bids submitted and did not request a final order approving the sale.

On April 19, 2009, Soglowek Nahariya, Ltd. and others, including Nathan Tzivin, came back to the table and made an offer to purchase Agriprocessors for $17,000,000, payable on June 1, 2011, and rent of $3,000,000 per year or $250,000 per month until June 1, 2011. *See* Sentencing Transcript (criminal docket no. 936) at 92-93; Defense Sentencing Exhibits 11127, 11128 & 11129 (criminal docket nos. 912-264, 912-265 & 912-266). Either the bankruptcy trustee or FBBC rejected it. *See* Sentencing Transcript (criminal docket no. 936) at 92-93; Defense Sentencing Exhibit 11128 (criminal docket no. 912-265).

On June 23, 2009, the bankruptcy trustee again sought to sell substantially all of Agriprocessors' assets to another party, that is, SHF Industries, LLC. *See* Supplemental Sale Motion (bankr. docket no. 802). When doing so, the bankruptcy trustee stated that SHF Industries, LLC, would be required to provide a disclosure statement, which again substantially followed the disclosure statement that Soglowek Nahariya, Ltd. included in its term sheet. *Id*. at 5. The bankruptcy trustee also observed that several parties negotiated with the primary secured parties and obtained their consent to the proposed sale to SHF Industries, LLC. *Id*.

On July 1, 2009, government counsel responded to a June 24, 2009 inquiry about a proposed sale of equipment. *See* Gov't App'x (civil docket no. 52-1) at 27. Government counsel clarified that, although the government would not enter into the proposed certification, it did not intend to assert any forfeiture rights against the sale of the identified equipment and any proposed purchaser of the equipment should feel free to call if questions arose. *Id*.

Prior to the sale of Agriprocessors' assets, the government and SHF Industries, LLC, discussed a disclosure statement that would be included as part of the final sale order of the United States Bankruptcy Court for the Northern District of Iowa. On July 13, 2009, government counsel emailed Anita Shodeen, then-counsel for SHF Industries, LLC, in an effort to determine the status of the disclosure statement because the contents of such statement would allow the government to address its significant and varied interests and determine the position it would take at a hearing scheduled for July 15, 2009. *Id*. at 8-9. In response, Anita Shodeen sent the government the disclosure statement and indicated that her client would sign it prior to the July 15, 2009 hearing. *Id*. at 8. In relevant part, the disclosure statement provided:

> [SHF Industries, LLC,] does not have any connections or affiliations, whether direct or indirect, express, implied, contingent or unmatured, with any creditors or other parties-in-interest in the captioned Bankruptcy Case, including

connections or affiliations with Related Parties (as defined in the Bid Procedures) as set forth in the Order.

. . .

[SHF Industries, LLC, or an assignee of SHF [Industries, LLC,] may, following the closing of the transaction contemplated by the Order entered by this Court related to the Sale of Assets pursuant to 11 U.S.C. §[ ]363 as submitted by the [bankruptcy trustee] in the captioned Bankruptcy Case, employ, or enter into consulting agreements with, certain parties-in-interest in the captioned Bankruptcy Case that are currently employed by [Agriprocessors].

None of the Related Parties will have an ownership interest, directly or indirectly, in the Assets and/or [SHF Industries, LLC, or an assignee of SHF Industries, LLC,] following the consummation of the transaction contemplated by the Order.

. . .

[SHF Industries, LLC,] intends to continue to operate the plant located in Postville, Iowa following the consummation of the transaction approved by the Court pursuant to 11 U.S.C. § 363.

Pursuant to its Offer[, SHF Industries, LLC, or an assignee of SHF Industries, LLC,] will acquire all of the intellectual property of [Agriprocessors], including all trademarks and tradenames owned by [Agriprocessors]. [SHF Industries, LLC, or an assignee of SHF Industries, LLC,] may continue to use such intellectual property following the consummation of the transaction set forth in the Court Order.

[SHF Industries, LLC, or an assignee of SHF Industries, LLC,] intends to adopt, promptly following the consummation of the transaction contemplated by its Offer and the Court Order a comprehensive screening and compliance program for the retention of employees and to ensure compliance with all immigration laws and regulations.

*Id*. at 10-12.

On July 14, 2009, government counsel sent Anita Shodeen a letter, which, in pertinent part, stated:

> This is to confirm our office's telephone conversation of May 21, 2009, with you and representatives of SHF Industries, LLC, including Mr. Hershey Friedman, and the July 7, 2009, telephone conversation involving me, [another government counsel], and you.
>
> We understand the bankruptcy trustee for Agriprocessors, Inc., has recently accepted your client's bid to purchase certain assets from the bankruptcy estate and that a hearing to approve the sale of those assets is scheduled for this week.
>
> As we have discussed, our office is interested in seeing the Agriprocessors, Inc. business sold to an individual or entity that intends to continue to operate the meat slaughtering and processing plant in Postville, while abiding by all applicable laws and regulations. It is our hope that such a business will serve as a source of economic strength for the region and will help secure Postville as a vibrant community for future generations.
>
> We have been pleased to hear that your client shares our interest in strengthening the community of Postville by continuing to operate and improve the Postville plant as a going concern. We are also assured by the representations that neither your client nor the purchasing entity are currently, nor will become, associated in the purchase or operation of the plant, including through any financial or management interest or arrangement, with any of the previous owners or plant managers, including those charged with criminal offenses. As you know, this relates to our concern that any person involved in previous criminal wrongdoing not be permitted to circumvent the forfeiture laws through bankruptcy, or otherwise benefit or enrich themselves through the use, acquisition, or disposition of any financial or management interest in assets subject to forfeiture.
>
> Finally, as we have discussed, and as you have previously acknowledged in conversations, it remains our position that any forfeiture interest of the United States will remain

unaffected by the bankruptcy process. However, we are certainly willing to continue to discuss any matters related to forfeiture and, in particular, the orderly disposition of trademarks and trade names. With regard to those matters, we are confident that we can reach agreement with your client along the lines of our previous discussions.

*Id*. at 5-6, 14-15, 64-66; Movant App'x (civil docket no. 44-1) at 118-19.

On July 15, 2009, Thomas Miller, a Deputy Attorney General of Iowa, emailed the government. In his email, he stated:

Your office has been involved in the Agriprocessors bankruptcy proceedings, and has held talks with [the bankruptcy trustee] and the major creditors. Based upon my conversations with both of you over the past several months, it is my understanding that it has been the U.S. Attorney's position that the federal forfeiture action, which threatens to seize all of the assets of Agriprocessors, will act as a safeguard against the possibility of a sale to anyone who might have inappropriate connections with [the movant] or any of those who have been engaged with [the movant] in the matters which are the subject of your indictments.

I telephoned [government counsel] last week regarding the impending sale, and learned that while your office has not done any independent investigation of the proposed purchaser, nevertheless you have spoken with [the bankruptcy trustee] and others and have found no reason to believe that he is connected with the Rubashkin family. Moreover, it is my understanding that you are satisfied that your pending forfeiture action, coupled with the certification that the purchaser must file under oath in order to complete the sale, should suffice to protect against that possibility.

Late yesterday we received a telephone call from an individual known to us to have a longstanding family background in the kosher meat processing business. The caller informed us that there is circulating within the kosher consumer community a claim that the purchaser has plans to enter into consulting contracts, or other business relationships, with one or more members of the Rubashkin family immediately following the

sale. I checked yesterday afternoon with the U.S. Trustee and learned that while the sale is scheduled to proceed at the hearing in bankruptcy court this afternoon, that it remains unknown to either [the bankruptcy trustee] or Mr. [Habbo] Fokkena just who it is that the Friedman group intends to employ to manage this plant. Since the purchaser's background is apparently in plastics and real estate, and not in meat processing, this last fact would seem to add weight to the above-mentioned concern. I also gathered from Mr. [Habbo] Fokkena that the expected certification would not necessarily prevent the purchaser from entering into such a consulting arrangement.

As you know, I am not a bankruptcy expert, and I do not even know whether the information received yesterday is accurate. If the information is accurate, it may conceivably even describe a legitimate business relationship for all I know. Nevertheless, any concealed relationship that the purchaser might presently have with the Rubashkin family, whatever its nature, would potentially raise serious concerns which I am sure you would share. Accordingly, I wanted to get this information to you as soon as possible.

Gov't App'x (civil docket no. 52-1) at 25-26; Movant App'x (civil docket no. 44-1) at 116-17. In response, government counsel provided a copy of the disclosure statement that the buyer, SHF Industries, LLC, prepared and expressed that it made SHF Industries, LLC, aware of the government's position that bankruptcy proceedings would not adversely impact the government's forfeiture rights. *See* Gov't App'x (civil docket no. 52-1) at 25. In addition, government counsel made clear that there were limits as to what the government could do to affect the sale and it had a strong interest in seeing that a buyer acquire and lawfully operate the plant for the benefit of the community. *Id.*

On July 16, 2009, Anita Shodeen asked government counsel whether the government thought additional language should be included in the findings of the bankruptcy order or whether attaching the disclosure statement to the bankruptcy order would be sufficient. *Id.* at 16. On July 17, 2009, government counsel emailed Anita

Shodeen to resolve concerns that it expressed in the July 14, 2009 letter. *Id*. Specifically, government counsel asked Anita Shodeen to include the following language in the proposed bankruptcy order:

> [SHF Industries, LLC,] agrees that [SHF Industries, LLC], its agents, assignees, and any subsequent recipient or transferee of assets acquired by [SHF Industries, LLC,] pursuant to this order, shall be obligated for a period of five years from the date of this order to disclose the amount, date, and method of any payment or other consideration given, or any agreement to make a future payment or to provide other consideration, to any related party (as defined in the Bid Procedures). Such disclosure must be made to the United States Attorney's Office for the Northern District of Iowa not later than the date of the payment or other consideration is given or the date an agreement is reached to do so in the future.

> Further, [SHF Industries, LLC,] acknowledges that the forfeiture interest of the United States will remain unaffected by the sale of assets pursuant to this order and the provisions of 11 U.S.C. § 363(f).

*Id*.

On July 20, 2009, the United States Bankruptcy Court for the Northern District of Iowa entered an order approving the sale of substantially all of the assets, free and clear of all liens, interests, claims and encumbrances, to SHF Industries, LLC. *See* July 20, 2009 Order (bankr. docket no. 873); Gov't App'x (civil docket no. 52-1) at 42; Sentencing Transcript (criminal docket no. 936) at 34; Defense Sentencing Exhibit 11019 (criminal docket no. 912-225). Before entering its sale order, the United States Bankruptcy Court for the Northern District of Iowa, among other things, observed that the consideration provided by SHF Industries, LLC, that is, $8,500,000, constituted reasonably equivalent value and fair consideration under the law, referenced pertinent parts of the disclosure statement and stated that SHF Industries, LLC, in its sole discretion, could employ any of Agriprocessors' employees. *See* July 20, 2009 Order (bankr. docket no. 873) at 4, 9-11,

16.[16]  The United States Bankruptcy Court for the Northern District of Iowa attached the disclosure statement, which Daniel Hirsch signed on July 15, 2009, to its sale order but did not include in such order the provision that remained in place for five years and required SHF Industries, LLC, to disclose to the government any compensation or other payment provided by SHF Industries, LLC, to parties related to the bankruptcy action.

On the same date, government counsel emailed Anita Shodeen to express the government's dissatisfaction with the lack of input it had with respect to the sale order. *See* Gov't App'x (civil docket no. 52-1) at 18.  In response, Anita Shodeen stated that the record sufficiently represented the cooperation between the parties.  *Id.*  On July 21, 2009, Anita Shodeen emailed government counsel about several concerns, and government counsel again expressed dissatisfaction about the requested language being omitted from the sale order.  *Id.* at 21-24.

Consistent with the sale order, SHF Industries, LLC, purchased substantially all of Agriprocessors' assets, free and clear of all liens, interests, claims and encumbrances. SHF Industries, LLC, however, did not purchase Agriprocessors' pre-petition inventory or accounts receivable.  *See* May 12, 2009 Order (bankr. docket no. 723); July 30, 2009 Order (bankr. docket no. 897); Defense Sentencing Exhibit 11017 (criminal docket no. 912-223).  Daniel Hirsch's son-in-law, Hershey Friedman, became the chief executive officer of Agriprocessors.

The government never obtained any property associated with Agriprocessors' bankruptcy estate as a result of pursuing the forfeiture allegations that it included in the indictments in the underlying criminal case.  Although it chose not to pursue forfeiture under criminal statutes, the government relied on civil forfeiture provisions when it asserted that life insurance proceeds, in which Aaron Rubashkin was a potential trust

---

[16] Regarding the credit bid of $8,500,000, the United States Bankruptcy Court for the Northern District of Iowa directed $6,500,000 to be paid to MLIC Assets Holdings, LLC and $2,000,000 to be paid to FBBC.

beneficiary, constituted property that was either involved in money laundering or derived from the unlawful harboring of illegal aliens. *See* Movant App'x (civil docket no. 44-1) at 49; Sentencing Transcript (criminal docket no. 936) at 68-69; Gov't App'x (civil docket no. 52-1) at 92-114. The parties reached a settlement pursuant to which the Aaron Rubashkin Trust agreed to forfeit $661,592.64 in cash value to the United States for money laundering in violation of 18 U.S.C. § 1957 and the government agreed to forgo forfeiture of $100,000 in additional cash value. *See* Gov't App'x (civil docket no. 52-1) at 115-18.

On April 21, 2010, the movant amended his sentencing memorandum, asserting that:

> [P]art of FBBC's actual loss stems from governmental interference amounting to misconduct. The government has not accused Aaron Rubashkin of any federal crime relating to Agriprocessors. Yet, during and prior to the bankruptcy, the [United States] Attorney's Office for the Northern District of Iowa insisted that none of the Rubashkin family retain an ownership interest in the company. Agriprocessors' sole owner was Aaron Rubashkin, whose name had immense value and good will in the Orthodox Jewish community. The government's position had the effect—foreseeable to the government but not the [movant]—of reducing the sale or liquidation value of Agriprocessors.

Amended Sentencing Memorandum (criminal docket no. 895) at 39.

On the same date, defense counsel emailed the government. *See* Gov't App'x (civil docket no. 52-1) at 3-4. Such email, in relevant part, stated:

> Pursuant to the local rules, I hereby make request for voluntary production of the [following] exculpatory sentencing information pertaining to the above case prior to sentencing, which is currently set for April 28, 2010:
>
> The Terms/Agreement the Buyers of Agriprocessors had to Sign Per Federal Requirement.
>
> The foregoing are requested in light of the principles of constitutional law. *See, e.g.,* [*Brady*, 373 U.S. at 83] ("suppression by the prosecution of evidence favorable to the

accused upon request" is violative of the Due Process Clause
of the Fourteenth Amendment where such evidence is material
to guilt or punishment).

*Id*. at 3 (formatting omitted). On April 22, 2010, government counsel spoke with defense

counsel and sent the following email:

[A]s we discussed—I am not aware of any agreement of the
sort you describe. Here is the letter I mentioned in our phone
call just now.

*Id*. The July 14, 2009 letter to Anita Shodeen was attached to the government's email.

*See id*. at 5-6. On April 23, 2010, government counsel again emailed defense counsel.

The email, in relevant part, stated:

[Y]ou recently requested "The Terms/Agreement the Buyers
of Agriprocessors had to Sign Per Federal Requirement." As
we discussed yesterday by telephone, I am unaware of any
such agreement—however I did send you a letter that
[government counsel] sent to [Anita Shodeen] on the subject.
As I have already explained to you by telephone, we do not
agree that we are under any obligation to provide such
information. Nonetheless, I am providing some additional
communications that may relate to the general topic of your
inquiry (see attached).

*Id*. at 7. The government's attachments included: (1) the July 1, 2009 correspondence

between the government and counsel who represented the seller of equipment; (2) the July

13, 2009 correspondence between the government and Anita Shodeen; (3) the disclosure

statement of SHF Industries, LLC; (4) the July 14, 2009 letter to Anita Shodeen; (5) the

July 15, 2009 correspondence between the Deputy Attorney General of Iowa and the

government; (6) the July 16, 2009 and July 17, 2009 correspondence between Anita

Shodeen and the government; and (7) the July 20, 2009 and July 21, 2009 correspondence

between the government and Anita Shodeen. *See id*. at 8-28, 59-79; Defense Sentencing

Exhibit 11023 (criminal docket no. 912-232).

On April 27, 2010, the government notified defense counsel that additional information would be added to the discovery file. *See* Gov't App'x ( civil docket no. 52-1) at 36. Specifically, it referred to the December 8, 2008 letter to Lloyd Palans and attached such letter to its email. *Id*. at 36-38.

During the sentencing hearing that the court held between April 28, 2010 and April 30, 2010, the parties, among other things, presented evidence regarding the government's forfeiture position and its impact on the sale of Agriprocessors. Specifically, defense counsel elicited the following testimony from FBI Special Agent Randy Van Gent:

> Q.   In fact, one of the conditions of disposition of the plant, from as early as perhaps November of 2008, from the US Attorney's Office was no buyer could have any involvement with [the movant] or any other members of his family, true?
>
> A.   I know the US Attorney's Office was concerned that any future buyer—the concern was that—that a future buyer may be bidding on behalf of the [movant] and/or his family, and so that's a concern that the US Attorney's Office had, yes.
>
> Q.   And so there was a no-Rubashkin edict that was public knowledge among—in the bankruptcy and prospective bidders, correct?
>
> A.   I wouldn't describe it as a no-Rubashkin edict. I would describe it as I have, that there was a concern about that issue.

*Id*. at 48; Sentencing Transcript (criminal docket no. 936) at 56. Defense counsel introduced as exhibits the July 1, 2009 correspondence between the government and counsel who represented the seller of equipment, the July 13, 2009 correspondence between the government and Anita Shodeen, the disclosure statement of SHF Industries, LLC, the July 14, 2009 letter to Anita Shodeen, the July 15, 2009 correspondence between the Deputy Attorney General of Iowa and the government, the July 16, 2009 and July 17, 2009 correspondence between Anita Shodeen and the government and the July 20, 2009

and July 21, 2009 correspondence between the government and Anita Shodeen (collectively "bankruptcy documents"), and asked FBI Special Agent Randy Van Gent questions concerning the bankruptcy documents. *See* Sentencing Transcript (criminal docket no. 936) at 60-63; Defense Sentencing Exhibit 11023 (criminal docket no. 912-232). Aside from asking questions concerning the involvement that a buyer of Agriprocessors could have with the movant or his family, defense counsel sought to explore why a potential buyer might have withdrawn a bid during bankruptcy proceedings. Upon being questioned, FBI Special Agent Randy Van Gent testified that Soglowek Nahariya, Ltd. withdrew a $40,000,000 bid for Agriprocessors because it "was concerned about the accuracy of Agriprocessors' financial numbers." Gov't App'x (civil docket no. 52-1) at 50; Sentencing Transcript (criminal docket no. 936) at 65. On redirect, the government emphasized FBI Special Agent Randy Van Gent's testimony concerning the reason Soglowek Nahariya, Ltd. withdrew its bid by admitting the February 11, 2009 letter from Soglowek Nahariya, Ltd. to the bankruptcy trustee. *See* Gov't App'x (civil docket no. 52-1) at 55, 80; Sentencing Transcript (criminal docket no. 936) at 85.

Aside from questioning FBI Special Agent Randy Van Gent, the government questioned Paula Roby, who served as counsel for the bankruptcy trustee. *See* Gov't App'x (civil docket no. 52-1) at 81-89; Sentencing Transcript (criminal docket no. 937) at 485-519. When testifying, Paula Roby generally indicated the following:

> The bankruptcy trustee and his counsel confronted an extremely complex bankruptcy process involving Agriprocessors.
>
> Immigration issues were a matter of great concern because the bankruptcy action sought to maintain Agriprocessors as an operating business.
>
> She originally focused on the collection of accounts receivable, the necessary investigation, the auction procedures and the prospective buyers.

Her focus ultimately shifted to pursuing preferences, fraudulent transfers, transfers to insiders and recoupment of money for creditors.

The bankruptcy trustee's overreaching goal was to maximize the value of the bankruptcy estate and the return to creditors.

The bankruptcy trustee pursued other goals such as running day-to-day operations at Agriprocessors, continuing to obtain DIP financing and ensuring that Agriprocessors' employees continued to have jobs.

The bankruptcy estate would be forced to liquidate if Agriprocessors ceased to operate as a going concern and creditors would only receive pennies on the dollar if Agriprocessors shut down.

Several things that came to light, including the fraudulent accounts receivable, the fraudulent inventory numbers and the overall criminal scheme, greatly reduced the value of Agriprocessors.

The situation that the bankruptcy trustee confronted involved an absence of individuals who could or would provide information.

Fairly early after the bankruptcy trustee took over it became clear that Agriprocessors would not be able to collect its accounts receivable and the full extent of the problem associated with the accounts receivable would be difficult to determine.

She spent a considerable amount of time with prospective bidders, including Eli Soglowek.

The bankruptcy trustee and his counsel initially "freaked out" and worried when they learned about the government's criminal forfeiture allegation because they believed that it could have a chilling effect on prospective buyers.

The bankruptcy trustee immediately contacted the United States Attorney's Office, and all parties agreed that it would be best if prospective bidders would communicate directly with the government.

She held the opinion that the government's forfeiture position did not have an affect on prospective bidders.

She attended a meeting that included Eli Soglowek, his attorney, Bill Fish, one of Bill Fish's associates and several members of the government's team; either Eli Soglowek or someone associated with him asked many questions about the government's forfeiture allegations; the government's team asked either Eli Soglowek or someone associated with him questions; Eli Soglowek and those associated with him seemed very satisfied with the responses that they had received from the government's team.

The bankruptcy trustee and his counsel sent many prospective bidders to the United States Attorney's Office and many of them, including Eli Soglowek, indicated that they intended to keep Rubashkin family members as advisors or senior management.

Eli Soglowek indicated during the meeting with the government's team that he felt Heshy Rubashkin was a "crucial part of the organization" and Aaron Rubashkin was an "absolutely indispensable advisor," and, in response, the government told him that having them involved was not a deal breaker.

She met with Hershey Friedman because he had many concerns about the value of Agriprocessors, including but not limited to considerable concerns about the inventory, the accounts receivable and the wastewater treatment plant, and he only spoke about the government's right to forfeiture in a passing manner.

She was not aware of any agreement that prevented a buyer from hiring the Rubashkins.

The bidding procedures included a provision that required bidders to disclose their connections with several parties, including related parties and anyone involved in Agriprocessors, to qualify as a bidder.

Such disclosure ensured that the bankruptcy trustee could provide the United States Bankruptcy Court for the Northern

District of Iowa with a good faith assurance that he had qualified bidders.

The question of related parties is a concern that needs to be addressed in bankruptcy proceedings.

Neither the bankruptcy trustee nor FBBC destroyed a substantial amount of inventory.

The bankruptcy trustee and his counsel did what they determined to be in the best interests of the bankruptcy estate and did not do anything because the government gave a directive.

Eli Soglowek withdrew his $40,000,000 offer because he and/or others associated with him discovered inflated inventory numbers and inflated accounts receivable when conducting due diligence and determined that $40,000,000 was not a reasonable amount to offer for Agriprocessors.

Eli Soglowek and/or others associated with him sent a follow-up letter indicating that some level of interest in Agriprocessors still existed, but nothing else ever occurred after the letter was sent and no dollar amount was associated with his letter of interest.[17]

Heshy Rubashkin continued to work at Agriprocessors until at least the last day that the bankruptcy trustee was onsite.

See Gov't App'x (civil docket no. 52-1) at 81-84; Sentencing Transcript (criminal docket no. 937) at 485-99.

After the government finished asking Paula Roby questions as part of its rebuttal case, a lengthy colloquy between the movant's counsel and Paula Roby ensued. It generally revealed the following:

In January of 2009, the bankruptcy trustee received the $40,000,000 stalking-horse bid from Soglowek Nahariya, Ltd.

---

[17] The court notes that, to the extent Paula Roby is referring to April 19, 2009 offer, it did include specific terms.

The government enumerated specific instances of inflated accounts receivable in multiple counts included within the fourth superseding indictment.[18]

The government sought forfeiture in the fourth superseding indictment.[19]

The issue of forfeiture had been discussed prior to the date that the bankruptcy trustee received the stalking-horse bid from Soglowek Nahariya, Ltd.

The physical plant, the inventory, the accounts receivable, the trademarks and the name recognition all added to Agriprocessors' value.

To Paula Roby's knowledge, no edict prevented any purchaser from being involved with Aaron Rubashkin.

Some discussions occurred because the government was concerned about someone buying on behalf of Aaron Rubashkin.

At the meeting that included Eli Soglowek, his attorney, Bill Fish, one of Bill Fish's associates and several members of the government's team, Eli Soglowek and the bankruptcy trustee made it clear that they saw Aaron Rubashkin as an indispensable advisor, and the government told them that his involvement was not a deal breaker.

---

[18] The court notes that defense counsel's question implied that the government filed a fourth superseding indictment in which it outlined numerous instances of inflated accounts receivable shortly after Soglowek Nahariya, Ltd. and the bankruptcy trustee entered into a term sheet on January 21, 2009. But, the grand jury returned the fourth superseding indictment on January 15, 2009. Further, the government first alleged in its November 20, 2008 second superseding indictment that the movant committed bank fraud when he unlawfully diverted customer payments on accounts receivable and caused Agriprocessors' books to reflect an inflated amount for accounts receivable.

[19] The court notes that defense counsel's question implied that the government sought forfeiture shortly after Soglowek Nahariya, Ltd. and the bankruptcy trustee entered into a term sheet on January 21, 2009. But, the government first alleged forfeiture in its December 11, 2008 third superseding indictment.

Although Paula Roby could not recall the date that the meeting with Eli Soglowek took place, Paula Roby believed it occurred after January but before Eli Soglowek came back in April of 2009 to again try to buy Agriprocessors, before a party offered to pay $3,000,000 per year in rent and $17,000,000 on June 1, 2011, before the initial auction that occurred on March 23, 2009 and March 24, 2009 and before Soglowek Nahariya, Ltd. entered its $40,000,000 bid.[20]

The bankruptcy trustee received numerous offers that never materialized.

The movant had nothing to do with the offers that failed to materialize.

Paula Roby did not know whether the exposure of inflated accounts receivable in the fourth superseding indictment caused FBBC to act out of a concern for contributions that allowed Agriprocessors to keep operating.

Paula Roby was aware that the rumor of forfeiture was in existence before the grand jury returned the January 15, 2009 fourth superseding indictment.

Such rumor created some uncertainty among potential buyers, and, as a result, the bankruptcy trustee wanted to start a dialogue with the United States Attorney's Office to figure out if there was a way to make prospective buyers comfortable.

The government never told Paula Roby that it would not seek forfeiture before January 15, 2009.

There was a rumor in the business community that there was going to be a forfeiture allegation and ultimately there was a forfeiture allegation.

---

[20] When trying to approximate the date of the meeting with Eli Soglowek, Paula Roby provided inconsistent testimony. The meeting actually took place on February 6, 2009, which is consistent with Paula Roby's testimony that it did not occur in January because her son was in the hospital at that time. The meeting, however, occurred after Soglowek Nahariya, Ltd., entered into a term sheet on January 21, 2009. Additionally, there appeared to be some confusion about whether Eli Soglowek or another party offered to pay $3,000,000 per year in rent and $17,000,000 on June 1, 2011.

Paula Roby did not know whether there was a rumor in the business community that Aaron Rubashkin was prohibited from being involved in Agriprocessors.

The bankruptcy trustee and those individuals who he hired to help him "worked very, very hard to dispel any rumors" that were in the community and to market the sale of Agriprocessors as vigorously as possible.

During discussions that the bankruptcy trustee and his counsel had with the government prior to the return of the January 15, 2009 fourth superseding indictment, the government was very clear that the bankruptcy trustee could be facing forfeiture allegations.

The trademarks that the Rubashkins spent almost eighteen years building had value and were transferred to SHF Industries, LLC.

The government repeatedly assured potential buyers, who were qualified, that it would not seek to forfeit the trademarks.

Paula Roby did not know why the government expressed in its July 14, 2009 letter to Anita Shodeen that it appreciated that SHF Industries, LLC, did not intend to be associated with any person involved in the previous criminal wrongdoing at Agriprocessors.

Agriprocessors' upper management, including Heshy Rubashkin, Chaim Abrahams and Gary Norris, remained largely undisturbed.

Paula Roby could only speak about what she witnessed during the bidding and the bankruptcy case.

The government never asserted a prohibition that prevented charged management from being involved with a new purchaser, and the government gave "the thumbs up" every time the bankruptcy trustee sent a prospective bidder to the United States Attorney's Office.

It was not true that every potential bidder that the bankruptcy trustee sent over to the United States Attorney's Office already qualified because all of them had already agreed not to use any of the charged defendants or Aaron Rubashkin.

It was true that Eli Soglowek made it clear that he saw Heshy Rubashkin and Aaron Rubashkin as indispensable and Eli Soglowek was told that their involvement was fine.

Paula Roby did not have an understanding as to whether the government would allow Eli Soglowek to purchase Agriprocessors and re-install Aaron Rubashkin because nobody posed that question.

Paula Roby did hear questions regarding individual involvement, and, in response to the questions posed, the government gave assurances.

Paula Roby did not recall if anyone disclosed at the stalking-horse deal in January of 2009 that Eli Soglowek or others associated with him wanted some related party other than Heshy Rubashkin to be involved.

No prospective bidder or qualified bidder sought to involve themselves with Aaron Rubashkin.

Prospective bidders expressed concern about losing Rubashkin-related trademarks in forfeiture proceedings, and the bankruptcy trustee and his counsel set up meetings with the government so that they could have their concerns addressed by the government.

Paula Roby did not recall whether government counsel told Meyer Eichler and another member of the board of directors for LibertyPointe Bank in March of 2009 that they would be subject to prosecution if any member of the Rubashkin family had an ownership interest or management role.

Paula Roby did recall that government counsel told Meyer Eichler and the other board member that it would be permissible to hire Heshy Rubashkin.

Paula Roby thought that there was some discussion of the concern held by the bankruptcy trustee and the government that someone could make an offer on behalf of the family and that the subject of equity could have come up at the meeting in March of 2009.

Paula Roby did not recall a particular discussion about management roles because almost every potential purchaser,

if not every potential purchaser, indicated a desire to have Rubashkins in management.

Paula Roby had a hard time testifying about a "rumor[] in the wind" that there was a particular prohibition against Aaron Rubashkin, that is, a no-Aaron Rubashkin edict, and observed that the "grapevine can be a very unreliable thing."

The bankruptcy trustee followed the bid procedures, which required prospective buyers to disclose any relationship to a related party.

The July 15, 2009 letter from the Deputy Attorney General of Iowa indicated that government counsel had a discussion about the seizure of assets in conjunction with any inappropriate connections to the movant.

*See* Gov't App'x (civil docket no. 52-1) at 84-89; Sentencing Transcript (criminal docket no. 937) at 499-519.

Lastly, Paula Roby testified that the bankruptcy trustee did everything he could do to maximize the value of the bankruptcy estate and FBBC did everything it could do to maximize the value of its collateral. *See* Gov't App'x (civil docket no. 52-1) at 89; Sentencing Transcript (criminal docket no. 937) at 518-19. She stated that FBBC's efforts included but were not limited to providing DIP financing so that Agriprocessors could be sold as a going concern. *See* Gov't App'x (civil docket no. 52-1) at 89; Sentencing Transcript (criminal docket no. 937) at 518-19.

Steve Cohen also testified during the sentencing hearing. *See* Sentencing Transcript (criminal docket no. 937) at 530-36. He maintained that, in December of 2008 or January of 2009, he spoke with the bankruptcy trustee and learned that Rubashkins could not be involved in any acquisition. *Id*. at 531. He also stated that he considered the Rubashkins to be an important component in keeping Agriprocessors viable and such consideration and several other reasons caused him not to make an offer. *Id*. at 534. He thought that the prohibition against having Aaron Rubashkin involved in a successor corporation reduced

the value of Agriprocessors by millions of dollars because Aaron Rubashkin would be unable to tell him how to go forward. *Id*. at 535-36.

Based on the evidence admitted during the sentencing hearing, the movant argued that the government threatened forfeiture of Agriprocessors' assets and the loss amount reflected the government's misconduct. *See* Sentencing Transcript (criminal docket no. 936) at 33-95; Sentencing Transcript (criminal docket no. 937) at 485-519; Defense Sentencing Exhibits 11000-11030, 11127-11131 (criminal docket nos. 912-301-912-315, 912-221-912-239 & 912-264-912-268). Specifically, at the conclusion of the sentencing hearing, defense counsel asserted:

> The events that took place well after [the movant] left the business, the conduct of the bankruptcy trustee, the conduct of others, including the United States Attorney for the Northern District of Iowa—demanding that there be no Rubashkins involved in the sale of the business, as clearly set forth in [the bankruptcy documents], quite directly stating, contrary to the last witness's testimony, [Paula] Roby, the government insisted there be no Rubashkins involved, and as we've discussed in our papers, further caused a loss that [the movant] could not have foreseen.

Sentencing Transcript (criminal docket no. 937) at 568.

After the sentencing hearing, the movant filed a summary of his sentencing exhibits. *See* Summary of Sentencing Exhibits (criminal docket no. 905). He described the import of the bankruptcy documents in the following manner:

> The [g]overnment's prohibition against future involvement by a purchaser with Aaron Rubashkin and the looming forfeiture proceedings substantially devalued the company and caused FBBC loss of recovery. It was not reasonably foreseeable to [the movant] that the [g]overnment would act in the manner that would naturally and proximately cause the company to lose value and reduce FBBC's recovery in any sale of the company.

*Id*. at 10. Additionally, the movant offered the affidavit of Meyer Eichler as an exhibit, and described it in the following manner:

> Meyer Eichler expressed interest in finding a group of investors to purchase Agriprocessors[.] His affidavit details the [government's] threat of prosecution and Rubashkin family prohibition which occurred even though Aaron Rubashkin was never charged with any federal crime relating to Agriprocessors. The decisions to file forfeiture charges against Agriprocessors and forbid involvement by Aaron Rubashkin in the purchase of the company from the [bankruptcy trustee] diminished the value of Agriprocessors' sale value, trademark value and good name in the market. These decisions were unforeseeable to [the movant], and caused diminution of value of Agriprocessors which directly affected FBBC's ability to recover as one of the two lead secured creditors.

*Id*. at 9. The court admitted all of the movant's exhibits without objection. *See* Gov't App'x (civil docket no. 52-1) at 57; Sentencing Transcript (criminal docket no. 936) at 92. In his affidavit dated April 9, 2010, Meyer Eichler declared:

> In March 2009, I traveled to Cedar Rapids, Iowa, together with a member of LibertyPointe Bank's Board of Directors and LibertyPointe Bank's outside counsel. We met with [government counsel]. We told [him] that a group of investors was interested in purchasing Agriprocessors.

> [Government counsel] forewarned us in no uncertain terms that if he (or members of his office) were to discover that any member of the Rubashkin family had either an equity interest or a management role in the company after we purchased it, the US Attorney's Office would not allow this. [Government counsel] made it clear that this exclusion applied to all members of the Rubashkin family, not just to [the movant]. We understood from [government counsel's] statement that if any member of the Rubashkin family were to have an ownership interest or a management role in the company after we purchased Agriprocessors, the Department of Justice would pursue this and we would be subject to prosecution.

I asked [government counsel] whether the prohibition extended to regular employees. Could we, for example, hire Mr. Heshy Rubashkin as an employee? [Government counsel] told us it would be permissible to hire Mr. Heshy Rubashkin as an ordinary employee, but not as a manager.

In the months following my meeting with [government counsel], I had several conversations with . . . the bankruptcy trustee. During that time, we were in discussions with parties who were interested in purchasing Agriprocessors.

Ultimately, however, the exclusion of Rubashkin family members pronounced by the US Attorney's Office prevented the group of investors from making a formal offer for the company. While the parties that we were in discussions with had the financial wherewithal to consummate a deal that we believed would be acceptable to [FBBC] and the [bankruptcy] trustee, due to the admonition from the US Attorney's office the investors were unable to put together a management team that they felt had sufficient experience in the kosher meat-processing industry.

Agriprocessors was the largest kosher meat-processing plant in the country. The Rubashkin family's extensive experience and knowledge of the industry were extremely difficult to replicate. By forbidding all members of the Rubashkin family from having any type of management role in the company, the US Attorney's Office made it virtually impossible for us to put together a management team with the experience and knowledge necessary (a) to satisfy our investors and (b) to successfully operate such a business.

Gov't App'x (civil docket no. 52-1) at 137-39 (formatting omitted); Movant App'x (civil docket no. 44-1) at 46-48 (formatting omitted).

In its June 21, 2010 sentencing memorandum, the court stated:

Defendant argued that, in the Bankruptcy, the government took the position . . . that no purchaser of Agriprocessors could have any involvement with Defendant or Defendant's family, resulting in a depressed sale price of Agriprocessors. However, the attorney for the [bankruptcy trustee] in the Bankruptcy Auction, Paula Roby, testified that there was no

> such condition attached to the sale of Agriprocessors. The
> court credits [Paula] Roby's testimony and discredits testimony
> from Defendant's witnesses. Accordingly, the court declines
> to consider this theory in arriving at an actual loss calculation.

Sentencing Memorandum (criminal docket no. 927) at 22-23. In addition, the court generally observed that the movant failed to present sufficient evidence to support the theories that he offered in an effort to reduce the loss amount and failed to recognize that his theories disregarded the impact that a massive fraudulent scheme has on the value of a company and the effect that a bankruptcy has on the value of assets of the estate. *See id.* at 23. It concluded that intervening causes did not make the loss amount unforeseeable to the movant. *Id.* at 23-25.

### *(3)    Additional information*

On December 5, 2008, a meeting that included the bankruptcy trustee, the bankruptcy trustee's criminal counsel, the bankruptcy trustee's other counsel, including Paula Roby, and government counsel took place. *See* Movant App'x (civil docket no. 44-1) at 88-96, 170-77. Notes regarding that meeting indicate that participants made various assertions when discussing Agriprocessors' bankruptcy. The edited and truncated discussion generally reveals the following:

> Paula Roby—14,000 chickens processed yesterday; 4,000 the
> day before yesterday.
>
> Bankruptcy trustee—There is rancor in the county. We have
> to deal with chickens some of which are dying. We have to
> keep the plant running so we can sell it.
>
> Bankruptcy trustee's criminal counsel—The bankruptcy trustee
> does not want to keep the Rubashkins around if he does not
> have to, but they have institutional knowledge. But, the
> bankruptcy trustee has a fiduciary duty to maximize the value
> of Agriprocessors. We are trying to deal with potential
> buyers.
>
> Bankruptcy trustee—A buyer will not let Rubashkins be
> involved in Agriprocessors going forward because they ran it

so poorly. The Rubashkins are unprofessional on so many levels. When dealing with Agriprocessors' volume, there is a need to run the business with precision and good management. The Rubashkins do not have either precision or good management. I am considering whether to bring in a crisis manager to run Agriprocessors for a few weeks. Bernard Feldman is gone. He is not on the payroll. I told him last week that he is out. This is a real plant. It has to be run by professionals. This plant cannot compete in a non-kosher world so it has to be incredibly efficient. My gut feeling is that Agriprocessors has been in distress for years. I met with a financial buyer last week. There is no way that he would allow the Rubashkins to be involved. We are talking about $50,000,000.

Bankruptcy trustee's criminal counsel—Rubashkins are a pariah to a large part of the Jewish community.

Government counsel—The concern is that the Rubashkins controlled the kosher beef market forever using very aggressive tactics. There are reports that indicate they are very territorial. So, the problem is that Agriprocessors might end up in the Rubashkin's control again because they have considerable influence.

Bankruptcy trustee's criminal counsel—But, Rubashkins could be behind bars if you guys do your job.

Paula Roby—We cannot control what happens years from now.

Government counsel—Well, that is a concern.

Government counsel—I think you can. There are things that you can do.

Bankruptcy trustee—My entreaty: let me run a process for best value. It will be done. We're working on bidding procedures. We will run them by you. A sale under 363 in the Bankruptcy Code must be in good faith.

Government counsel—What does "good faith" mean? Whatever the judge says it means. It is very broad.

Paula Roby—But, the judge will want to save the town and fix everything.

Bankruptcy trustee—Give me sixty days to run this process. I will share with you every piece of information. You will be involved in the process. People are scared of you guys.

Bankruptcy trustee's criminal counsel—That is another issue. You guys obviously want to keep conducting your investigation as you see fit. In recent days, a couple of customers have stopped paying because of grand jury subpoenas. That is affecting the bankruptcy trustee's ability to collect money for the estate. But, we are not telling you to stop with subpoenas because you have to do what you have to do.

Paula Roby—That is why we have not totally cut out the Rubashkins. They might tell their contacts not to pay.

Bankruptcy trustee—If Heshy Rubashkin is fired, customers will hear and stop paying.

Government counsel—The problem may be the Rubashkins. TCP or another customer got a call from Heshy Rubashkin saying do not pay us, pay the feed supply company. So, maybe you should not be relying on Heshy Rubashkin.

Bankruptcy trustee—No. We are relying on others. Look, the Rubashkins violated a lot of corporate formalities. It is as sloppy as I have ever seen it. From a bankruptcy standpoint, we are going to conduct a forensic investigation and bring in all of the related entities. For right now, I need to soak up any piece of data that we can get. That is why they are still there. But, it could be that, by the time of the sale, they will be gone. They are poison. When the plant shut down in May, they probably went to lenders. The lenders probably said 80-20. The Rubashkins said no because they did not want to give up their business. So, they waited and waited. These guys that I am dealing with now will not let a bunch of jokers, that is, the Rubashkins, be involved in the business.

Government counsel—No Rubashkins is very important to us. It is non-negotiable. The problem is we do not have a seat at the table.

Paula Roby—We are setting one up for you.

Government counsel—Yes, but there is no legal backstop.

Paula Roby—Are there other non-negotiables?

Government counsel—They are not finalized. We need to meet with the United States Attorney. But, there should be no involvement of the Rubashkins or family from any control, equity or benefit standpoint. If we file a forfeiture action, then we are in place. Then we can agree not to go forward with the case if there is a good faith purchaser.

Bankruptcy trustee—That would kill off bidders.

Government counsel—We will give you written assurance. There will be no move by the government if there is a good-faith purchaser.

Bankruptcy trustee—But, if I was a lender, I would not lend if the government could come in down the road.

Bankruptcy trustee's criminal counsel—A forfeiture action would enormously hurt the bankruptcy trustee's ability to do his job. If you plan to seek forfeiture, please tell me in advance. Please do us this courtesy.

Government counsel—The forfeiture issue seems like form over substance because anyone taking over Agriprocessors already knows it is there. It is better to file now and get it out in the open.

Bankruptcy trustee's criminal counsel—I disagree. The existence and enforcement of forfeiture are two different worlds.

Government counsel—If there is no peep from the government for two months and a 363 sale occurs and then the government files a forfeiture action, good faith is lacking. It is possible that a purchaser might come to the government and seek a guarantee before closing. It can be an issue in the bid packet. A point of negotiation.

Bankruptcy trustee's criminal counsel—Everyone here wants the bankruptcy case to be in Iowa. If it comes back to Iowa, then we can all sit down and we can have more certainty.

Government counsel—I do not think so because we do not have a legal leg to stand on. Until we take some action to put our marker down, people are asking us to rely on the bankruptcy process and a promise that "good faith" means the same to you as the government needs it to mean. It is a matter of legal procedure. But, I think we all want the same thing here.

Bankruptcy trustee—I would like to reach out to Sam Giordano and then come back to you guys. Agriprocessors is on the operating table. I am just trying to keep it alive.

Government counsel—What about names and trademarks going forward?

Bankruptcy trustee—I do not know.

Paula Roby—It may depend on the buyer.

Government counsel—This is a serious issue for us. "Aaron," "Rubashkin" etc. should go away. The IP should be taken out. One way to do this is to forfeit it and then sell/retire it.

Bankruptcy trustee—What if a huge, clean buyer offered lots of money but wanted "Aaron"?

Government counsel—They might not get it. A condition might be that any potential buyer must sit down with the government. Everyone has tight schedules. Regarding your request for advance notice of forfeiture, there are no guarantees. But, let us keep an open line of communication. We have to do what we have to do.

Bankruptcy trustee—Regarding procedure, if the assets of Agriprocessors are sold and everyone is not paid, then the bankruptcy trustee goes on and commences lawsuits to get transfers. If the bid is $100,000,000 and the total claims are $70,000,000, then usually $30,000,000 would go back to the Rubashkins. So, here maybe the government could get $30,000,000.

> Government counsel—That is what we are talking about with forfeiture. Other consideration is that the government takes the stock. Is that what you are talking about?
>
> Bankruptcy trustee—Yes. Let us try to fashion something together.
>
> Government counsel—I think that we can. Let us be creative. This is new uncharted territory. Empire would not be interested in operating the plant. They would buy it and shut it down. That is a concern too because that would destroy the community. So, we want a buyer who will keep operating the plant.
>
> Bankruptcy trustee—Let us keep talking.

*See id*. at 88-96, 170-77 (reproducing discussion verbatim).

In response to the government's December 8, 2008 letter, Lloyd Palans sent the government a letter, which is dated December 9, 2008. *Id*. at 86-87. In such letter, Lloyd Palans stated:

> We are encouraged that your office is sensitive to the dynamics of a potential sale of the assets of Agriprocessors by its [bankruptcy] trustee. We agree with you that your office's willingness to waive forfeiture claims against assets available for sale to a good-faith, arm's-length purchaser, and to refrain from pursuing forfeiture of the proceeds of the sale in the hands of good-faith creditors, is likely to enhance the value of Agriprocessors' assets.
>
> . . .
>
> We remain concerned, however, by the suggestion in your letter that your office may assert forfeiture claims in the very near future involving property of Agriprocessors' bankruptcy estate. We understand, of course, that you have the right to assert such claims and that you may be faced with considerations beyond the desire to facilitate a sale. Nevertheless, we believe that the public assertion of forfeiture claims, even if accompanied by a statement that your office will work with potential purchasers, is likely to have a significantly negative impact on the prospects for the sale of

Agriprocessors' assets as a going concern or a turnkey operation and thereby "chill" the bidding process. In particular, although we are encouraged that your office is willing to communicate with potential purchasers about its expectations for the sale process, there may be few, if any, potential purchasers willing to navigate through a pending forfeiture proceeding and pay fair value for Agriprocessors' assets. We do not believe that such an outcome would be in the interests of Agriprocessors' creditors, its employees or the Postville community.

*Id.*

FBBC's counsel sent the bankruptcy trustee a letter of default on March 24, 2009. *Id.* at 113-15. Such letter specified additional occurrences of default and indicated the following:

[B]ased on discussions with certain government officials on or about March 24, 2009, the Lender deems itself insecure with respect to the actual or potential assertion by the United States of a right to forfeiture of assets of the [e]state and the actions of the United States in pursuit of such a right or claim [of] right.

*Id.* at 113-14.

Jay Eaton, as counsel for SHF Industries, LLC, sent "gentlemen," who presumably were associated with the purchase of Agriprocessors' assets, a letter, which is dated July 30, 2009. *Id.* at 120-22. Such letter, in relevant part, stated:

The bottom line is that . . . the [government] is eager to resolve its differences with the new buyer and gain clarity of the situation.

. . . [I]t seems to me that conceptually the [government's] forfeiture position/concern is a function of the [government's] comfort level about whether the new buyer (Hershey [Friedman]), either now or in the future, might be standing in for the Rubashkin family or its companies. I gathered the [the government] obtained comfort about that in its first meeting with Hershey [Friedman]. However, the subsequent published article quoting (whether or not accurately) Hershey [Friedman]

about the Rubashkins and the Postville situation gave the [government] some pause.

[Government counsel's] forfeiture focus was on taking money which the buyer might pay, or assets which in the future the buyer might transfer, to the Rubashkin family or one of its entities. I focused on the other side of the forfeiture coin, i.e. whether the [the government] had in mind forfeiting and taking from the buyer assets which it purchases to operate the company.

[Government counsel] and I expressed our respective concerns. . . . [Government counsel] said he was happy to begin this dialog and he wanted to reach resolution of issues with the buyer.

I told [government counsel] the buyer was keenly focused on the [government's] current position, because it is not too late to cut its losses by deciding not to close. I said it is not realistic to expect the buyer to incur the huge anticipated future financial commitment necessary to close and begin operating the company if an ever-present risk hangs over its head that the [government] might come in to forfeit and take assets which the buyer acquired from the Agriprocessors bankruptcy estate, or from the Nevel Properties bankruptcy estate, or from the FDIC or from the Best Value bankruptcy estate, or forfeit assets because the best financial decision for the buyer to make at this time would be to continue buying broilers from the company's current supplier (Cottonballs) which is a Rubashkin-owned entity.

[Government counsel] acknowledged that would not be a realistic starting point for the new buyer. [Government counsel] ultimately said the [the government] is not concerned about taking assets from the buyers unless they are the Rubashkins in disguise.

Id. at 120-21. It also listed multiple future meeting topics, including whether a comfort letter of some sort or, in Jay Eaton's opinion, an unrealistic agreement in some form that included the language which the government wanted in the bankruptcy sale order would give the government appropriate comfort, and noted that the government wanted a list of

items that the buyer would need comfort on before deciding to proceed with the closing.

*Id*. at 121-22.

Triax Capital Advisors, LLC, completed a valuation report, which is dated June 10, 2011. *See id*. at 55-83. Portions of such report indicated:

> [The] valuation was performed solely to estimate the fair value of the sole stockholder's equity shares, as of [June 27, 2008, July 29, 2007, December 29, 2006 and June 30, 2006], to assist in the matter of avoidance actions . . . . We were restricted or limited in the scope of our work as we were not provided projections by [Agriprocessors], nor was there access [to] much of the senior management of [Agriprocessors], many of whom are now serving sentences in the Federal Prison System.

> . . . Based upon [estimates of value between $26,700,000 and $30,330,000], the value of the sole stockholder's equity shares was $0 as of June 27, 2008, July 29, 2007 and December 29, 2006, and between $996,000 and [$1,600,000] as of June 30, 2006. This conclusion is subject to [assumptions, limiting conditions, exhibits and analyst representations].

> The purpose of this report is to provide an opinion as to the estimate of value of Agriprocessors . . ., and whether Agriprocessors was solvent during the two years prior to the Bankruptcy Filing Date, November 4, 2008. . . .

> At all times [between June 30, 2006 and June 27, 2008], Agriprocessors was experiencing both cash flow and balance sheet insolvency. The analysis highlighted within this report shows that [between June 30, 2006 and June 27, 2008] Agriprocessors was unable to meet its debts as they came due, and while additional credit was at times extended by its primary secured lenders, [FBBC] and [MLIC Asset Holdings, LLC], and its vendors and other third parties, the anticipated cash flows of the business would never be sufficient to relieve [Agriprocessors'] debt burden to these creditors. Thus, from an operating perspective, [Agriprocessors] was cash flow insolvent. Additionally, the fair value of the assets of [Agriprocessors] were insufficient to cover [Agriprocessors'] liabilities, thus, from a balance sheet perspective,

[Agriprocessors] was insolvent. . . . [A]lthough [Agriprocessors] had substantial Enterprise Value, [the Enterprise Value between June 30, 2006 and June 27, 2008] was insufficient [to cover] Agriprocessors' obligations to its creditors. An informed and willing equity participant would not pay enough for [Agriprocessors] to satisfy its obligations and provide existing equity with any recovery on its investment. Any reasonable investor would pay no more than Enterprise Value for the assets to be delivered free and clear of the debt security holder's obligations. At all times [between June 30, 2006 and June 27, 2008], Enterprise Value was lower than [Agriprocessors'] outstanding debt security obligations.[21]

. . .

In May 2008, the Postville facility was raided by . . . [ICE] for its hiring practices and the employment of undocumented workers. Over 350 workers were forcibly removed from the facility; another 300 personnel either took refuge in their homes, Postville's churches or fled the community. The ICE raid forced [Agriprocessors] to temporarily cease operations. After several difficult weeks, Agriprocessors was again producing, but only at 50% of its pre-raid levels. Moreover, as a direct result of the ICE raid, [FBBC], Agriprocessors' lender, was no longer willing to continue to extend credit, and ultimately, Agriprocessors filed for Chapter 11 Bankruptcy protection on November 4, 2008.

. . .

The Valuation Analyst utilized Agriprocessors' internally compiled financial statements . . . . Adjustments were made

---

[21] As of June 27, 2008, Agriprocessors' equity valuation based on the income approach was $0 ($26,916,000 (Enterprise Value) - $68,452,000 (Debt) = $-41,536,000), and Agriprocessors' equity valuation based on the asset approach was $0 ($10,205,000 (Book Value) - $33,451,000 (Adjustments) = -$23,246,000 (Total Adjusted Net Liabilities, at Fair Value)). For the same date, Agriprocessors had $68,662,617 in total assets, which included $21,929,246 for its property, plant and equipment, and $70,620,141 in total liabilities.

to these financial statements to reflect the estimated fair values of these assets . . . and to normalize costs and revenues . . . . Agriprocessors' management perpetrated a [$28,000,000] fraud on [FBBC], [and] its other creditors. When [Agriprocessors] filed bankruptcy, over $80,000,000 of claims were filed in the case. . . . [N]o adjustments were made to reflect fraudulent activity prior to September 2007. . . . No pro-forma adjustments were made to account for the additional costs that would be necessary to employ legal aliens or naturalized U.S. citizens.

. . .

. . . The use of a weighted average cost of equity and debt would have resulted in a higher discount rate and a lower enterprise value. . . .

. . . Utilizing any deductions from free cash flow for tax and working capital requirements would have resulted in a lower enterprise value.

[A lower enterprise value would have resulted if the adjusted profit and loss statements were] negatively adjusted for downward adjustments to gross profit margin that resulted from [Agriprocessors'] failure to adjust inventories to net realizable value on an on-going basis. . . .

. . .

[U]tilizing an Equity Cost of Capital component would have resulted in a lower Enterprise Value. The lower Cost of Debt Capital was utilized to demonstrate that under the most favorable conditions, [Agriprocessors] was significantly over-leveraged at all times [between June 30, 2006 and June 27, 2008]. . . .

. . . [T]axes were considered $0, which resulted in a higher Enterprise Value.

. . .

[Agriprocessors] required a significant working capital infusion, as is evidenced by its significant growth in cash overdrafts and accounts payable [between June 30, 2006 and June 27, 2008], as well as unrecorded advances provided to

[Agriprocessors]. No adjustment was made for increased net working capital requirements. If adjustments were made, they would have resulted in a lower Enterprise Value.

. . . During the pendency of the Bankruptcy case, under the [bankruptcy trustee's] stewardship, over $75,000 per month was spent on maintenance, which was approximately half of what was required to maintain the equipment, limit production stoppages and maintain safety and OSHA compliance. When substantially all the operating assets were sold to [SHF Industries, LLC], a significant investment was necessary to modernize and maintain the plant.

. . .

While Agriprocessors had significant value, as an enterprise, any reasonable investor would have required a significant balance sheet restructuring in order to invest in this entity. Such a restructuring would require the senior lenders to not only modify the terms of their debt, but to cancel a significant portion of it. While the analysis shows that there is between $996,000 and [$1,600,000] of Equity Value at June 30, 2006, this value was not sufficient to allow [Agriprocessors] to operate as a going concern. Bankruptcy and a reorganization of [Agriprocessors'] balance sheet was inevitable.[22]

---

[22] The report includes a balance sheet, which lists the property, plant and equipment as $40,013,246, which is the same number that Agriprocessors, through Aaron Rubashkin, included in its January 9, 2009 bankruptcy schedule. In its list of assumptions, the report, among other things, referred to the $21,929,246 that accounted for the net property, plant and equipment and noted that:

> The plant and equipment were not discounted, on the basis that if the plant was valued at replacement value, it would not exceed book value. During the bankruptcy process, the property was purchased by [SHF Industries, LLC] for less than [$12,000,000], as a going concern, inclusive of all assets free and clear. It is likely that [a willing participant would pay for up to book value for the plant and equipment] alone, as of [the] bankruptcy date, however, no downward adjustments have been made. The plant was in major disrepair as of the

(continued…)

. . .

> The analyses, opinions, and conclusions of value . . . are subject to the specified assumptions and limiting conditions and they are the personal analyses, opinions, and conclusions of value of the Valuation Analyst. The conclusion of value arrived at herein is valid only for the stated purpose as of the date of the valuation.

> Financial statements and other related information provided to the Valuation Analyst, in the course of this engagement, have been accepted without any verification as fully and correctly reflecting [Agriprocessors'] business conditions and operating results for the respective periods, except as specifically noted herein. Triax Capital Advisors, LLC has not audited, reviewed, or compiled this information. . . .

> The valuation report is not intended to be and should not be used by anyone other than that stated in the accompanying report.

*Id.*

In his affidavit dated September 29, 2013, Eli Soglowek declared:

> By the end of January, 2009, I was sufficiently satisfied with my due diligence that I signed a term sheet on behalf of [Soglowek Nahariya, Ltd.], offering to purchase the assets of Agriprocessors, Inc. for the price of $40,000,000. . . .

> I had questions concerning the fact that the United States Attorney's Office for the Northern District of Iowa was asserting a right of forfeiture of Agriprocessors' assets in

---

[22](...continued)

> bankruptcy date, according to maintenance supervisors. During the [bankruptcy trustee's] tenure, [approximately $75,000] was spent each month on maintenance to maintain minimum safety standards and production, although at least [$30,000] per week is required. These monies were not spent during the two years prior to filing. An adjustment has been made to cost of sales to project minimum maintenance requirements.

connection with a criminal case . . . . Accordingly, on February 6, 2009, I traveled to [meet] with representatives of the United States Attorney's Office to address my concerns.

At the February 6, 2009 meeting, representatives of the United States Attorney's Office told me that if [Soglowek Nahariya, Ltd.] purchased the assets of Agriprocessors, no member of the Rubashkin family or any related entity could have any management, consulting or ownership role in the business going forward. I was told by representatives of the United States Attorney's Office that if it was discovered that any Rubashkin was involved in the business going forward, there would be "very bad consequences" for me and [Soglowek Nahariya, Ltd.]

It is also my understanding that [Paula] Roby testified that I did not complete the acquisition of Agriprocessors because we "began due diligence and discovered that there were inflated inventory and receivables numbers and didn't believe that [$40,000,000] was a reasonable amount to offer for this company". This is also not true. My reasons for not completing the acquisition were not related to any inflated inventory and receivables numbers or that I didn't believe that the [$40,000,000] was a reasonable amount to offer for the company at that time.

*Id*. at 99-100 (formatting omitted); *see also id*. at 123-24 (indicating that the threats and demands of the United States Attorney's Office were the principal reasons that caused Soglowek Nahariya, Ltd. to withdrew the offer reflected in the $40,000,000 term sheet and elect not to appear at the bankruptcy auction held on March 23, 2009 and March 24, 2009).

In his affidavit dated March 1, 2016, the bankruptcy trustee declared:

As [the bankruptcy trustee], my mission was to maximize the value of the bankruptcy estate for the benefit of Agriprocessors' creditors. I felt the best way to accomplish this goal was by selling [Agriprocessors] as a going concern, and therefore from the outset focused my energies on preparing [Agriprocessors] for sale as an operating entity. At

the outset of the case, [Agriprocessors] was shut down and me and my staff had to restart operations. . . .

I received numerous . . . inquiries from potentially interested buyers in the weeks following my appointment as [the bankruptcy trustee]. Many of these buyers had the sophistication and financial wherewithal necessary to consummate a transaction. I viewed their interest as serious and genuine.

In my view, the buyer who would pay the most money for the business was either a member of the Rubashkin family or someone associated in the Lubavitch community as they knew the business better than anyone else and they would naturally have to satisfy the existing creditors in order to continue operating the business. On several occasions, I encouraged buyers to consult with the Rubashkins.

Aaron Rubashkin, in particular, was vital to maximizing the value of [Agriprocessors] on a going forward basis, as he had the relationships with large customers and unmatched experience and knowledge in the industry. Mr. [Aaron] Rubashkin was the namesake for the "Aaron's Best" and "Rubashkin" trademarks, which had significant meaning and value in the glatt kosher meat industry and were among Agriprocessors' most valuable assets. Aaron Rubashkin's ongoing involvement was crucial to maximizing [Agriprocessors'] value in a bankruptcy sale and I met with him numerous times during the sale process.

. . .

The [government's] potential forfeiture claims were of substantial concern to me. I worried they would have a chilling effect on the bankruptcy sale and therefore hurt my ability to do my job of maximizing the value of the estate. [FBBC], the largest secured creditor, shared my concerns, as did [the] United States Bankruptcy Trustee for the Northern District of Iowa, Habbo Fokkena.

My attorneys and I met with prosecutors shortly after my appointment as [the bankruptcy trustee] to express our concerns regarding the potential forfeiture claims. The

prosecutors listened to our concerns, but ultimately made clear that they believed the assertion of forfeiture was necessary and appropriate regardless of the effect it would have on the bankruptcy sale. The prosecutors wanted to be actively involved in the bankruptcy sale process and felt the assertion of forfeiture was necessary to ensure [Agriprocessors] would not be sold without their approval. They were particularly focused on making sure [Agriprocessors] was not sold to Aaron Rubashkin or any other member of the Rubashkin family, and that no member of the Rubashkin family would have any involvement in managing the business on a going forward basis. Prosecutors made this restriction very clear to my attorneys and me during the meeting shortly after my appointment as [the bankruptcy trustee].

Several potential buyers who appeared to be well-capitalized and had the wherewithal to purchase the business, including, among others, Meyer Eichler and Abraham Shaulson, expressed interest in having an ongoing relationship with the Rubashkins if they purchased [Agriprocessors]. However, at the government's direction, I disclosed to [Meyer] Eichler, [Abraham] Shaulson, and others that members of the Rubashkin family could not be involved in buying or managing [Agriprocessors].

In January 2009, a potential buyer named Eli Soglowek submitted a [$40,000,000] bid for Agriprocessors on behalf of an entity with which he was affiliated. I chose not to accept the [$40,000,000] bid outright, but rather to treat it as a "stalking horse" bid to try to drive higher bids from other interested parties. I believed an auction process would lead to a bid even higher than [$40,000,000].

I informed [Eli] Soglowek, [Meyer] Eichler, and other potentially-interested parties that they would need to meet directly with prosecutors prior to consummating any purchase of Agriprocessors to discuss the issue of forfeiture and the conditions on which the government would waive its forfeiture rights. Many such meetings occurred in the early months of 2009, including meetings during the bankruptcy auction in Cedar Rapids, Iowa, in March 2009.

The offers submitted by various bidders at the bankruptcy auction in March 2009 were insufficient to satisfy [FBBC] and [MLIC Asset Holdings, LLC] and ultimately resulted in a "failed auction." Shortly after the auction, I received a letter from [FBBC] declaring a default on certain loans [FBBC] issued to Agriprocessors subsequent to [Agriprocessors'] filing for bankruptcy. [FBBC] declared the default on the basis of, among other things, "discussions with certain government officials on or about March 24, 2009 . . . with respect to the actual or potential assertion by the United States of a right to forfeiture of assets of the Estate and the actions of the United States in pursuit of such claim or right." . . .

Following the bankruptcy auction in March 2009, we continued our efforts to sell Agriprocessors as a going concern. Ultimately, however, the highest offer we received was from [SHF Industries, LLC] in the amount of $8.5 million. Although I felt Agriprocessors was worth substantially more than $8.5 million, we had no choice but to accept the offer. The sale to [SHF Industries, LLC] was finalized in August 2009.

Among other things, the government's assertion of forfeiture claims and restriction on the involvement of members of the Rubashkin family clearly had a chilling effect on the Agriprocessors' bankruptcy sale process and resulted in [Agriprocessors] selling for a lower amount than it otherwise would have.

*Id*. at 43-45 (formatting omitted) (thirty-third alteration in original).

In their affidavits, other individuals on behalf of prospective bidders generally asserted variations of the following themes: (1) after meeting with government counsel, the bankruptcy trustee or individuals associated with him, prospective bidders learned that the government would exercise its right to forfeiture if Aaron Rubashkin or other members of the Rubashkin family obtained an ownership interest or management role in Agriprocessors, (2) the government viewed Agriprocessors as a criminal enterprise, (3) the government's forfeiture position had a chilling effect on prospective bidders' interests in purchasing Agriprocessors because operation of Agriprocessors required extensive skills

in the areas of purchasing livestock, kosher slaughtering and sales and distribution, (4) Aaron Rubashkin was the only person with the ability to manage Agriprocessors, (5) any transition would be much more difficult and risky if Rubashkins could not be in management, (6) government counsel threatened, accused and intimidated potential bidders by asserting, among other things, that it might use criminal forfeiture to seize Agriprocessors' assets after the bankruptcy sale, (7) the government's restrictions caused bidders to lower their bids, including the highest bid for nearly $16,000,000, at the March auction, and the government's interactions with bidders at the March auction further reduced Agriprocessors' valuation, (8) prospective bidders at the March auction understood that Rubashkins could not be involved in the ownership or operation of Agriprocessors following the sale, (9) annual earnings before taxes of $25,000,000 could be earned in one's sleep, but all of the money that the Rubashkin family had was diverted to other companies or never realized due to very poor management of the enterprise; (10) the inability to have any ties with the Rubashkins, any employment or consulting relationship with any member of the Rubashkin family or any connection to any company affiliated with the Rubashkins caused prospective bidders to chose not to contact the United States Attorney's Office; and (11) prospective bidders did not feel comfortable calling the government because they were unwilling to have the government dictate who could be hired and how business should be conducted. *See id.* at 49-54, 103-12, 123-24.

### b. *Applicable legal principles*

### (1) *Framework relied upon after conviction*

Pursuant to 28 U.S.C. § 994(a)(1), the United States Sentencing Commission establishes Guidelines, which provide the essential framework for federal sentencing proceedings.

> The Guidelines enter the sentencing process long before the district court imposes the sentence. The United States Probation Office first prepares a presentence report which includes a calculation of the advisory Guidelines range it

considers to be applicable. Fed. Rules Crim. Proc.
32(d)(1)(A)-(C); *see generally* 18 U.S.C. §3552(a). The
applicable Guidelines range is based on the seriousness of a
defendant's offense (indicated by his "offense level") and his
criminal history (indicated by his "criminal history category").
Rules 32(d)(1)(B)-(C). The presentence report explains the
basis for the Probation Office's calculations and sets out the
sentencing options under the applicable statutes and
Guidelines. Rule 32(d)(1). It also contains detailed
information about the defendant's criminal history and
personal characteristics, such as education and employment
history. Rule 32(d)(2).

*Molina-Martinez v. United States*, ___ U.S. ___, ___, 136 S. Ct. 1338, 1342 (2016).

After receiving the presentence report, the parties have an opportunity to raise

objections. *See* Fed. R. Crim. P. 32(f)(1) ("Within 14 days after receiving the presentence

report, the parties must state in writing any objections, including objections to material

information, sentencing guideline ranges, and policy statements contained in or omitted

from the report."); Fed. R. Crim. P. 32(i) (making clear that a district court must provide

an opportunity at the sentencing hearing for the parties to address their objections). In

deciding disputed sentencing factors, the district court can consider a wide variety of

evidence not normally admissible at trial. *See* USSG §6A1.3(a) ("[T]he court may

consider relevant information without regard to its admissibility under the rules of evidence

applicable at trial, provided that the information has sufficient indicia of reliability to

support its probable accuracy."); *see also* 18 U.S.C. § 3661 ("No limitation shall be

placed on the information concerning the background, character, and conduct of a person

convicted of an offense which a court of the United States may receive and consider for

the purpose of imposing an appropriate sentence."); Fed. R. Evid. 1101(d)(3) (clarifying

that the Federal Rules of Evidence do not apply in sentencing proceedings); *United States

v. Watts*, 519 U.S. 148, 157 (1997) (explaining that information may be considered if it

has sufficient indicia of reliability to support its probable accuracy); *Witte v. United States*,

515 U.S. 389, 399-401 (1995) (noting that sentencing courts have traditionally considered

a wide range of information without the procedural protections of a criminal trial); *United States v. Tucker*, 404 U.S. 443, 446 (1972) ("Before making [the sentencing] determination, a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come."); *Williams v. New York*, 337 U.S. 241, 246 (1949) (explaining that courts have traditionally exercised "wide discretion in the sources and types of evidence used to assist [them] in determining the kind and extent of punishment to be imposed within limits fixed by law"). Additionally, "the nature of the dispute, its relevance to the sentencing determination, and applicable case law" guides what procedure should be utilized by the district court, USSG §6A1.3 cmt. background, and a preponderance of the evidence standard of proof, rather than a beyond a reasonable doubt standard of proof, is relied upon by the district court when making its findings of fact, *see id*. ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements . . . ."); *see also Watts*, 519 U.S. at 156 ("[A]pplication of the preponderance standard at sentencing generally satisfies due process."); *McMillan v. Pennsylvania*, 477 U.S. 79, 88-93 (1986) (endorsing a preponderance-of-the-evidence standard at sentencing).

After receiving input from the parties, the district court formulates a sentence that is sufficient, but not greater than necessary, to further the goals enumerated by Congress in 18 U.S.C. § 3553(a). When formulating a sentence, the district court must consult a properly calculated Guidelines range. *See Molina-Martinez*, ___ U.S. at ___, 136 S. Ct. at 1342 (citing *Peugh v. United States*, 569 U.S. ___, ___, 133 S. Ct. 2072, 2080 (2013); *United States v. Booker*, 543 U.S. 220, 264 (2005)); *Gall v. United States*, 552 U.S. 38, 49 (2007) ("[T]he Guidelines should be the starting point and the initial benchmark."). But, "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Rita v. United States*, 551 U.S. 338, 351 (2007) (citing *Booker*, 543 U.S. at 259-60). Rather, it must make an independent determination

that a Guidelines sentence comports with the sentencing factors set forth in 18 U.S.C. § 3553(a). *See Hawkins v. United States*, 706 F.3d 820, 822-23 (7th Cir. 2013) (emphasizing that district courts cannot impose a sentence that is within the applicable Guidelines range if such a sentence is inconsistent with the considerations set forth in 18 U.S.C. § 3553(a)). A district court may choose an out-of-Guidelines sentence, but it must ensure that the facts justify the degree of variance from the Guidelines. *See Gall*, 552 U.S. at 50; *see also United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc) (stating that district court commits procedural error, inter alia, where it miscalculates Guidelines or does not consider 18 U.S.C. § 3553(a) factors).

Aside from challenging the application of the Guidelines during sentencing proceedings, a defendant's primary avenue for obtaining relief is to assert on direct appeal that a sentence calculation error occurred. When reviewing a defendant's sentence, an appellate court must "ensure that the district court committed no significant procedural error." *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (quoting Gall, 552 U.S. at 51). "A failure to properly calculate the advisory Guidelines range is a significant procedural error . . . ." *United States v. Waller*, 689 F.3d 947, 957 (8th Cir. 2012) (quoting *United States v. Woods*, 670 F.3d 883, 886 (8th Cir. 2012)).

Appellate courts analyze preserved objections for harmless error and unpreserved objections for plain error. *See Molina-Martinez*, ___ U.S. at ___, 136 S. Ct. at 1343; *Booker*, 543 U.S. at 268. Pursuant to either harmless error review or plain error review, appellate courts routinely remand cases to correct sentencing errors. However, there may be occasions where it is appropriate to excuse application of an erroneous Guidelines range. A preserved error is harmless if "the government can show the procedural error did not substantially influence the outcome of the sentencing proceeding." *Waller*, 689 F.3d at 958 (quoting *Woods*, 670 F.3d at 886). And, an unpreserved sentencing error does not require an appellate court to remand for resentencing if the defendant is unable to "'show a reasonable probability that, but for the error,' the outcome of the proceeding

would have been different." *Molina-Martinez*, ___ U.S. at ___, 136 S. Ct. at 1343 (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 76 (2004)).

> The sentencing process is particular to each defendant, of course, and a reviewing court must consider the facts and circumstances of the case before it. *See United States v. Davila*, 569 U. S. ___, ___ , 133 S. Ct. 2139, 2149 (2013) ("Our essential point is that particular facts and circumstances matter"). The record in a case may show, for example, that the district court thought the sentence it chose was appropriate irrespective of the Guidelines range. Judges may find that some cases merit a detailed explanation of the reasons the selected sentence is appropriate. And that explanation could make it clear that the judge based the sentence he or she selected on factors independent of the Guidelines. The Government remains free to "poin[t] to parts of the record"—including relevant statements by the judge—"to counter any ostensible showing of prejudice the defendant may make." *United States v. Vonn*, 535 U.S. 55, 68 (2002).

*Id.* at 1346-47 (citations omitted) (alteration in original); *see also Williams v. United States*, 503 U.S. 193, 203 (1992) (explaining that remand is unnecessary if "the district court would have imposed the same sentence absent the erroneous factor").

Once the appeals process concludes and a defendant's conviction becomes final, a sentencing error may be asserted in a proceeding under 28 U.S.C. § 2255. But, not every sentencing error can be corrected on collateral review. *See Sun Bear*, 644 F.3d at 704 (clarifying that the scope of 28 U.S.C. § 2255 is severely limited); *see also United States v. Springs*, 988 F.2d 746, 747 (7th Cir. 1993) (emphasizing that the domain of 28 U.S.C. § 2255 is limited). If the alleged sentencing error is neither constitutional nor jurisdictional, there is no authority under § 2255 to review such error unless it amounts to "a fundamental defect which inherently results in a complete miscarriage of justice." *Sun Bear*, 644 F.3d at 704 (quoting *Addonizio*, 442 U.S. at 185); *see also Reed v. Farley*, 512 U.S. 339, 354 (1994) (indicating that a non-constitutional error can be raised for the first time on collateral review only where the alleged error constitutes a "fundamental

defect which inherently results in a complete miscarriage of justice" (quoting *Hill*, 368 U.S. at 428)); *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999) ("Moreover, an error in the application of the Sentencing Guidelines does not warrant collateral relief under § 2255 absent a complete miscarriage of justice."); *Burke v. United States*, 152 F.3d 1329, 1332 (11th Cir. 1998) ("We thus hold that a claim that the sentence imposed is contrary to a post-sentencing clarifying amendment is a non-constitutional issue that does not provide a basis for collateral relief in the absence of a complete miscarriage of justice."); *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996) (holding that, absent a complete miscarriage of justice, claims regarding a sentencing court's error in failing to properly apply the Guidelines are not subject to collateral review). Review is only appropriate if the district court is presented with "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Hill*, 368 U.S. at 428.

Given the permissible scope of review under § 2255,

> "ordinary questions of [G]uideline interpretation falling short of the 'miscarriage of justice' standard do not present a proper section 2255 claim." *Auman v. United States*, 67 F.3d 157, 161 (8th Cir. 1995); *accord United States v. Pregent*, 190 F.3d 279, 284 (4th Cir. 1999), and cases cited; *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999); [*Graziano*, 83 F.3d at 590]. Therefore, such questions "may not be re-litigated under § 2255." [*McGee*, 201 F.3d at 1023].

*Sun Bear*, 644 F.3d at 704; *see also United States v. Foote*, 784 F.3d 931, 943 (4th Cir. 2015) (concluding that an erroneous Guidelines classification is not cognizable under § 2255); *Spencer v. United States*, 773 F.3d 1132, 1135 (11th Cir. 2014) (en banc) (explaining that a misapplication of the advisory Guidelines is not a basis to collaterally attack a sentence); *Donnell v. United States*, 765 F.3d 817, 819 n.2 (8th Cir. 2014) (stating that "[s]entencing errors are generally not cognizable in § 2255 proceedings"); *United States v. Coleman*, 763 F.3d 706, 710 (7th Cir. 2014) (recognizing that even sentencing

errors that are not harmless are not cognizable in post-conviction proceedings); *Hawkins*, 706 F.3d at 824 ("An error in the interpretation of a merely advisory [G]uideline is less serious [than a sentence that exceeds the statutory maximum]. Given the interest in finality, it is not a proper basis for voiding a punishment lawful when imposed."); *Welch v. United States*, 604 F.3d 408, 412 (7th Cir. 2010) ("[D]eviations from the Sentencing Guidelines generally are not cognizable on a § 2255 motion."); *United States v. Mikalajunas*, 186 F.3d 490, 495 (4th Cir. 1999) ("[M]isapplication of the sentencing [G]uidelines does not amount to a miscarriage of justice.").

It is clear that a post-conviction change in the law that renders conduct no longer criminal can be corrected on collateral review. *See Davis*, 417 U.S. at 346-47 (explaining that, if a prisoner's punishment is for something that the law does not make criminal, "there can be no room for doubt that such a circumstance 'inherently results in a complete miscarriage of justice' and 'present[s] exceptional circumstances' that justify collateral relief"). It is also clear "that, in sentencing, a miscarriage of justice cognizable under § 2255 occurs when the sentence is in excess of that authorized by law." *Sun Bear*, 644 F.3d at 706 (citing *Addonizio*, 442 U.S. at 184); *see also Foote*, 784 F.3d at 938 (recognizing that sentencing errors in cases of actual innocence and sentences above the statutory maximum are cognizable on collateral review); *Meirovitz v. United States*, 688 F.3d 369, 371-72 (8th Cir. 2012) (concluding that alleged error in calculating the Guidelines range did not amount to a miscarriage of justice because the sentence was not in excess of that authorized by law). But, in the context of sentencing, an error that does not result in the imposition of a sentence that does not exceed the statutory maximum rarely, if ever, qualifies as a "fundamental defect" that is cognizable on § 2255 review.

Surely, there are constitutional limitations on the scope of information that a court may consider at sentencing. *See United States v. Pratt*, 553 F.3d 1165, 1170 (8th Cir. 2009). Indeed, although a sentencing court may consider relevant information without regard to its admissibility under the Federal Rules of Evidence, provided the evidence has

"sufficient indicia of reliability to support its probable accuracy," USSG §6A1.3(a), a sentence cannot stand if it is based in part on "misinformation of constitutional magnitude," *Tucker*, 404 U.S. at 447. *See also Roberts v. United States*, 445 U.S. 552, 556 (1980) ("We have . . . sustained due process objections to sentences imposed on the basis of 'misinformation of constitutional magnitude.'" (quoting *Tucker*, 404 U.S. at 447)); *Hill*, 368 U.S. at 429 (emphasizing that there was no suggestion that the district court was "misinformed or uninformed as to any relevant circumstance").

Where a violation of a defendant's due process right to be sentenced on the basis of accurate and reliable information occurs, appellate courts vacate sentences and remand for resentencing. *See, e.g.*, *United States v. Ortiz*, 741 F.3d 288, 295 (1st Cir. 2014) (vacating sentence because reliance on erroneous information that materially influences the sentencing calculus undermines the integrity of the sentencing process); *United States v. McGowan*, 668 F.3d 601, 606-09 (9th Cir. 2012) (vacating sentence because district court relied on allegations that were insufficiently reliable when it imposed a sentence); *United States v. Corona-Gonzalez*, 628 F.3d 336, 342-43 (7th Cir. 2010) (vacating sentence because there was a distinct possibility that the district court relied on a nonexistent fact when it made its sentencing assessment); *United States v. Wilson*, 614 F.3d 219, 225 (6th Cir. 2010) (vacating sentence after recognizing "the general rule that a violation of due process exists when a sentencing judge relies upon erroneous information" (quoting *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005))); *United States v. Simmons*, 964 F.2d 763, 776-78 (8th Cir. 1992) (vacating defendant's sentence because drug quantity finding could have been based on testimony of a drug addict with impaired memory); *United States v. Shacklett*, 921 F.2d 580, 584 (5th Cir. 1991) (vacating sentence because district court relied solely on probation officer's conclusory statement as to drug quantity involved); *United States v. Cammisano*, 917 F.2d 1057, 1062 (8th Cir. 1990) (vacating sentence because uncorroborated testimony of FBI agents that defendant was member of organized crime was not sufficiently reliable); *United States v. Robison*, 904 F.2d 365, 371 (6th Cir.

1990) (vacating sentence because drug quantity estimates provided by witness who was heavy drug user lacked sufficient indicia of reliability); *United States v. Williams*, 668 F.2d 1064, 1072 (9th Cir. 1981) (vacating sentence because trial judge relied on materially false or unreliable information). And, under certain circumstances, due process concerns may give rise to relief in a collateral proceeding. *See, e.g.*, *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (concluding that relief was warranted because appellate court's refusal to correct unconstitutional mandatory prison term deprived petitioner of a state-provided liberty interest in a jury determination). "[A]s a practical matter, collateral relief does exist to vindicate rights of constitutional import that may lurk beneath otherwise garden-variety issues of statutory rights or [G]uideline calculations." *Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996). But, only where "the error is committed in a context that is so positively outrageous as to indicate a 'complete miscarriage of justice'" does due process require a district court to "correct" a sentence that is in every sense final. *Id.*; *see also Crank v. Duckworth*, 905 F.2d 1090, 1090 (7th Cir. 1990) (observing that "'misinformation of constitutional magnitude', [*Tucker*, 404 U.S. at 447]—that is, reliance on an invalid prior conviction—authorizes relief from the current sentence"); *cf. United States v. Eakman*, 378 F.3d 294, 301 (3d Cir. 2004) (explaining that "the appropriate test inquires whether (1) the district court made an objectively ascertainable error (one that does not require courts to probe the mind of the sentencing judge) and (2) the district court materially relied on that error in determining the appropriate sentence"); *Jones v. United States*, 783 F.2d 1477, 1480 (9th Cir. 1986) ("Where a § 2255 petition alleges reliance on materially false sentencing information, the sentence will be vacated on appeal only if the challenged information is (1) false or unreliable and (2) demonstrably made the basis for the sentence.").

(2) *Nature and extent of due process rights when a failure to disclose occurs during trial*

The level of materiality at which nondisclosure effects a constitutional error depends upon whether the prosecution's

108

failure to disclose additional exculpatory or impeaching evidence is simply that, or, alternatively, results from the prosecution's knowing use of false testimony or evidence.

*Mastracchio v. Vose*, 274 F.3d 590, 601 (1st Cir. 2001). The materiality standard for a claim for the knowing use of perjured testimony is less stringent than the materiality standard for a general *Brady* violation. *See Clay*, 720 F.3d at 1025-26 (citing *Rosencrantz v. Lafler*, 568 F.3d 577, 587 (6th Cir. 2009)); *see also Perkins v. Russo*, 586 F.3d 115, 119 (1st Cir. 2009) ("[A] prosecutor's knowing inducement of perjury is treated more harshly than a failure, which could be inadvertent, to disclose exculpatory evidence.").

"A conviction obtained by the knowing use of perjured testimony must be set aside 'if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" [*Rosencrantz*, 568 F.3d at 583 (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)]). Instead of asking, as under *Brady*, "whether 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different,'" a court addressing a *Giglio* false-testimony claim "ask[s] only 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Id*. at 584 (citations omitted); *see* [*Napue*, 360 U.S. at 272].

*Wogenstahl v. Mitchell*, 668 F.3d 307, 323 (6th Cir. 2012) (first, second and fourth alterations in original); *accord Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1107-08 (11th Cir. 2012); *Perkins*, 586 F.3d at 119; *Mastracchio*, 274 F.3d at 601; *Braun v. Powell*, 227 F.3d 908, 920 (7th Cir. 2000); *Gilday v. Callahan*, 59 F.3d 257, 267 (1st Cir. 1995).

The proper materiality standard, however, is only part of the equation. . . . On habeas review, . . . constitutional violations that are categorized as "trial error" generally are "amenable to harmless-error analysis." [*Brecht*, 507 U.S. at 629]. . . . Accordingly, [habeas relief is typically available] only if the asserted trial error "had substantial and injurious effect or influence in determining the jury's verdict." [*Id*. at 637 (quoting *Kotteakos*, 328 U.S. at 776)]. This standard

> requires a showing of "actual prejudice" for habeas relief. *Id*.
> (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)).
> The Supreme Court has avoided assigning a formal burden of
> proof for this analysis, but it has stated that "[w]hen a federal
> judge in a habeas proceeding is in grave doubt about whether
> a trial error of federal law had 'substantial and injurious effect
> or influence in determining the jury's verdict, that error is not
> harmless. And, the petitioner must win.'" *O'Neal v.
> McAninch*, 513 U.S. 432, 436 (1995).

*Clay*, 720 F.3d at 1026-27 (citations omitted) (sixth alteration in original).

Hence, on direct appeal, the knowing use of perjured testimony requires a conviction to be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury, but, on collateral review, the knowing use of perjured testimony might not give rise to relief if the error is considered harmless under *Brecht*. *See id*. Where a movant alleges in a collateral proceeding that the prosecution knowingly presented false testimony during trial, the appropriate inquiry is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)), because such inquiry is the same as the *Brecht* harmless-error inquiry. *See Clay*, 720 F.3d at 1026 n.4; *see also Wogenstahl*, 668 F.3d at 323 (explaining that "a traditional *Brady* materiality analysis obviates a later harmless-error review under [*Brecht* and] courts may excuse *Brady*/*Giglio* violations involving known and materially false statements as harmless error" (quoting *Rosencrantz*, 568 F.3d at 584)); *Rosencrantz*, 568 F.3d at 591 (emphasizing that, under *Brecht*, the crucial inquiry for due process purposes concerns the effect that the prosecutorial misconduct had on the jury's verdict) (citing *Smith v. Phillips*, 455 U.S. 209, 219 n.10 (1982)); *Mitchell v. Gibson*, 262 F.3d 1036, 1062 n.13 (10th Cir. 2001) (explaining that, in collateral proceedings, a court applies the "reasonable probability" standard of *Kyles*, not the "reasonable likelihood" standard of *Giglio*, because an error that may have occurred as a result of the presentation of false testimony is still subject to

harmless-error analysis under *Brecht*, which is essentially the same analysis that is required by *Kyles*); *Braun*, 227 F.3d at 921 (reviewing government's conduct under "substantial and injurious effect" standard (citing *Brecht*, 507 U.S. at 637)); *Gilday*, 59 F.3d at 269 (stating that a court must consider whether the error more likely than not had no effect on the verdict) (citing *O'Neal*, 513 U.S. at 436). Even if a court concludes that the presentation of false testimony did not have a substantial and injurious effect on the factfinding process at trial, the grant of habeas relief might still be warranted if the circumstances show that "a deliberate and especially egregious error of the trial type, or [an error] that is combined with a pattern of prosecutorial misconduct, [infected] the integrity of the proceeding." *Rosencrantz*, 568 F.3d at 589 (quoting *Brecht*, 507 U.S. at 638 n.9).

### c.    *Application*

#### (1)    *Procedural obstacles*

These proceedings are not a substitute for earlier proceedings, and, consequently, the movant cannot reformulate arguments, reconstruct the record or relitigate issues that have already been decided. The movant has not plausibly alleged cause that excuses his failure to assert the sentencing error earlier and prejudice that resulted from such error. *Cf. Clay*, 720 F.3d at 1025 n.2 (pointing out that, even though movant arguably procedurally defaulted his claim that his conviction was based on the use of perjured testimony in violation of his right to due process, the merits of such claim would be addressed because the government chose not to argue that movant's claim was procedurally defaulted). The parties presented evidence and arguments in support of their positions regarding the Guidelines and appropriate disposition. Witnesses testified and the court received exhibits. The movant argued that the loss amount was unreliable and unforeseeable. The court previously considered all of the parties' contentions regarding loss under the Guidelines and under 18 U.S.C. § 3553(a). The court overruled the movant's objection regarding the application of USSG §2B1.1(b). After considering all

of the Guidelines and the § 3553(a) factors, the court provided reasons that justified the sentence. The court's discussion of the appropriate sentence clearly reflects consideration of the factors under 18 U.S.C. § 3553(a). Assuming that the movant can establish cause for failing to raise the Guidelines issue during sentencing or on direct appeal, the movant cannot show prejudice because the court emphasized that the movant's sentence was well-justified in light of the factors under § 3553(a).

It is clear that, even if the court accepted the movant's argument that the government impermissibly caused the loss amount to increase when it legally asserted its right to forfeiture, the court would have departed or varied upward to arrive at the same sentence because such sentence is the sentence that is sufficient, but not greater than necessary, to achieve the overall goals of sentencing. The extent of the enhancement under USSG §2B1.1(b) really was immaterial because the court made clear that the circumstances justified a term of 324 months imprisonment or a greater term of imprisonment. The movant does not assert that the court could not have departed or varied upward based on its assessment of the factors under § 3553(a), and the court's explanation of the sentence makes clear that it intended to impose a term of 324 months imprisonment regardless of the Guidelines range. *See Molina-Martinez*, ___ U.S. at ___, 136 S. Ct. at 1346 (recognizing that, "despite application of an erroneous Guidelines range, a reasonable probability of prejudice does not exist" when "[t]he record in the case . . . show[s] . . . that the district court thought the sentence it chose was appropriate irrespective of the Guidelines range"); *United States v. Hentges*, 817 F.3d 1067, 1068 (8th Cir. 2016) (finding that district court's variant sentence made it unnecessary to address whether district court erred in applying the Guidelines); *United States v. Hager*, 609 F. App'x 355, 358 (8th Cir. 2015) (finding that there was no need to determine whether district court procedurally erred because the record unequivocally indicated that the district court would have imposed the same sentence based on the 18 U.S.C. § 3553(a) factors); *United States v. Pappas*, 715 F.3d 225, 230 (8th Cir. 2013) (holding that any error in applying the

Guidelines was harmless because district court made sufficient findings that sentence would be the same regardless of calculations under the Guidelines); *United States v. Sanchez-Martinez*, 633 F.3d 658, 660-61 (8th Cir. 2011) (concluding that miscalculation of the advisory Guidelines range was harmless because the record clearly established that district court intended to impose the same sentence under 18 U.S.C. § 3553(a) regardless of the error); *United States v. Henson*, 550 F.3d 739, 741-42 (8th Cir. 2008) (emphasizing that district court's procedural error did not substantially influence the outcome of the sentencing proceeding because judge expressly took into account the potential impact of the claimed error and made clear that he intended to impose the same sentence); *United States v. Idriss*, 436 F.3d 946, 951 (8th Cir. 2006) (emphasizing that non-constitutional misapplication of the Guidelines does not require remand if the record establishes that district court would have imposed the same sentence absent the error). A variant sentence based on the factors under § 3553(a) defeats any claim that the movant suffered prejudice. In light of the record, it is clear that the court's application of the advisory sentencing Guidelines, consideration of the parties' sentencing arguments and application of the sentencing factors under 18 U.S.C. § 3553(a) violated no constitutional right. Nothing restricted the court's discretion during the sentencing hearing, and the sentence that the movant received is reasonable and appropriate. Accordingly, the movant's sentencing error claim is procedurally defaulted, and relief on the basis of such error is unavailable to the movant.

Further, an issue which has been decided by the Eighth Circuit Court of Appeals may not be revisited absent exceptional circumstances. An example of such a circumstance includes an intervening change in the law. No intervening change in the law or other extraordinary circumstance exists such that it is appropriate to relitigate the issue of loss under the Guidelines. *See Baranski*, 515 F.3d at 861 (affirming district court's decision denying collateral relief because prior rulings were law of the case and movant did not establish an intervening change in controlling authority); *see also United States v. Marks*,

768 F.3d 1215, 1218 (8th Cir. 2014) (explaining that the law of the case doctrine requires an appellate court to adhere to decisions that were made in earlier proceedings unless a party introduces substantially different evidence or the prior decision is clearly erroneous and works a manifest injustice); *United States v. Winters*, 600 F.3d 963, 966 (8th Cir. 2010) (concluding that additional evidence offered in subsequent proceeding after remand did not substantially differ from testimony offered at earlier hearing); *United States v. Bartsh*, 69 F.3d 864, 866-67 (8th Cir. 1995) (determining that district court did not err in determining that law of the case doctrine precluded further review of defendant's sentence even though district court arrived at a different loss amount on remand).

### *(2)     Cognizability*

Even if the movant's claim concerning the loss amount was not procedurally defaulted, it is not cognizable.  Any entitlement to collateral relief is severely limited; the language of § 2255(a) demonstrates that collateral review is available for a narrow range of defects.  The facts asserted by the movant do not establish "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Hill*, 368 U.S. at 428.  No sentencing error amounted to a fundamental defect which inherently resulted in a complete miscarriage of justice.  *See Sun Bear*, 644 F.3d at 704-05 (concluding that sentencing errors are generally not cognizable in § 2255 proceedings).

As the government correctly points out, claims involving errors in the application of the sentencing Guidelines, which are non-constitutional errors, generally are not cognizable under § 2255.  *See Addonizio*, 442 U.S. at 187-88 (explaining that a district court's subjective intent in sentencing is not a subject cognizable on § 2255 review); *Henson*, 550 F.3d at 741 (stating that district court's improper treatment of the sentencing range as presumptively reasonable was undoubtedly a non-constitutional error).  Unless the record reflects a fundamental defect in the proceedings which necessarily resulted in a complete miscarriage of justice, a sentencing error, to wit a non-constitutional error, cannot be raised in a § 2255 motion.

The movant cannot use § 2255 to raise the alleged error in calculating the Guidelines range. The error asserted by the movant is not a member of the "small" class of errors which would call for § 2255 review. *See United States v. Peterman*, 249 F.3d 458, 462 (6th Cir. 2001) ("Courts have generally declined to collaterally review sentences that fall within the statutory maximum."); *Pregent*, 190 F.3d at 284 ("[W]hile § 2255 applies to violations of statutes establishing maximum sentences, it does not usually apply to errors in the application of the Sentencing Guidelines."); *Auman*, 67 F.3d at 161 ("While section 2255 does provide relief for cases in which 'the sentence was in excess of the maximum authorized by law,' this provision applies to violations of statutes establishing maximum sentences, rather than garden-variety Sentencing Guideline application issues."). The alleged error in the application of the advisory Guidelines is not a fundamental defect that inherently results in a complete miscarriage of justice.

Notably, when the court sentenced the movant, it relied on advisory Guidelines and the movant received a sentence that is below the maximum that is authorized by the law. *See United States v. Villareal-Amarillas*, 562 F.3d 892, 898 (8th Cir. 2009) (observing that a sentencing judge is only constrained by the statutory maximum and minimum for an offense and the factors included in 18 U.S.C. § 3553(a)). The court sentenced the movant within the statutory limits, and, although actual loss under USSG §2B1.1(b) was an issue at the time of sentencing, the application of USSG §2B1.1(b) did not affect the lawfulness of the movant's sentence—then or now. In the context of collateral proceedings, a sentence below the ceiling imposed by Congress—whether by statute or the Guidelines—does not constitute a miscarriage of justice. Therefore, the court is not presented with exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent.

### (3)     *Merits of sentencing error claim*

The dimensions of the issues that are addressed during a criminal trial and during a sentencing hearing are fundamentally different. *See Nichols v. United States*, 511 U.S.

738, 747 (1994) (noting that "the sentencing process . . . [is] less exacting than the process of establishing guilt").  Indeed, a sentencing hearing is not undertaken to convict a defendant for the alleged violation, and, therefore, it does not give rise to the full panoply of rights that are due a defendant at trial.  *See Witte*, 515 U.S. at 399-401 (noting that sentencing courts have traditionally considered a wide range of information without the procedural protections of a criminal trial).  It is also clear that different standards apply when trial errors and sentencing errors are reviewed on direct appeal and when they are reviewed in a collateral proceeding.  *Compare Wogenstahl*, 668 F.3d at 323 (emphasizing that the knowing use of perjured testimony requires an appellate court to set aside a conviction if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury), *and United States v. Boyce*, 564 F.3d 911, 918 (8th Cir. 2009) (explaining that, where a defendant asserts that a violation of due process occurred at the time of sentencing, appellate relief is available if the defendant establishes that "the prosecution used perjured testimony, [that it] knew or should have known of the perjury, and that there is a 'reasonable likelihood that the perjured testimony could have affected the [court's] judgment'" (quoting *United States v. Martin*, 59 F.3d 767, 770 (8th Cir. 1995) (second alteration in original)), *with Clay*, 720 F.3d at 1026 n.4 (explaining that, in a collateral proceeding where a movant asserts that the prosecution knowingly presented false testimony during trial, the appropriate inquiry is whether there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" (quoting *Rosencrantz*, 568 F.3d at 584 n.1)), *and Grant*, 72 F.3d at 506 (emphasizing that only where "the error is committed in a context that is so positively outrageous as to indicate a 'complete miscarriage of justice'" does due process require a district court to "correct" a sentence that is in every sense final).

Here, the movant does not argue that the government presented false testimony or committed misconduct during trial.  Rather, the movant argues that the total loss that the victims suffered and the court calculated for sentencing purposes was based on false or

misleading testimony and incomplete information. But, the movant falls woefully short of establishing that the alleged error was committed in a context that is so positively outrageous as to indicate a complete miscarriage of justice. *See Grant*, 72 F.3d at 506.

### (a)  Parties' positions/arguments

It is apparent that the position advanced by the movant in this proceeding is essentially the same position that he advanced in prior proceedings. In advance of the sentencing hearing, throughout his sentencing proceeding and after judgment entered against him, the movant argued some variation of the following:

> The government unfairly injected itself into the bankruptcy process; the government did not allow the bankruptcy process to operate in a normal way; the government impermissibly interfered with the sale of Agriprocessors' assets. The government used its forfeiture allegations to impose conditions on the future ownership and operation of Agriprocessors; the government insisted that none of the Rubashkin family retain an ownership interest in the company; the government forbid Aaron Rubashkin from being involved in the purchase of Agriprocessors' assets; the government demanded/insisted that no Rubashkins could be involved in the sale of Agriprocessors. The government's actions scared bidders. The government's looming forfeiture proceedings reduced the sale price of Agriprocessors; the government's prohibition against future involvement by a purchaser with Aaron Rubashkin substantially devalued Agriprocessors. The government's forfeiture position had the unforeseeable effect of reducing the liquidation value of Agriprocessors; it was not reasonably foreseeable that the government would act in a manner that would reduce FBBC's recovery of the money it loaned.

Similarly, the evidence of record clearly revealed the government's purpose for asserting a forfeiture allegation and the manner in which the government advanced its forfeiture rights. The government consistently asserted some variation of the following:

> the government would not execute its forfeiture rights against assets which could be sold in a section 363 sale to an arm's length, good faith, purchaser who has no connection to the

current owner of Agriprocessors, Inc., and no connection with the managers that were in place at the times of the offenses; by asserting forfeiture, the government sought to prevent assets which might be subject to a 363 sale from being controlled by or being used for the benefit of those who allowed Agriprocessors' assets to be used for criminal purposes in the past; the government approved of any buyer that did not have associations and would not become associated with the previous owner or plant managers, including those charged with criminal offenses; the government desired to prevent any person involved in previous criminal wrongdoing from circumventing the forfeiture laws through bankruptcy or from otherwise enriching themselves through the use, acquisition, or disposition of any financial or management interest in assets subject to forfeiture.

At nearly the outset of criminal proceedings against the movant and Agriprocessors, the government decided to put potential buyers on notice that any asset acquired with or for a defendant and any money paid to a defendant could be subject to forfeiture. And, shortly after making such decision, the government included a forfeiture allegation in the December 11, 2008 third superseding indictment.[23] It also publicly maintained its forfeiture position throughout bankruptcy proceedings, which the movant expressed familiarity with during the sentencing hearing. *See United States v. Coplen*, 565 F.3d 1094, 1097 (8th Cir. 2009) (citing *United States v. Zuazo*, 243 F.3d 428, 431 (8th Cir. 2001)); *United States v. Albanese*, 195 F.3d 389, 394 (8th Cir. 1999); *United States v. Jones*, 160 F.3d 473, 479 (8th Cir. 1998).

Aside from the fact that readily available information indicated that the government was trying to prevent Aaron Rubashkin from regaining control of Agriprocessors either

---

[23] The court notes that, when the government first included a forfeiture allegation in the December 11, 2008 third superseding indictment, neither the government nor the bankruptcy trustee had a clear understanding of the value of Agriprocessors. Clearly, the government did not want proceeds that exceeded the amount owed to creditors to revert to the Rubashkins.

directly or through another purchaser and would pursue forfeiture if any of Agriprocessors' assets were ultimately owned by the Rubashkins, controlled by the Rubashkins or used for the benefit of the Rubashkins, abundant information apprised the movant that the bankruptcy trustee, FBBC and other interested parties had concerns about the government's forfeiture position. Actual documents disclosed those concerns, and it would have been obvious to anyone involved in the bankruptcy process that the issue of forfeiture would need to be addressed.

The arguments offered by the movant with respect to Paula Roby's testimony do not support a finding that Paula Roby committed perjury. If all of Paula Roby's testimony is considered, it cannot be said that she wilfully intended to provide either false or substantially misleading testimony. *See Tassin v. Cain*, 517 F.3d 770, 778-79 (5th Cir. 2008). Rather, it is clear that any inaccuracy in her testimony occurred as a result of confusion, mistake or faulty memory.

Paula Roby's testimony can be fairly characterized as generally addressing the following:

> the bankruptcy trustee's duties and goals; the issues that the bankruptcy trustee confronted; the timing of forfeiture discussions and the government's bank fraud charges and forfeiture allegations; the efforts undertaken to address the government's forfeiture position; the need to have prospective buyers communicate directly with the government about its forfeiture position; the time spent with prospective buyers and others associated with the bankruptcy case; the limited ways in which the government would allow Rubashkins to be involved in a new entity; the nonexistence of an edict that prevented potential buyers from having any involvement with Aaron Rubashkin; the possibility of discussions regarding the government's concerns about a buyer acquiring Agriprocessors on behalf of Aaron Rubashkin or the Rubashkins obtaining an equity interest; the strong desire of prospective buyers to have Rubashkins involved as advisors or senior management; the view held by prospective buyers that Heshy Rubashkin and Aaron Rubashkin were indispensable; the impact that the

government's forfeiture position had on prospective buyers; the concerns other than the government's forfeiture position that prospective buyers had; the bidding procedures; the receipt of Eli Soglowek's $40,000,000 stalking-horse bid and the reason that Eli Soglowek withdrew such bid; the timing of Eli Soglowek's meeting with the government and others; the continued employment of Rubashkin family members at Agriprocessors; the aspects of Agriprocessors that added to its value; the receipt of offers that did not materialize; the lack of the movant's involvement in bankruptcy proceedings; FBBC's response to the government's actions; the existence of rumors; the bankruptcy trustee's efforts to dispel rumors; and the knowledge of why the government took some actions.

*See* Sentencing Transcript (criminal docket no. 937) at 485-519. Paula Roby repeatedly emphasized that potential bidders needed to work out forfeiture details with the government. She never implied that the government was not pursuing forfeiture. In February of 2009, she clearly thought that the government's forfeiture position did not prohibit all involvement by the Rubashkins, that is, they could have some type of limited involvement. It is apparent that she believed Aaron Rubashkin could be involved as an advisor and other Rubashkins could be employed in some capacity. By relying on terms such as "advisor", she fairly conveyed that the circumstances under which the government would pursue forfeiture depended on the manner in which the Rubashkins would be involved and the benefit they would receive.

The movant's attempts to disparage the government and its witnesses are misguided. There was no doubt that the government would be pursuing all of its significant interests. But, it was also true that the government appropriately recognized that it could not act out of vindictiveness and that the advancement of its rights to forfeiture had limits. It clearly tried to balance the interests of the Postville community and other interests against its assertion of its right to forfeiture. Indeed, it did not persist when SHF Industries, LLC indicated that it was unwilling to go forward if the government continued to pursue its forfeiture interests. And, consistent with testimony offered at the sentencing hearing, the

bankruptcy trustee did what he thought was in the best interests of creditors. Even though the government expressed reservations about Heshy Rubashkin being involved in Agriprocessors, the government did not interfere with the bankruptcy trustee's determinations as to what was best for Agriprocessors.

Regarding the movant's attempts to disparage the government's witnesses, a fair description of the record reveals that the government's witnesses actually provided testimony that favored the movant, or, at least, can be described as relatively neutral. *See Boyce*, 564 F.3d at 918 (concluding that defendant failed to establish a reasonable likelihood that false statements affected his sentence). They both acknowledged that the government's forfeiture position caused people to react, to explore the limitations or restrictions on the Rubashkins and/or to seek information about the parameters of the government's forfeiture position. The government's witnesses provided testimony that aligned with the work that they did: FBI Special Agent Randy Van Gent investigated the movant, and Paula Roby, as counsel for the bankruptcy trustee, served the interests of the creditors of the bankruptcy estate. They both expressed views based on their observations and perspectives.

The movant mischaracterizes the new evidence. A fair description of the new evidence indicates the following:

> During the December 5, 2008 meeting, the participants addressed many issues. It is clear that, from an early point, serious concerns regarding the involvement of Rubashkins in a new entity existed. For various reasons, all of the participants in the December 5, 2008 meeting believed that it would be unwise to involve the Rubashkins in a new entity. The government emphasized that no involvement of the Rubashkins from any control, equity or benefit standpoint was very important and non-negotiable, that trademarks should be eliminated and that a buyer should commit to operating the plant because shutting it down would destroy the community. Serious concerns regarding whether the government should or should not formally assert its right to forfeiture also existed.

The government did not believe that lingering concerns about forfeiture would allow a good faith purchaser to be identified. Despite the existence of serious concerns, all of the participants agreed that an open line of communication should be maintained and that something creative could be worked out.

FBBC recognized that the value of Agriprocessors' assets would be enhanced if the government agreed to forgo forfeiture of assets that are available for sale to a good-faith, arm's-length purchaser and expressed a belief that the public assertion of the government's right to forfeiture would not be in the best interests of Agriprocessors' creditors, its employees or the Postville community. FBBC acted in response to information that it learned during bankruptcy proceedings.

The government's forfeiture interest only concerned money that a buyer might pay or assets that a buyer might transfer to the Rubashkins in the future and it would not forfeit assets which a good-faith buyer acquired to operate Agriprocessors.

Triax Capital Advisors, LLC prepared a valuation report regarding Agriprocessors. A determination regarding the value for Agriprocessors prior to the date that it filed for bankruptcy took into account many assumptions.

Many individuals reacted to the government's assertion of forfeiture, explored the limitations or restrictions on ownership of or involvement in Agriprocessors and/or sought information about the parameters of the government's forfeiture position.

*See* Movant App'x (civil docket no. 44-1) at 88-98, 170-77. The movant's new evidence is consistent with the evidence that the movant previously relied on during sentencing proceedings. It does not substantially differ from the evidence that the parties presented during the sentencing hearing. Because the new evidence that the movant relies on is essentially the same as the evidence that he previously introduced during the sentencing hearing, a reasonable probability that the result of the sentencing proceeding would have been different does not exist. Thus, it cannot be said that the government's conduct caused

a complete miscarriage of justice, *see Grant*, 72 F.3d at 506, or had a substantial and injurious effect or influence in determining the outcome, *see Brecht*, 507 U.S. at 637.

The movant had all the information that he needed to make a full and fair argument concerning the loss amount. After obtaining relevant information, nothing prevented the movant from following up or conducting further investigation. And, nothing prevented the movant from doing more with the information that he had. The movant absolutely could have provided a different accounting and/or made other arguments, including an argument about the legality of the government's forfeiture position.[24] Given the information that the movant had or could have easily obtained if he deemed more information to be necessary to advance his argument, the movant's reconstruction of the record and reformulation of his arguments concerning loss is precluded.

### *(b) Understanding of the court*

Given the parties' positions, the court understood that numerous variables or factors, not just the government's forfeiture position, could have impacted the value of Agriprocessors. It also understood that reasonably accurate estimates for those variables or factors could not be provided.

### *(i) Variables or factors*

The record is filled with statements that make it relatively easy to infer that the circumstances surrounding the sale of Agriprocessors' assets involved many

---

[24] Neither the movant nor Agriprocessors previously asserted that the government could not legally pursue forfeiture or that it had improper reasons for doing so. *See, e.g., United States v. Robinson*, 809 F.3d 991, 1000-01 (8th Cir. 2016) (determining that sufficient evidence to raise a presumption of impermissible prosecutorial vindictiveness did not exist); *United States v. Williams*, 720 F.3d 674, 701-02 (8th Cir. 2013) (discussing purpose of forfeiture). The time for challenging the government's assertion of its right to forfeiture passed a long time ago, and the movant cannot do so now. Moreover, if the government could not legally assert a right to forfeiture, then the government's assertion of such right should not have had any impact whatsoever on the bidding process.

considerations. For example, it is possible that the value of Agriprocessors could have been influenced by the following:

> the government's role and statements; Aaron Rubashkin's role and statements; the chief executive officer's role and statements; the actions of and statements by other Rubashkins; FBBC's actions and/or greed; other creditors' actions; the bankruptcy trustee's actions, including his estimation of what price he could obtain in a sale of Agriprocessors' assets; the insistence that those associated with criminal activity be involved with a new company; the intensity of the government's response to an assertion that Rubashkins must be involved in a new entity; the need to maintain Agriprocessors as a going concern; assertions made by potential buyers, including those that might be made to drive the price lower; accounting irregularities; rumors in the community; deteriorating market conditions; overall business conditions; bad business planning; poor management by the bankruptcy trustee; the bankruptcy trustee's refusal to consider offers; pressure by the Rubashkins; the devotion to religious obligations, including the duty to pay off debts; the lack of responsible management at Agriprocessors; the dysfunctional nature of Agriprocessors; the lack of centralized control over Agriprocessors' finances, including incurrence of debt, expenditures and payment of accounts payable; operations being conducted remotely or from the East coast; the lack of cross-checking or accountability within Agriprocessors; Aaron Rubashkin's lack of oversight and controls; the way that Aaron Rubashkin structured Agriprocessors, including that he, rather than a board of directors, should make all major decisions; the lengthy amount of time during which Agriprocessors faced a serious financial crisis; the lack of a centralized system for decision-making, bill paying and expense management; Agriprocessors' thin profit margin; Agriprocessors' poor business decisions, including adding new and unprofitable products, expanding the plant and overproducing products; Agriprocessors' difficulty in turning a profit after 2004; Agriprocessors' increased managerial dysfunction; the loss of goodwill that would occur as a result of Agriprocessors' issues, including employing an illegal workforce and failing to

pay individuals or creditors; the hope of Agriprocessors'
management that the executive branch would help with its
illegal worker situation; the loss of Agriprocessors' largest
account shortly before the ICE enforcement action; the lack of
a decision making authority to stop illegal conduct from
occurring at Agriprocessors; the destruction of documents; the
concealment of information; the realization that Agriprocessors
had not paid its cattle and poultry suppliers; the inability of
Agriprocessors' management and Aaron Rubashkin to secure
new sources of financing prior to and after the ICE
enforcement action; the failure of Agriprocessors to act fast
enough to get investors in place after November 4, 2008; the
existence of serious labor issues, including Agriprocessors'
inability or unwillingness to replace employees and restaff the
plant; the pending civil litigation brought by FBBC in October
of 2008; the pending criminal charges against Agriprocessors
and certain of its principals; the bankruptcy trustee's control
over Agriprocessors and alteration of it; the length of time
Agriprocessors had been shut down; the inability to secure
financing from any third party as a result of the government's
indictment; the acknowledgment that liquidation would be the
only option if $50,000,000 could not be obtained in a short
period of time; the acknowledgment that someone would have
to be willing to spend $75,000,000 to give Agriprocessors the
maximum opportunity to survive; Agriprocessors' failure to
operate at full capacity for a long time; Agriprocessors being
structured as an oversized plant; Agriprocessors' loss of its
niche; Agriprocessors' need to reach an agreement with
authorities; Agriprocessors' inability to satisfy FBBC; the loss
of potential investors and the inability to reorganize or restart
Agriprocessors as a result of the transfer of the bankruptcy
case to the Northern District of Iowa; the concern with the
administration of justice; the minimization of criminal conduct,
knowledge of it and role that individuals and Agriprocessors
played in it; feelings toward Agriprocessors and the
Rubashkins; feelings toward the government; Agriprocessors'
inability or unwillingness to comply with the law for a very
long period of time; the preference to have a buyer continue to
operate Agriprocessors rather than shut it down; the
uncertainty of whether adequate due diligence could be

conducted; the understandings of the government, the bankruptcy trustee, FBBC, other creditors and potential buyers; the availability of information; the information being conveyed to potential buyers; the information being conveyed to the government; the information that potential buyers conveyed to the bankruptcy trustee; employees' communications with potential buyers; the unwillingness of potential buyers to communicate with the government; the failure to accept a $40,000,000 bid outright; the objections of creditors regarding the proposed sale price of $40,000,000; the uncertainty of the primary secured creditors at the March auction; the rejection of the highest March bid; the rejection of the April 19, 2009 offer; the existence of inappropriate connections to the movant or Agriprocessors; the complexity of the bankruptcy process; the fraudulent accounts receivable, fraudulent inventory numbers and overall criminal scheme; the concern about the wastewater treatment plant; the failure to remove individuals and put professionals in place prior to filing for bankruptcy; the need for Agriprocessors to be run in an incredibly efficient manner; the inability of Agriprocessors to compete in a non-kosher world; the limited number of interested parties given the nature of Agriprocessors' business; the use of aggressive tactics by the Rubashkins; the considerable influence of the Rubashkins; the possibility that a successor company might have to address the negative influence of Rubashkins if such company did not involve them; the ability to collect on accounts after the government commenced criminal proceedings; the information that the Rubashkins might be telling their contacts; the belief that Aaron Rubashkin's name had immense value and good will in the Orthodox Jewish community; the "sloppiness" of Agriprocessors; the failure of the Rubashkins to adhere to corporate formalities; the refusal of the Rubashkins to give up their business; the concern about destroying the Postville community if a buyer shut the plant down; the lack of access to management because they were unavailable; the inability of Agriprocessors to meet its debts; the unwillingness of FBBC to extend credit after the ICE enforcement action; the additional cost to lawfully employ individuals; the size of working capital requirements; the failure to expend capital to

maintain the plant and equipment; the accuracy of operating results or Agriprocessors' books; the need to satisfy existing creditors in order to continue operating the business; the need to develop relationships with large customers and gain experience in and knowledge of the industry; the failure of the bankruptcy trustee to have his concerns about the government's forfeiture position addressed after December of 2008; the lack of potential buyers that declined to pursue their business interests by negotiating with the government or pursuing other avenues through the bankruptcy process; the number of product sales after the ICE enforcement action; the passage of time, etc.

Not one of those variables considerably outweighs the other listed variables. The government's role is no more important than the role that FBBC, the bankruptcy trustee, the Rubashkins or potential buyers played prior to and/or during bankruptcy proceedings.

The movant repeatedly emphasizes that potential buyers would have paid more for Agriprocessors if the Rubashkins could have been involved, but he fails to acknowledge that some buyers wanted absolutely nothing to do with the Rubashkins and were willing to spend around $50,000,000. He also fails to recognize that the buyers' declarations that they would have paid more if the Rubashkins could have had an ownership interest or management role directly conflicts with their interest in paying as little as possible for Agriprocessors' assets. No potential buyer could credibly assert that Aaron Rubashkin's name and the involvement of the other remaining Rubashkins had value in the tens of millions, and it is highly likely that buyers' interests in obtaining a sale price as low as possible far outweighed the value and good will associated with the use of Aaron Rubashkin's name and the involvement of the Rubashkins. Potential buyers clearly had an incentive to profess their need for the Rubashkins to be involved and their desire that the government not assert its forfeiture rights. Indeed, they cannot credibly deny that they wanted to pay as little as possible for Agriprocessors' assets.

It is telling that not one potential buyer deemed the government's forfeiture position and the involvement of the Rubashkins to be so important that they asked to meet with the

government to negotiate appropriate terms. The movant does not point to businesses or individuals that identified the government's forfeiture position as an overwhelming concern and deemed it essential to negotiate an agreement not to pursue forfeiture before submitting a bid or offer. Sophisticated businesses run by savvy individuals do not run from a challenge. Rather, they seize opportunities, especially when an opportunity benefits the bottom line. If it serves their interests, savvy investors who have concerns attempt to get them addressed. If any potential buyer really thought that the remaining Rubashkins were indispensable or the government's forfeiture position caused unreasonable restrictions, such buyer could have sought to negotiate favorable terms with the government. And, if negotiations with the government failed to alleviate a potential buyer's concerns, nothing prevented such buyer from pursuing other options, such as asking the bankruptcy trustee or the United States Bankruptcy Court for the Northern District of Iowa to get involved. The suggestion that savvy individuals felt so threatened or frightened by the government that they would not even entertain the thought of asking for a meeting is unbelievable; it is incredibly difficult to conclude that all investors were so debilitated by fear that they refused to act in any manner whatsoever.

### *(ii)*     *Estimate of loss*

In order for the court to depart downward, reliable evidence regarding the impact that particular factors had on the sale of Agriprocessors' assets needed to be part of the record. The movant did not present specific evidence to support his theory about a depressed sale price, and, as a result, the court could not reasonably estimate the value associated with particular factors. The court still cannot reasonably estimate the value associated with specific factors and doubts that it ever could given the circumstances surrounding this case.

During the sentencing hearing, the government exercised great restraint. Due to the evidence already in the record, the government did not have to offer anything but a temperate response, that is, it only needed to admit reliable evidence of the banks' losses

during the sentencing hearing.[25] It did so by, among other things, calling FBI Special Agent Randy Van Gent. In response, the movant called Abe Roth, who testified about how he arrived at a total loss amount around $4,500,000. Abe Roth did not deem it appropriate to further reduce that number based on FBBC's failure to unilaterally investigate Agriprocessors' fraud or to provide an alternative analysis based on factors that might have caused the bankruptcy trustee to recover less.

Throughout sentencing proceedings, the movant never emphasized a specific value that could be attributed to any particular factor, and nobody placed a value on any particular factor that impacted the sale of Agriprocessors' assets. When the government called Paula Roby as a rebuttal witness, Paula Roby opined that she did not think the government's forfeiture position impacted the sale of Agriprocessors' assets. And, the movant's sur-rebuttal witness failed to identify all of the considerations that caused him not to make an offer for Agriprocessors' assets or a specific number that he associated with having the Rubashkins involved in a new entity. He only testified that he believed the prohibition against having Aaron Rubashkin involved in a successor corporation reduced the value of Agriprocessors by millions of dollars.

Contrary to the movant's contention, the court did not discredit or credit any specific testimony of any witness. It did not specify the forfeiture position that it believed the government advanced during bankruptcy proceedings because a determination regarding the loss amount did not hinge on the exact nature of the government's forfeiture position. It was clear that the government aggressively pursued its right to forfeiture. But, it was also clear that not *all* involvement by Rubashkins was prohibited. Because it was

_____

[25] A report dated September 14, 2007 indicates that FBBC sold a $10,000,000 portion of its secured interest to MB Financial Bank, N.A. After FBBC made such sale, FBBC held a $25,000,000 secured interest in Agriprocessors and MB Financial Bank, N.A. held a $10,000,000 secured interest in Agriprocessors. The court determined that FBBC suffered a $18,525,362.18 loss and MB Financial Bank, N.A. suffered a $8,322,989.12 loss.

clear from Meyer Eichler's affidavit and Paula Roby's testimony that no absolute prohibition regarding all of the Rubashkins existed, it was not difficult to reject the movant's argument that no purchaser could have any involvement whatsoever with the movant or the movant's family. Rather than focus on the extent of the government's restriction on the Rubashkins' involvement, the court focused on whether any forfeiture position could have impacted the sale price of Agriprocessors' assets. The court credited Paula Roby's opinion about the impact that the government's forfeiture position had on potential bidders. And, the court discredited witnesses' opinions that were offered in support of the movant's assertion that the government's forfeiture position resulted in a depressed sale price of Agriprocessors' assets. Namely, the court did not find that the value of Agriprocessors' assets fell by millions of dollars because buyers could have absolutely no association or involvement with Aaron Rubashkin, that is, could not even ask Aaron Rubashkin for advice on how to move forward, or that buyers opted not to bid because they could not put together a sufficiently experienced management team if a Rubashkin could not be part of it.

At their core, the movant's allegations regarding the government's conduct amount to no more than the use of accusations, especially unjust ones, to damage the reputation of an opponent. The movant's mudslinging is wholly inappropriate. Although zealous advocacy is permitted, a litigant may not embellish, disparage and take words out of context in an effort to prove a weak or non-existent argument. Clearly, the movant's all-consuming endeavor to call into question the government's actions and to impugn witness testimony caused him to lose track of the central issue in this proceeding.

The government never disputed that it sought forfeiture of Agriprocessors' assets and that it took steps to enforce its right to forfeiture. But, without credible evidence that established amounts that could be attributed to various factors, the government's forfeiture position and what it did during bankruptcy proceedings really had no bearing whatsoever on the sentencing proceeding. When initially making points about the Guidelines, the

parties presented straight-forward calculations, and neither the government nor the movant offered any specific evidence regarding any particular factor. Given the movant's evidence, the government really had no reason to call a rebuttal witness. And, even after the government offered the rebuttal testimony of Paula Roby and the movant offered the sur-rebuttal testimony Steve Cohen, the evidence of record did not show with any specificity whatsoever the impact that the government's forfeiture position had on the value of Agriprocessors' assets.

It is apparent that the movant is reluctant to focus on the facts because the facts do not give rise to relief. Speculation that one factor over all of the other factors caused an increase in the loss amount is not a sufficient basis for a court to impose a sentence. It is not possible to reasonably approximate values for particular factors. This is particularly evident when some of the numbers that are part of the record are analyzed: (1) as of June 27, 2008, no reasonable investor would pay more than the enterprise value of $26,916,000 for Agriprocessors' assets to be free and clear of the debt security holder's obligations; (2) as of June 27, 2008, Agriprocessors had a book value of $10,205,000 and $21,929,246 in net property, plant and equipment; (3) in the summer of 2008, the Rubashkin family was asking Mordechai Korf to pay around $40,000,000 for Agriprocessors;[26] (4) in November of 2008, Mordechai Korf was already seeking to obtain an interest in Agriprocessors at a discount between $5,500,000 and $7,000,000, that is, Mordechai Korf sought to obtain FBBC's interest for between $21,500,000 and $22,000,000 even though FBBC had exposure between $27,000,000 and $29,000,000; (5) in December of 2008, a buyer was apparently willing to pay $50,000,000 and would never allow the Rubashkins to be involved; (6) Eli Soglowek offered $40,000,000 on January 21, 2009 and then he was back

---

[26] It is uncertain whether the Rubashkin family discounted the price in light of various factors. Apparently, Aaron Rubashkin knew what had happened toward the end of Agriprocessors or by mid-October of 2008. *See* Presentence Report (criminal docket no. 887) at ¶ 295.

at the table with a $23,000,000 offer ($6,000,000 in rent and $17,000,000 payable after about two years) on April 19, 2009; and (7) Eli Soglowek's April 19, 2009 offer exceeded the offer of almost $16,000,000 during the March auction.

The $68,662,617 number that the movant provides as a starting point for the value of Agriprocessors' assets is disingenuous. Regarding the more realistic starting point that is at some point below $40,000,000, potential buyers would absolutely be concerned about how to value Agriprocessors in light of various factors, including accounting irregularities, and to suggest that those factors did not decrease the $40,000,000 value that the Rubashkins placed on Agriprocessors is absolutely belied by the actions of bidders.

The movant argues that the loss amount is no more than $19,500,000, which is $27,000,000 (FBBC's outstanding unpaid balance) - $7,500,000 (the difference between the bid of almost $16,000,000 during the March auction and the $8,500,000 paid by SHF Industries, LLC). But, he fails to acknowledge that Eli Soglowek offered between $17,000,000 and $23,000,000 on April 19, 2009, which purportedly would have accounted for the government's forfeiture threats. So, something other than the government's forfeiture position must account for the $8,500,000 to $14,500,000 drop that occurred between April 19, 2009 and July 20, 2009.[27]

In addition, the movant argues that the government interfered with the free operation of market forces by asserting its legal right to forfeiture. But, he wholly fails to address the fact that he improperly interfered with the free operation of market forces well before and after Agriprocessors filed for bankruptcy. Aside from the fact that harboring an illegal workforce and committing financial crimes artificially increased the

---

[27] The court notes that the movant overlooks the specific nature of the secured creditors' interests. FBBC only received $2,000,000 of the $8,500,000 credit bid by SHF Industries, LLC. MLIC Assets Holdings, LLC received the remaining $6,500,000. Presumably, MLIC Assets Holdings, LLC received more because MLIC Assets Holdings, LLC had a senior lien and/or FBBC primarily held a security interest in Agriprocessors' pre-petition inventory and accounts receivable.

value of Agriprocessors for a lengthy amount of time, the movant and Agriprocessors duped FBBC into providing another $5,000,000 in DIP financing, that is, before it realized the extent of the fraud. FBBC unwittingly loaned such amount without realizing that the movant falsely inflated Agriprocessors' accounts receivable by $10,000,000 and that it would be unable to recover approximately $5,000,000 as a result of the movant's failure to comply with the Packers and Stockyards Act. It is possible that the movant's failure to disclose his unlawful conduct and additional unlawful conduct, even after being indicted by the government, bolstered the sale price of Agriprocessors' assets because the bankruptcy trustee was able to sell Agriprocessors as a going concern. At a minimum, it is probable that FBBC would have made different choices if it had known the extent of the fraudulent activity and the low amount that it would ultimately recover.

### (c)     Application of the sentencing Guidelines

The movant asserts that the government's misconduct deprived him of a fair sentencing hearing. There is absolutely no support for the movant's allegations of misconduct. The government did not conceal any information that materially affected the outcome of the sentencing hearing and it did not offer misleading testimony. The court was neither misinformed nor uninformed as to any relevant circumstance, correctly applied the Guidelines and imposed a sentence after exercising its informed discretion.

> The Guidelines define "loss" for purposes of the enhancement for fraud offenses as "the greater of actual loss or intended loss." [USSG §2B1.1], comment. n.3(A). Under this [G]uideline as extensively amended in 2001, "actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." Note 3(A)(i); *see United States v. Hartstein*, 500 F.3d 790, 798 n.3 (8th Cir. 2007), *cert. denied*, 552 U.S. 1102 (2008). As the Sentencing Commission explained, this "net loss" approach "recognizes that the offender who transfers something of value to the victim[] generally is committing a less serious offense than an offender who does not." [USSG] App. C., Vol. II, Amend. 617, at 183; *accord* [USSG §2B1.1] comment. (background).

*United States v. Markert*, 774 F.3d 922, 925 (8th Cir. 2014) (fourth alteration in original).

"Because the loss caused by fraud is often difficult to determine precisely, 'a district court is charged only with making a reasonable estimate of the loss.'" *United States v. Waldner*, 580 F.3d 699, 705 (8th Cir. 2009) (quoting *United States v. Parish*, 565 F.3d 528, 534 (8th Cir. 2009)); *accord Markert*, 774 F.3d at 925.

> For purposes of the [USSG §2B1.1(b)(1)] enhancement, actual loss is "reasonably foreseeable pecuniary harm," that is, "harm that is monetary or that otherwise is readily measurable in money." Note 3(A)(i) & (iii). For many, perhaps most fraud offenses, actual loss is properly and readily measured by the fair market value of property "taken" from the victim. Note 3(C)(i).

*Markert*, 774 F.3d at 926. After considering all of the evidence and the arguments of the parties in light of the evidence and the Guidelines, the court correctly calculated the loss amount.

As the court observed during sentencing proceedings, the movant's theory regarding loss was fundamentally flawed in that it disregarded the general effect that a massive fraudulent scheme and a subsequent bankruptcy have on the value of a corporation's assets. There is a common denominator among the various factors that affected the sale of Agriprocessors' assets: the movant and Agriprocessors. When assigning fault, nearly all, if not all, of the loss amount is attributable to the conduct of the movant and Agriprocessors. But for the criminal actions of the movant and Agriprocessors, the government would not have asserted a forfeiture allegation. But for the actions of the movant and Agriprocessors, no bankruptcy petition would have been filed. But for the actions of the movant and Agriprocessors, prospective bidders would have been able to evaluate the value of Agriprocessors with some certainty. The movant's conduct, through Agriprocessors, was the foreseeable cause of loss.

The court was well aware of the movant's position at the time of sentencing. The court understood that the movant blamed the government for failing to work with him and

his lawyers before the ICE enforcement action, the government for prosecuting him and seeking forfeiture, FBBC, his illegal workforce, his father, managers of Agriprocessors, other employees of Agriprocessors, the bankruptcy trustee, etc. It also understood that the movant orchestrated a massive criminal scheme that impacted a very large community, that is, defrauded financial institutions for approximately ten years, harbored an illegal workforce and laundered millions of dollars in an effort to provide kosher products across the nation. The court recognized that the movant repeatedly tried to obstruct justice when his criminal scheme came to light, never acknowledged what the law requires and never wholeheartedly accepted responsibility. The court knew that the movant's criminal conduct caused many individuals and entities to respond and that a business that is unable or unwilling to comply with the law could prove to be worthless, or, at the very least, significantly devalued.

The movant's alleged sentencing error is based on nothing more than a conclusory assertion that the loss estimate might have gone down if the movant could have established that the government's exercise of its lawful right to forfeiture caused a decrease in Agriprocessors' value. Clearly, in order to arrive a lower Guidelines range, the loss would have had to be $20,000,000 or less. And, in order to arrive at a Guidelines range that did not encompass 324 months imprisonment, the loss would have had to be $7,000,000 or less. But, FBI Special Agent Randy Van Gent testified that inflated collateral exceeded $12,000,000 and the movant conceded on appeal that such number should have been used to calculate loss. More importantly, there is absolutely no need to recalculate the loss that the victims suffered, and a number that is more reasonable than the one that the court calculated could not be determined given all of the variables. Supposition as to the value of a business that does not face forfeiture allegations is not a proper basis to estimate loss. The movant does not suggest a way to reasonably quantify such a variable and implicitly acknowledged that it could not be quantified when he failed

to present reliable evidence at the sentencing hearing. It necessarily follows then that there is absolutely no need to resentence the movant.

The court did not base the movant's sentence upon misinformation of constitutional magnitude; the court did not arrive at the movant's sentence after relying on any incorrect facts. Neither the government nor its witnesses misled the court about anything. *See Boyce*, 564 F.3d at 918-19 (concluding that no due process violation occurred as a result of any alleged misconduct by the government during defendant's sentencing and emphasizing that inconsistent testimony does not always create a due process concern). Surely, the government would not have pursued forfeiture absent the movant's criminal conduct, and the loss that the court calculated appropriately accounts for the natural and foreseeable consequences of such conduct. *See United States v. Morris*, 744 F.3d 1373, 1374 (9th Cir. 2014) (emphasizing that the sentencing Guidelines "ensure that defendants who fraudulently induce financial institutions to assume the risk of lending to an unqualified borrower [be held] responsible for the natural consequences of their fraudulent conduct" (quoting *United States v. Mallory*, 709 F. Supp. 2d 455, 459 (E.D. Va. 2010))); *Rubashkin*, 655 F.3d at 868 (citing *Turk*, 626 F.3d at 750); *Parish*, 565 F.3d at 535 ("The appropriate test is not whether market factors impacted the amount of loss, but whether the market factors and the resulting loss were reasonably foreseeable.").

### (4) Summary

The movant is unable to overcome procedural obstacles and presents a ground for relief that is not cognizable in § 2255 proceedings. Moreover, even if the movant's arguments regarding the sentencing error are considered, it is clear that they are meritless, frivolous and/or malicious. Accordingly, the movant is not entitled to relief based on ground one.

### 2. Trial error

With respect to the alleged *Brady* violation that occurred during trial, the movant

must establish (1) "the prosecution suppressed evidence," (2) "the evidence was favorable to him," and (3) "the evidence was material to either his guilt or his punishment." *United States v. Carman*, 314 F.3d 321, 323-24 (8th Cir. 2002). To establish materiality in the context of *Brady*, "the accused must show there is a reasonable probability that if the allegedly suppressed evidence had been disclosed at trial the result of the proceeding would have been different." *Drew v. United States*, 46 F.3d 823, 828 (8th Cir. 1995). "A 'reasonable probability' is a probability sufficient to undermine the reviewing court's confidence in the outcome of the proceeding." *Id*.

*Mandacina v. United States*, 328 F.3d 995, 1001 (8th Cir. 2003).

The *Brady* standard is not met if a movant shows a mere possibility that the suppressed evidence might have produced a different outcome. *See United States v. Agurs*, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense . . . does not establish 'materiality' in the constitutional sense."); *United States v. Sigillito*, 759 F.3d 913, 929 (8th Cir. 2014) (quoting *United States v. Haskell*, 468 F.3d 1064, 1075 (8th Cir. 2006)). Further, the

*Brecht* harmless-error analysis is unnecessary for a general *Brady* withholding claim because "practically speaking, the two analyses are the same." *Rosencrantz*, 568 F.3d at 584 n.1. More specifically, "'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different' necessarily entails the conclusion that the suppression must have had 'a substantial and injurious effect or influence in determining the jury's verdict.'" *Id*. (quoting *Kyles*, 514 U.S. at 435 (citations omitted in original)).

*Clay*, 720 F.3d at 1026 n.4.

*Brady* applies even when the defendant does not specifically request the covered information. *United States v. Gonzales*, 90 F.3d 1363, 1368 (8th Cir. 1996). One of the limits of *Brady* is that it does not cover "information available from

other sources or evidence already possessed by a defendant."
[*Jones*, 160 F.3d at 479] (citation omitted).

*Sigillito*, 759 F.3d at 929; *see also United States v. Roy*, 781 F.3d 416, 421 (8th Cir. 2015) (emphasizing that no *Brady* violation occurs if a defendant has access to undisclosed evidence through other channels); *United States v. Ladoucer*, 573 F.3d 628, 636-37 (8th Cir. 2009) (citing *Jones*, 160 F.3d at 479); *United States v. Willis*, 997 F.2d 407, 412-13 (8th Cir. 1993) ("Due process does not require the prosecution to turn over its entire file or to do the defense counsel's work." (citing *United States v. Pou*, 953 F.2d 363, 366 (8th Cir. 1992)); *United States v. McMahan*, 744 F.2d 647, 651 (8th Cir. 1984) ("[*Brady*] does not require the government to provide defendants with all information it has regarding each of its witnesses.").

Having reviewed the entire record, the court concludes that no *Brady* violation occurred. *See, e.g.*, Gov't App'x (civil docket no. 52-1) at 142-212. The government correctly points out that: the movant denied having any knowledge whatsoever of why it was necessary to round checks up and transfer money between accounts, the movant thought Mitchel Meltzer or Yomtov Bensasson were responsible for doing so and the movant presented evidence and argument concerning the float during trial. It also correctly points out that the statements offered by Mitchel Meltzer: incriminate the movant; are cumulative of Yomtov Bensasson's testimony; are based on what he thought the movant was doing when law enforcement officers told him what was occurring; are not probative of the movant's actual state of mind at the time he committed criminal acts; and fail to account for why the movant directed checks to be rounded up and why the movant concealed or manipulated financial transactions. *Cf. United States v. Ellefsen*, 655 F.3d 769, 777-78 (8th Cir. 2011) (observing that "self-serving exculpatory acts performed substantially after a defendant's wrongdoing is discovered are of minimal probative value as to [a defendant's] state of mind at the time of the alleged crime" (quoting *United States v. Radtke*, 415 F.3d 826, 840-41 (8th Cir. 2005))).

Given the record, it cannot be said that any additional testimony by Mitchel Meltzer would have had a substantial influence on the jury's verdicts, especially considering that the other evidence overwhelmingly weighed in favor of the jury's verdicts. The jury apparently did not believe anything that the movant testified about and Mitchel Meltzer's testimony about an intent that the movant denied having would have had absolutely no effect or influence in determining the jury's verdicts. *See Brecht*, 507 U.S. at 637. The movant advances a position that is not consistent with the position that he advanced during trial and he is unable to advance a new theory that is based on an opinion that has limited or no bearing on the movant's state of mind at the time he committed criminal acts, especially considering that the movant offers no explanation whatsoever for directing the use of particular numbers.

Nothing the government did was of such a magnitude that it actually casts doubt on the integrity of the jury's verdicts. *See Robinson*, 809 F.3d at 997 (concluding that there was no reasonable probability defendant would have been acquitted given the additional testimony of an eye witness). And, it necessarily follows that the court's sentences are proper. Accordingly, the movant is not entitled to relief based on ground three.

## VII.  CERTIFICATE OF APPEALABILITY

In a 28 U.S.C. § 2255 proceeding before a district judge, the final order is subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held. *See* 28 U.S.C. § 2253(a). Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. *See* 28 U.S.C. § 2253(c)(1)(A). A district court possesses the authority to issue certificates of appealability under 28 U.S.C. § 2253(c) and Fed. R. App. P. 22(b). *See Tiedeman v. Benson*, 122 F.3d 518, 522 (8th Cir. 1997). Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue only if a movant has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003); *Garrett v. United States*, 211 F.3d 1075, 1076-77 (8th Cir. 2000); *Carter v. Hopkins*, 151 F.3d 872, 873-74 (8th

Cir. 1998); *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997); *Tiedeman*, 122 F.3d at 523. To make such a showing, the issues must be debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings. *See Cox*, 133 F.3d at 569 (citing *Flieger v. Delo*, 16 F.3d 878, 882-83 (8th Cir. 1994)); *see also Miller-El*, 537 U.S. at 335-36 (reiterating standard).

Courts reject constitutional claims either on the merits or on procedural grounds. "'[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy [28 U.S.C.] § 2253(c) is straightforward: the [movant] must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Miller-El*, 537 U.S. at 338 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). When a federal habeas petition is dismissed on procedural grounds without reaching the underlying constitutional claim, "the [movant must show], at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *See Slack*, 529 U.S. at 484.

Having thoroughly reviewed the record in this case, the court finds that the movant failed to make the requisite "substantial showing" with respect to the grounds that he raised in his motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. *See* 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b). Because he does not present a question of substance for appellate review, there is no reason to grant a certificate of appealability. Accordingly, a certificate of appealability shall be denied. If he desires further review of his 28 U.S.C. § 2255 motion, the movant may request issuance of the certificate of appealability by a circuit judge of the Eighth Circuit Court of Appeals in accordance with *Tiedeman*, 122 F.3d at 520-22.

## VIII.  CONCLUSION

There is no need for discovery or an evidentiary hearing because the facts and legal contentions are adequately presented in the parties' briefs, and neither discovery nor an evidentiary hearing would aid the decisional process.  There is no need to prolong this case any further because it is very clear that this is not a case where the government's conduct strikes a heavy blow to the public's "trust in the prosecutor as 'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'"  *Kyles*, 514 U.S. 439 (alterations in original) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).  The prosecutors in this case appropriately prosecuted the movant with "earnestness and vigor."  *Berger*, 295 U.S. at 88.  Their zealous advocacy never caused them to rely on "improper methods calculated to produce . . . wrongful conviction[s]" or sentences.  *Id*.  Throughout all steps in this case, the government remained committed to ensuring that the factfinding process would be fair.

The accuracy of the outcome is not subject to second-guessing because the government did not present false or misleading evidence, did not fail to correct false or misleading evidence and did not fail to disclose material evidence.  The jury fairly and dispassionately considered all of the evidence when deciding what verdicts to return, and the court fairly and dispassionately considered all of the evidence when deciding what sentences to impose.  The movant's convictions and sentences remain valid.  None of the movant's grounds for relief, including the ground that the court resolved on January 20, 2016, have any merit.  Accordingly, the movant's motion pursuant to 28 U.S.C. § 2255 shall be denied.

As for a certificate of appealability, the movant has not made the requisite showing.  *See* 28 U.S.C. § 2253(c)(2).  Accordingly, a certificate of appealability under 28 U.S.C. § 2253 will not issue.  If he deems it appropriate, the movant may seek a certificate of appealability at the appellate level.

**IT IS THEREFORE ORDERED**:

(1) The movant's motion for leave to take discovery is **DENIED**.

(2) The movant's motion for an evidentiary hearing is **DENIED**.

(3) The movant's motion pursuant to 28 U.S.C. § 2255 is **DENIED**.

(4) A certificate of appealability is **DENIED**.

**DATED** this 26th day of January, 2017.

_____
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA